**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2287**

KALEY CHILES,

     Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; and
REINA SBARBARO-GORDON in her official capacity as Program Director of the State Board
of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor
Examiners;
JENNIFER LUTTMAN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
AMY SKINNER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KAREN VAN ZUIDEN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
MARYKAY JIMENEZ, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KALLI LIKNESS, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
SUE NOFFSINGER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
RICHARD GLOVER, in his official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
ERIKA HOY, in her official capacity as a member of the State Board of Licensed Professional
Counselor Examiners;
KRISTINA DANIEL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
HALCYON DRISKELL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
CRYSTAL KISSELBURGH, in her official capacity as a member of the State Board of
Addiction Counselor Examiners;
ANJALI JONES, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
THERESA LOPEZ, in her official capacity as a member of the State Board of Addiction
Counselor Examiners; and
JONATHAN CULWELL, in his official capacity as a member of the State Board of Addiction
Counselor Examiners;

     Defendants.

---

**VERIFIED COMPLAINT**

---

Plaintiff Kaley Chiles submits the following Verified Complaint against Defendants:

## I. INTRODUCTION

1. The relationship between a mental health professional and her client has always been based on a deeply held trust from which a critical therapeutic alliance forms allowing the professional to provide vital mental health care to the client. The client communicates their goals, desires and objectives to the mental health professional, and the mental health professional provides counseling that aligns with the client's self-determined choices. This relationship has always been viewed as sacrosanct and inviolable. Until now.

2. With the passage of the Counseling Censorship Law (defined below), the government has interjected itself between mental health professionals and their clients as effectively as if Defendants were standing in the counselor's office with their hand over her mouth lest she dare say something contrary to the state-approved orthodoxy mandated by the law. This is repugnant to the First Amendment liberties of both counselors and their clients. Defendants' actions have caused, are causing, and will continue to cause irreparable injury to Plaintiff's fundamental liberties. Therefore, Plaintiff brings this action to challenge the constitutionality of the Counseling Censorship Law.

3. Plaintiff engages in licensed, ethical, and professional counseling that honors her clients' autonomy and right to self-determination, that permits clients to prioritize their religious and moral values above unwanted same-sex sexual attractions, behaviors, or identities, and that enables clients to choose a licensed counselor who can address their self-determined values, not values imposed by the government. Plaintiff has First Amendment rights as a

licensed counselor to engage in and provide counseling consistent with her and her clients' sincerely held religious beliefs, and her clients have First Amendment rights to receive such counseling free from Defendants' blatant and egregious viewpoint discrimination.

4.      The Counseling Censorship Law prevents a minor from seeking counseling to address a conflict about, or questions concerning, her unwanted same-sex sexual attractions, behaviors, and identities and from seeking to reduce or eliminate her unwanted same-sex sexual attractions, behaviors, or identities through counseling, such as sexual orientation change efforts ("SOCE").  Thus, the law denies Plaintiff's minor clients their right to self-determination, their right to prioritize their religious and moral values, and their right to receive effective counseling consistent with their freely chosen values.

5.      By prohibiting Plaintiff from counseling with clients in an effort fully to explore their sexuality (including seeking to eliminate or reduce unwanted same-sex attractions, behaviors, or identity), even when the client desires and freely consents to such counseling, the Counseling Censorship Law also violates the Plaintiff's constitutional rights.

6.      The Counseling Censorship Law is also unfairly discriminatory.  Plaintiff helps heterosexual clients by exploring with them their sexual attractions, behaviors and identity.  But in many situations the law makes it illegal for her to provide the same help to minors with same sex attractions and/or gender identity conflicts.  This is causing immediate and irreparable harm to Plaintiff and her clients.

7.      By denying minors the opportunity to pursue a particular course of action that could most effectively help them address the conflict between their sincerely held religious beliefs and their unwanted same-sex attractions, behaviors, or identity, the Counseling Censorship Law

is causing those minors confusion and anxiety and infringing on their free speech and religious liberty rights.

8.     Plaintiff seeks to enjoin enforcement of the Counseling Censorship Law because it violates her and her clients' rights to freedom of speech and free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

9.     Plaintiff also seeks a judgment declaring that the Counseling Censorship Law, both on its face and as applied, is an unconstitutional violation of the First and Fourteenth Amendments to the United States Constitution.

## II.  PARTIES

10.     Plaintiff is a resident of the State of Colorado.

11.     Patty Salazar ("Salazar") is the Executive Director of the Colorado Department of Regulatory Agencies.

12.     The Colorado State Board of Licensed Professional Counselor Examiners shall be referred to herein as the Counselor Board.  The Colorado State Board of Addiction Counselor Examiners shall be referred to herein as the Addiction Board.  The Counselor Board and the Addiction Board shall be referred to jointly as the "Boards."

13.     Reina Sbarbaro-Gordon ("Sbarbaro-Gordon") is the Program Director of both the Counselor Board and the Addiction Board.

14.     Jennifer Luttman, Amy Skinner, Karen Van Zuiden, MaryKay Jimenez, Kalli Likness, Sue Noffsinger, and Richard Glover are the members of the Counselor Board.

15.     Erika Hoy, Kristina Daniel, Halcyon Driskell, Crystal Kisselburgh, Anjali Jones, Theresa Lopez, and Jonathan Culwell are the members of the Addiction Board.

16.     All Defendants are sued in their official capacities.

17.     All Defendants are for all purposes relevant to this Complaint acting under color of state law.

## III.  JURISDICTION AND VENUE

18.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §1983.

19.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1343.

20.     Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

21.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

22.     This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## IV.  GENERAL ALLEGATIONS

### A.     THE COUNSELING CENSORSHIP LAW

23.     C.R.S. § 12-245-202(3.5) states:

(a) 'Conversion therapy' means any practice or treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex.

(b) 'Conversion therapy' does not include practice or treatments that provide:

(I) Acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe

5

sexual practice, as long as the counseling does not seek to change sexual orientation or gender identity; or

(II) Assistance to a person undergoing gender transition.

24.     C.R.S. § 12-245-224(1) states in pertinent part:

"A person licensed, registered, or certified under this article 245 violates this article 245 if the person: . . .

(t) Has engaged in any of the following activities and practice: . . .

(V) Conversion therapy with a client who is under eighteen years of age.

25.     C.R.S. § 12-245-224(1)(t)(V) shall be referred to herein as the "Counseling Censorship Law" or the "Law."

**B.      THE COLORADO LICENSING LAWS**

26.     Pursuant to C.R.S. § 12-245-604(1), the Counseling Board issues licenses to qualified professional counselors.

27.     Pursuant to C.R.S. § 12-245-804(1), the Addiction Board issues licenses to qualified addiction counselors.

28.     Plaintiff holds a license as a licensed professional counselor issued by the Counseling Board.

29.     Plaintiff holds a license as an addiction counselor issued by the Addiction Board.

30.     Each of the Boards is a "regulator" as that term is used in Title 12 of the Colorado Revised Statutes.  See C.R.S. § 12-20-102(14).

31.     Pursuant to C.R.S. § 12-20-403, regulators, including the Boards, are authorized to initiate and carry out disciplinary procedures on account of any alleged violations of the provisions of the Counseling Censorship Law by a licensee.

32.    Pursuant to C.R.S. § 12-245-225, the Boards may revoke or suspend the license of any licensee that a violates and provision of C.R.S. § 12-245-224, including violating the Counseling Censorship Law.

33.    Pursuant to Administrative Procedure 10-1, the Boards delegate their authority to initiate and/or review complaints against licensees under their jurisdiction to Sbarbaro-Gordon.

34.    Pursuant to C.R.S. § 12-20-403, Salazar has authority to assign a complaint against a licensee to the appropriate regulator, assign a complaint specially for investigation, or take such other action on the complaint as appears to her to be warranted in the circumstances.

35.    In summary, the Boards have issued licenses to Plaintiff.  If Plaintiff were accused of violating the Counseling Censorship Law, each of the Defendants would play a role in the process of investigating the complaint against Plaintiff and taking action in response to the complaint, up to and including revoking Plaintiff's licenses.

36.    The purpose of this action is to seek a declaration that the Counseling Censorship Law is unconstitutional and to enjoin the Defendants from enforcing this unconstitutional law against Plaintiff.

## C.    RESEARCH ON SOCE COUNSELING

37.    It is well known to practitioners in the mental health field that most of those who seek counseling to change sexual orientation are motivated by religious convictions.  Thus, in 2013 the American Counseling Association issued a statement declaring that "Conversion therapy as a practice is a religious, not psychologically-based, practice. . . . The treatment may include techniques based in Christian faith- based methods . . ."[1] In other words, according to the ACA, the practice the Counseling Censorship Law seeks to prohibit is a religious practice.

---

[1] Joy S. Whitman, *et al*, *Ethical issues related to conversion or reparative therapy*, AMERICAN COUNSELING ASSOCIATION, https://bit.ly/3RoGkUA (last visited Sept. 1, 2022).

38.     The Human Rights Campaign organization, which is active nationally in promoting

counseling censorship laws and ordinances, in its website accuses "right-wing religious groups"

of "promot[ing] the concept that an individual can change their sexual orientation or gender

identity."[2]

39.     In a report published in 2009, a task force of the American Psychological Association

reported that "most SOCE ["sexual orientation change efforts"] currently seem directed to those

holding conservative religious and political beliefs, and recent research on SOCE includes

almost exclusively individuals who have strong religious beliefs."[3] The Task Force further

reported that those who seek counseling with a goal of moving away from same-sex attractions

are "predominately . . . men who are strongly religious and participate in conservative

faiths." *Id.*

40.     Leading authors in the field have made the same observation repeatedly over the last

two decades. In 1999, psychology professor and prominent advocate of counseling censorship

laws Douglas Haldeman wrote that "Historically, most conversion therapy occurred in religious

settings." In 2004, Prof. Haldeman again wrote that "the vast majority of those seeking sexual

orientation change because of internal conflict have strong religious affiliations." Douglas C.

Haldeman, *When Sexual & Religious Orientation Collide: Considerations in Working with

Conflicted Same-Sex Attracted Male Clients*, 32 THE COUNSELING PSYCHOLOGIST 691, 693

(2004).  In an important 2016 paper, internationally prominent authors Prof. Lisa Diamond and

Prof. Clifford Rosky cited multiple peer-reviewed papers to conclude that "[T]he majority of

individuals seeking to change their sexual orientation report doing so for religious reasons

---

[2] Human Rights Campaign, *The Lies and Dangers of "Conversion Therapy,"* https://bit.ly/3AH427V (last visited
Sept. 1, 2022).
[3] American Psychological Association, *Task Force on Appropriate Therapeutic Responses to Sexual
Orientation* (2009), https://bit.ly/3wMq7kq (last visited Sept. 1, 2022).

rather than to escape discrimination." Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 52 JOURNAL OF SEX RESEARCH 1, 6 (2016).

41.     In sum, through the Counseling Censorship Law, the State is not only seeking to censor and suppress ideas and personal goals with which it disagrees; it is targeting ideas and motivations well known to be primarily associated with and advocated by people of faith for reasons of faith.

42.     Gender dysphoria is defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), in adolescents and adults, as "A marked incongruence between one's experienced/expressed gender and assigned gender [i.e., biological sex], of at least 6 months duration," along with certain other indicators, and resulting in "clinically significant distress or impairment in social, occupational, or other important areas of

42.     The widely urged path of "affirming" a transgender identity for girls, for example, includes the use of puberty blockers beginning as young as eight; cross-sex hormones a few years later which build muscle mass and causes growth of facial hair and a deepened voice; "social transition," including adoption of a male name and male pronouns and dress; breast-binding to conceal their developing female biology; and ultimately double mastectomy and hysterectomy, followed by life-long administration of cross-sex hormones.

43.     It is commonly presumed that the gender affirming care model is evidence based. However, studies evaluating this are scarce and questionable. One study compared a group of waitlisted adolescents to those receiving puberty blockers and failed to show a statistically significant difference between the treated and waitlisted groups at the study end-period at 18 months. Although the authors highlighted in the abstract the small improvements in the

puberty-blocked group at 12 months. Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M., *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, THE JOURNAL OF SEXUAL MEDICINE, *12*(11) (2015), 2206. The actual conclusion demonstrated by the study was that by 18 months there were no significant differences between treated and waitlisted adolescents. Biggs, M, letter to the editor regarding the original article by Costa et al: *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, THE JOURNAL OF SEXUAL MEDICINE, *16*(12) (2019), 2043. More on this topic is below regarding various countries that are pulling away from gender affirming care and recognizing their haste in previously accepting it.

44.     Public opinion, media attention, and legislative advocacy appear to have swayed researchers seeking to paint gender affirming care as successful despite a lack of evidence or evidence contrary to their conclusions. Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K., *Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care*, JAMA NETWORK OPEN, *5*(2), 10/13 (2022). For example, Dr. Paul Sullins points out that in the above-mentioned study, the authors "list their study's "Question" as "Is gender- affirming care for transgender and nonbinary (TNB) youths associated with changes in depression, anxiety, and suicidality?" But they don't claim this anywhere — not specifically. They reference "improvements" twice… but offer no statistical demonstration anywhere in the paper or the supplemental material."[4]

---

4 *See* Jesse Sengal, *Researchers Found Puberty Blockers and Hormones Didn t Improve Trans Kids'Mental Health at Their Clinic. Then They Published a Study Claiming the Opposite*. (Updated) April 2022, https://bit.ly/3AIhaJQ (last visited Sept. 1, 2022).

45.     Dr. Sullins writes about his attempts to gain better access to the data and conclusions drawn by the study authors and explains, "In a March 6 email, [an author] wrote, "Although we provided the raw data in the supplement for transparency, I advise caution in interpreting these data as is." Great, I thought; I could hand off the data to someone who is better at this stuff than I am and ask what they think. Except the data wasn't actually included in the supplementary material. I asked Tordoff where it was. Radio silence. I sent a polite follow-up email. Again, nothing." *Id*.

46.     Academics and practitioners in the field have described evidence that many of these girls appear to have been strongly influenced by internet contacts, or by local friend groups. Littman, L., *Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners*, ARCHIVES OF SEXUAL BEHAVIOR, *50*(8), 3354) (2021) and are potentially harmed by "Access to Internet sites that uncritically support their wishes." William Byne, M. D., & Bradley, S., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 15.

47.     Obviously "sex reassignment surgery," which removes testicles or ovaries, permanently sterilizes the affected individual. However, it is generally recognized by practitioners that cross-sex hormones, which are increasingly prescribed even for minors, may also irreversibly sterilize a child for life. A Harvard Medical School professor and her co-authors, who are active in medically transitioning minors, admit that "cross-sex hormones . . . may have irreversible effects," and describes infertility as "a side effect" of these drugs. Guss, C., Shumer, D., & Katz-Wise, S. L., *Transgender and gender nonconforming adolescent care: psychosocial and medical considerations*, CURRENT OPINION IN PEDIATRICS, *26*(4) (2015), 424-5. Another team of prominent practitioners in the field caution that there is evidence that cross-sex hormones

administered to minors will permanently and irreversibly sterilize at least some of these youths, both male and female. Yet these practitioners also recognize that "research suggest[s] some of these individuals may desire genetic children as adults." Amy Tishelman *et al.*, *Health Care Provider Perceptions of Fertility Preservation Barriers and Challenges with Transgender Patients*, 36 JOURNAL OF ASSISTED REPRODUCTION AND GENETICS 579, 580 (2019).

48.     In addition to permanent sterilization, accepting and living in a transgender identity carries a number of known likely lifetime costs and risks for a young person.

49.     Any individual whose testicles or ovaries are surgically removed through so-called "sex reassignment surgery" requires life-long medical hormonal therapy. In general, the use of cross-sex hormones, once begun, will be continued for life.

50.     As a result of chemical or surgical impacts on their sexual development and organs, some transgender adults experience diminished sexual response and are unable ever to experience orgasm.

51.     Multiple authors have cautioned that administration of cross-sex hormones to biological males increases the individual's risk of blood clots and resulting strokes, heart attack, and lung and liver failure.

52.     It is often asserted that transgender youth attempt suicide at much higher rates than the general adolescent population. This is true. But it is not true that there is any statistically significant evidence that "affirmation" in a transgender identity substantially reduces actual suicide attempts. Instead, multiple studies report that adolescents and adults who adopt and live in a transgender identity continue to suffer severely negative mental health outcomes— including suicide and attempted suicide—throughout their lives, and this remains true even if

they undergo the ultimate "gender-affirming" step of extensive surgery to reconfigure their body to conform in appearance to their desired gender identity.

53.     Even advocates of medical transition recommend "delaying affirmation" because "At this time, the scientific and medical communities have not yet reached consensus regarding the appropriate treatment of prepubescent children with gender dysphoria" and note that failure to be completely affirmative to a child or adolescent's desire for transition "should not be construed as conversion therapy or an attempt to change gender identity" Byne W., *Regulations restrict practice of conversion therapy*, LGBT HEALTH, 3(2) (2016) 2.

54.     A long-term study in Sweden found that even *after* sex-reassignment surgery transgender individuals exhibited a rate of completed suicide 19 times higher than the control group, suicide attempts at a 7.6 times higher rate, and hospitalization for any psychiatric condition at a 4.2 times higher rate. These researchers concluded that "[t]he most striking result was the high mortality rate in both male-to-females and female-to-males, compared to the general population." C. Dhejne *et al*., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoS ONE, e16885, 5-6 (2011).

55.     Similarly, a study in the United States found that the death rates of transgender-identifying veterans are comparable to those who suffer from schizophrenia and bipolar diagnoses, with these individuals dying on average 20 years earlier than a comparable population.[5]

56.     Many academics and practitioners and even transgender activists have observed that gender identity is not necessarily either binary or fixed for life. Indeed, in formally

---

[5] U.S. Dept. of Vet. Affairs, *Rates of Suicide Higher among Transgender Veterans*, https://bit.ly/3KGHh8z (last visited Sept. 1, 2022).

promulgating a rule in 2016, the United States Department of Health and Human Services

defined "gender identity" as "an individual's internal sense of gender, which may be male,

female, neither, or a combination of male and female, and which may be different from an

individual's sex assigned at birth," and disparaged "the expectation that individuals will

consistently identify with only one gender" as an inaccurate "sex stereotype."

*Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31, 376 (May 18, 2016) at

31, 384 and 31,468.

57.     In addition, at least for pre-adolescents who experience gender dysphoria and receive

therapeutic support but do not socially transition, "every follow-up study of GD children,

without exception, found the same thing: Over puberty, the majority of GD children cease to

want to transition." J. Cantor, *Transgender and Gender Diverse Children and Adolescents:*

*Fact-Checking of AAP Policy*, 46 JOURNAL OF SEX & MARITAL THERAPY 1, 1 (2019). In fact,

multiple studies have documented that for pre-pubertal children who suffer from gender

dysphoria, the very large majority—estimates range between 61%-98% percent—will grow into

comfort with a gender identity congruent with their biological sex by young adulthood, so long

as they are not affirmed as children in a transgender identity.  Ristori, J., & Steensma, T. D.,

*Gender dysphoria in childhood*, INTERNATIONAL REVIEW OF PSYCHIATRY, *28*(1), (2016) 15.

58.     Pablo Expósito-Campos explains that some people who detransition conclude that

"being transgender is not the reason underlying his/her distress and body discomfort" and that

for some

> the decision to detransition is primarily motivated by the cessation of a
> transgender identity. This category potentially includes anyone who identified as
> trans-gender, socially or medically transitioned, and later returned to identifying
> with his/her birth sex. The reasons behind core or primary detransitions are
> multifarious, and may comprise: realizing that transitioning does not alleviate GD
> (Dodsworth, 2020; Herzog, 2017; Lev, 2019; Marchiano, 2020), finding

alternative ways to cope with GD (Herzog, 2017; Stella, 2016), mental health concerns (Post-Trans, n.d.; Stella, 2016), solving previous psychological/emotional problems that contributed to GD (Butler & Hutchinson, 2020; Stella, 2016), the remission of GD itself over time (Stella, 2016), understanding how past trauma, internalized sexism, and other psychological difficulties influenced the experience of GD (Dodsworth, 2020; Gonzalez, 2019; Herzog, 2017; McFadden, 2017; Post-Trans, n.d.; Stella, 2016; Yoo, 2018); the reconciliation with one's sexuality (Marchiano, 2020; GNC Centric, 2019; Pazos-Guerra et al., 2020; Post-Trans, n.d.); and a change in individual, political, social, or religious views that leads the person to question his/her trans- gender status (Dodsworth, 2020; Exposito-Campos, 2020; Herzog, 2017; Kermode, 2019; Stella, 2016; Turban & Keuroghlian, 2018).

Pablo Expósito-Campos, *A typology of gender detransition and its implications for healthcare providers,* JOURNAL OF SEX & MARITAL THERAPY, *47*(3) (2021), 270-280.

59.     Another study found that reasons for detransition included (70%) realizing that one's gender dysphoria was related to other issues; (62%) health concerns; (50%) observing that transition did not help gender dysphoria; and (45%) finding alternatives to deal with gender dysphoria, with external factors such as (13%) lack of support, (12%) financial concerns, and (10%) discrimination being less common. Elie Vandenbussche, *Detransition-related needs and support: A cross-sectional online survey,* JOURNAL OF HOMOSEXUALITY, *69*(9) (2021), 1607.

60.     It is not surprising, therefore, that increasing numbers of young women who for a time transitioned to live in a male gender identity and underwent varying degrees of hormonal and surgical "transition" but who later regretted those decisions and reclaimed a female gender identity are speaking up. These women are publicly expressing regret about the harm done to their bodies and minds, and anger against the too-hasty counsel and medical advice they received as minors which steered them into that transgender identity and those medical choices.

61.     While many of these women had previously detailed their experiences on internet blog websites pseudonymously, in recent years they have become more visible, writing under their

real names, posting videos online, and forming support groups for those in similar situations.[6] In 2018, *The Atlantic* profiled several high- profile "detransitioners" who have been raising awareness of their own stories as a warning to those who are promoting or hearing only positive narratives about the impact of gender transition on affected individuals.[7]

62.     For example, Max Robinson, who has been featured at length in both *The Atlantic* and *The Economist*,[8] became convinced that her internal discomfort needed to be resolved by a sex "transition" after discovering the "world of online gender-identity exploration" at age 15. A doctor prescribed cross-sex hormones for her beginning at age 16, and at age she underwent a double mastectomy. While Max was initially pleased with the results, it wasn't long before she realized that she had made a mistake and began the process of "detransitioning" at age 19. She lives with permanent physical changes—a deep voice, a beard, and a flat chest—that cannot be reversed.

63.     Similarly, Cari Stella was prescribed cross-sex hormones by a doctor at age 17 and underwent a double mastectomy at age 20. According to Cari, from the time she first saw a therapist, no professional ever suggested or helped her explore alternatives to a "transition."[9] Already by age 22, Cari realized that she had been led into a mistake, and "detransitioned." Cari maintained a blog[10] and YouTube channel[11] reflecting on her experiences, and in a video posted

---

[6] See Pique Resilience Project, www.piqueresproject.com (last visited Sept. 1, 2022) and Detrans Canada, detranscanada.com (last visited Sept. 1, 2022).
[7] *See* Jesse Singal, *When Children Say They're Trans*, *The Atlantic*, July/Sept. 2018, https://bit.ly/2MoIOkg (last visited Sept. 1, 2022).
[8] See Charlie McCann, *When girls won't be girls*, The Economist, Sept. 28, 2017, https://econ.st/3cAUKSO (last visited Sept. 1, 2022).
[9] *See In praise of gatekeepers: An interview with a former teen client of TransActive Gender Center*, 4th Wave Now, April 21, 2016, https://bit.ly/3Q20Zgh (last visited Sept. 1, 2022).
[10] See Cari Stella, Guide on Raging Stars Blog, https://bit.ly/3q01SLB (last visited Sept. 1, 2022).
[11] See Cari Stella, YouTube, https://bit.ly/3RtH5fe (last visited Sept. 1, 2022).

in 2016 said: "I'm a real-live 22-year-old woman with a scarred chest and a broken voice and a 5 o'clock shadow because I couldn't face the idea of growing up to be a woman."

64.     In the United Kingdom, 23-year-old Keira Bell successfully sued the Tavistock and Portman NHS Trust—the leading British clinic responsible for administering puberty blocking drugs—after her own experience culminated in the realization that she had been rushed "down the wrong path."[12]  As a teenager, Keira went through a regimen of puberty blockers and cross-sex hormones, before undergoing a double mastectomy at age 20. She initially believed that the measures would help her achieve happiness, but "detransitioned" shortly after having the double mastectomy. Keira has become an outspoken campaigner for reform, stating that her doctors had failed her as a confused and distressed adolescent by failing to "challenge" her oversimplified desires to be male. "I think it's up to these [medical] institutions," Keira has said, "to step in and make children reconsider what they are saying, because it is a life-altering path."

65.     Given Ms. Bell's experience and the experiences of many others, in July 2022 the U.K.'s National Health Service's order the Tavistock to be closed after a report found it was not safe for children.[13]

66.     Similarly, authorities in Finland issued guidelines drastically reducing puberty blockers as a treatment for gender dysphoria because, as the new guidelines note, "[c]ross-sex identification in childhood, even in extreme cases, generally disappears during puberty."[14]

67.     In a widely quoted press release, the National Academy of Medicine of France stated:

---

[12] *See Puberty blockers: Under-16s "unlikely to be able to give informed consent,"* BBC News, Dec. 1, 2020, https://bbc.in/3ee30c2 (last visited Sept. 1, 2022).
[13] Daily Mail, 7/28/22, https://bit.ly/3egeHPl (last visited Sept. 1, 2022).
[14] Wesley Smith, Finns Turn against Puberty Blockers for Gender Dysphoria, National Review, 7/21/21 https://bit.ly/3B4o5OO (last visited Sept. 1, 2022).

When [transgender medical care is provided], it is essential to ensure medical and psychological support . . . **especially since there is no test to distinguish between persisting gender dysphoria and transient adolescent dysphoria. Moreover, the risk of over-diagnosis is real, as evidenced by the growing number of young adults wishing to detransition**.  It is, therefore, appropriate to extend the phase of psychological care as much as possible.[15]

Emphasis added.

68.     Sweden has issued a report noting,

The risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases. This judgement is based mainly on three factors: **the continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments, the new knowledge that detransition occurs among young adults, and the uncertainty that follows from the yet unexplained increase in the number of care seekers, an increase particularly large among adolescents registered as females at birth.**"[16]

Emphasis added.

69.     Many stories similar to Ms. Bell's are coming to light as more individuals realize that they are not alone in enduring these experiences.[17] Researchers have emphasized the need for research into the specific needs of this group.  *See e.g.*, Butler, C., & Hutchinson, A., *Debate: The pressing need for research and services for gender desisters/detransitioners*, CHILD AND ADOLESCENT MENTAL HEALTH, *25*(1) (2020), 45-47; Entwistle, K., Debate: *Reality check– Detransitioner's testimonies require us to rethink gender dysphoria*, CHILD AND ADOLESCENT MENTAL HEALTH, *26*(1) (2021), 15-16; Hildebrand-Chupp, R., *More than 'canaries in the gender coal mine': A transfeminist approach to research on detransition*, THE SOCIOLOGICAL

---

[15] National Academy of Medicine, France, 2/28/22 Press Release, https://bit.ly/3CL86Xm (last visited Sept. 1, 2022).

[16] The National Board of Health and Welfare of Sweden, *Care of children and adolescents with gender dysphoria Summary*, English translation, https://bit.ly/3B509uL (last visited Sept. 1, 2022).

[17] See Post Trans, https://post-trans.com/ (last visited Sept. 1, 2022), Voices, Sex Change Regret, https://sexchangeregret.com/voices/ (last visited Sept. 1, 2022), among others. *See also* Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing Our Daughters*, Regnery Publishing (2020).

REVIEW, *68*(4) (2020), 800-816.  It is not surprising, therefore, that increasing numbers of young people who struggle with questions of gender identity, and the parents of such young people, are aware that there are often grave and lasting costs resulting from adopting a transgender identity and that adoption of or attraction to a transgender identity is not necessarily fixed, unchangeable, or desirable.

70.   One study claims that less than 1% of those who transition experience regret. Wiepjes, C. M., *et al.*, *The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets*, THE JOURNAL OF SEXUAL MEDICINE, 15(4) (2018), 582.

> However, this study suffers from significant limitations that lessen the certainty of the claim of 'low regret' in youth:
> - The currently-treated populations of adolescents are very different from the population studied. All study subjects had severe gender dysphoria that began in early childhood and had no significant mental health comorbidities, which is not true of today's adolescent patients. Further, the study only evaluated those who underwent gonadectomy (surgical removal of testes/ovaries), which is not as commonly performed today, especially among gender-dysphoric natal females.
> - The study excluded 22% of those who started on the hormonal treatment pathway but did not proceed further with surgical removal of ovaries or testes. These individuals may have higher levels of regret than the group that proceeded to complete their medical transition as outlined in the Dutch protocol.
> - The follow-up time was less than 10 years, which is when regret typically emerges in adult studies.
> - 20% of study subjects dropped out of care / were lost to follow-up, which can mask regret.
> - Importantly, the definition of 'regret' was exceedingly narrow. For example, neither Keira Bell [mentioned above], nor many of the regretful detransitioners from the recent research on detransition would be considered to be 'regretters' by the study.
> To qualify as a 'regretter,' one had to revert to living in their natal sex role by starting natal-sex hormone supplementation, and do so under medical supervision of the same clinic that facilitated the original transition.'[18]

71.   Unfortunately, the question about whether to transition, the risk of regret, and what kind of counseling should accompany such decisions, remains unanswered. Studies on the subject

---

[18] Society for Evidence-based Gender Medicine, *Gender-Dysphoric Adolescents and Gender Transition Regret: What We Don't Know, Society for Evidence-based Gender Medicine*, November 2, 2021 https://bit.ly/3CPeDjY (last visited Sept. 1, 2022).

have a long-term reputation of being "very low quality" due to "serious methodological

limitation. The "[s]tudies lacked bias protection measures such as randomization and control

groups, and generally depended on self-report[ing that] may also indicate a higher risk of

reporting bias within the studies." Murad, M. H., *et al*., *Hormonal therapy and sex*

*reassignment: A systematic review and meta-analysis of quality of life and psychosocial*

*outcomes*, Clinical endocrinology, *72*(2) (2010), 229. A more recent study echoes these

concerns, stating that studies attempting to evaluate the success of gender affirming care model

included "psychosocial aspects" were very limited in number and had "rather short follow-up

periods" or "comprised a very small sample." Ruppin, U., & Pfäfflin, F., *Long-term follow-up*

*of adults with gender identity disorder*, Archives of sexual behavior, *44*(5) (2015), 1321.

Dr. Roberto D'Angelo expounds on research being hindered by significant numbers of subjects

lost to follow up:

- Smith *et al*. report that sex reassignment is effective, based on a study of 162 adults who had undergone SRS. They were able to obtain follow-up data from only 126 (78%) of subjects because a significant number were "untraceable" or had moved abroad.
- De Cuypere *et al*. report that sex reassignment surgery is an effective treatment for transsexuals. Of 107 patients who had undergone SRS between 1986 and 2001, 30 (28%) could not be contacted and 15 (14%) refused to participate.
- Johannson *et al*. reported good outcomes for SRS. Of 60 patients who had undergone SRS, 42 (70%) agreed to participate in the follow up research. Of the non-participants, 1 had died of complications of SRS, 8 could not be contacted and 9 refused to participate.
- Salvador *et al*. reported that SRS has a positive effect on psychosocial functioning. Only 55 of the 69 patients (80%) could be contacted as 17 were lost to follow-up
- Van de Grift *et al*. reported 94–96% of patients are satisfied with SRS and have good quality of life. A total of 546 patients with Gender Dysphoria who had applied for SRS at clinics in Amsterdam, Hamburg and Ghent were contacted to complete an online survey. Only 201 (37%) responded and completed the survey.

Roberto D'Angelo, *Psychiatry's ethical involvement in gender-affirming care,* Australasian

Psychiatry, *26*(5) (2018), 462.

72.     It is also not surprising, and is entirely reasonable and legitimate, that some young people (and/or their parents) wish to explore whether it is possible for them to escape from gender dysphoria and achieve comfort with their own biological sex, so as to avoid all of these potentially severe lifetime costs of living in a transgender identity.

73.     Dr. D'Angelo adds,

> We generally understand adolescence to be a time of identity exploration in which young people may try on various ways or being in the world. While such exploration is healthy, making permanent medical decisions on the basis of this exploration is not usually considered to be a good idea… It is the responsibility of the medical and therapeutic establishment to guard against both under-diagnosis and treatment, as well as over-diagnosis and treatment, either of which can be harmful. Gender dysphoria ought not to be any different simply because it is more politicized… **we believe there is an important human rights issue at stake here in relation to young people receiving appropriate mental health care**. This includes developing our understanding of which young people will benefit from transitioning and which young people require other forms of intervention other than gender-affirming care to address their difficulties.[19]

Emphasis added.

74.     Meanwhile, there are no statistically significant studies that demonstrate that voluntary conversational counseling which aims to help the client towards a personally chosen goal of achieving or returning to comfort with his or her own biological sex is in any way harmful to the client. In 2012 the APA reported that SOCE counseling was not shown to be effective but then explained that the very evidence they examined to draw this conclusion is comprised of "a host of methodological problems with research in this area, including biased sampling techniques, inaccurate classification of subjects, assessments based solely upon self-reports, and poor or nonexistent outcome measures." American Psychological Association, *Guidelines for psychological practice with lesbian, gay, and bisexual clients*, THE AMERICAN PSYCHOLOGIST,

---

[19] Roberto D'Angelo, *Response to Julia Serano s critique of Lisa Littman s paper: Rapid Onset Gender Dysphoria in Adolescents and Young Adults: A Study of Parental Reports*, Sept. 27, 2018, https://bit.ly/3e8lp9X (last visited Sept. 1, 2022).

*67*(1) (2012), 14. To the contrary, a 2022 review concluded, "79 studies on SOCE do not

provide scientific proof that they are more harmful than other forms of therapy, more harmful

than other courses of action for those with SSA, or more likely to be harmful than helpful for

the average client."[20]

75.     Dr. Nicolas Cummings, former president of the American Psychological Association,

has noted that SOCE counseling can provide enormous benefits. Nicholas A. Cummings,

*Sexual reorientation therapy not unethical*, USA Today, July 30, 2013, https://bit.ly/3AEGyjM

(last visited Sept. 1, 2022). Dr. Cummings noted that the State's premise for adopting the

Counseling Censorship Law (i.e., the sweeping contention that must be a fraud because

homosexual orientation can't be changed) is damaging and incorrect. *Id*. Dr. Cummings

personally counseled countless individuals in his years of mental health practice, and he

reported that hundreds of those individuals seeking to reduce or eliminate their unwanted same-

sex attractions, behaviors, or identity were successful. *Id*. ("Of the patients I oversaw who

sought to change their orientation, **hundreds were successful**." (emphasis added)). Dr.

Cummings said that the assertion that same-sex sexual attractions, behaviors, or identity is one

identical inherited characteristic is unsupported by scientific evidence and that "**contending

that all same-sex attraction is immutable is a distortion of reality**." *Id*. (emphasis added).

76.     Dr. Cummings went on to criticize efforts to prohibit SOCE counseling as violating the

client's right to self-determination and therapeutic choice. *Id*. ("Attempting to characterize all

sexual reorientation therapy as unethical violates patient choice and gives an outside party a

veto over patients' goals for their own treatment.").

---

20 Peter Sprigg, (November 2020) *No Proof of Harm: 79 Key Studies Provide No Scientific Proof That Sexual Orientation Change Efforts (SOCE) Are Usually Harmful*, Family Research Council, https://bit.ly/3Q9e07u (last visited Sept. 1, 2022).

77.     Dr. Cummings concluded that "[a] political agenda shouldn't prevent gays and lesbians who desire to change from making her own decisions." *Id.*

78.     Dr. Cummings concluded by condemning political efforts to prohibit SOCE counseling as harmful to clients and counselors. *Id.* ("Whatever the situation at an individual clinic, accusing professionals from across the country who provide treatment for fully informed persons seeking to change their sexual orientation of perpetrating a fraud **serves only to stigmatize the professional and shame the patient**." (emphasis added)).

79.     The American College of Pediatricians has noted that the political position statements of numerous mental health organizations discouraging SOCE have "no firm basis" in evidentiary support.  American College of Pediatricians, *Legislators are Not Psychotherapists*! Jan. 27, 2014, https://bit.ly/3AFkXaP (last visited Sept. 1, 2022).  The ACP noted that, "[t]he scientific literature, however, is clear: **Same-sex attractions are more fluid than fixed, especially for adolescents— many of whom can and do change**." *Id.* (emphasis added).  The ACP also noted that "there is a body of literature demonstrating a variety of positive outcomes from SOCE." *Id.*  Like Dr. Cummings, the ACP concluded that SOCE counseling is beneficial and that laws, such as the Counseling Censorship Law here, serve only to impose harm on minors who seek couneling. *Id.* ("Barring change therapy or SOCE will threaten the health and well-being of children wanting therapy.").

80.     Whether one decides to believe conclusions drawn by certain studies, there is almost uniform consensus that the studies conducted thus far in this area of clinical practice are insufficient to draw firm conclusions (such as restricting access to care, as the Counseling Censorship Law does), thus nullifying any arguments that one stance or the other is firmly evidence based. Almost every study and paper cited above includes notes by the authors that

more exploration on this topic is needed and there is a significant lack of clarity on these matters thus far. For legislative entities to claim that restrictions on free speech are evidenced based is simply false.

**D.   VOLUNTARY COUNSELING PROVIDED BY PLAINTIFF**

81.     The above discussion uses the term sexual orientation change efforts (SOCE) and conversation therapy, because these are the labels chosen in the Counseling Censorship Law and in recent research.  Thus, these terms have been the most functional search term when discussing forms of counseling alternative to the affirmative only approach. However, "[d]uring its May 27th, 2016, meeting, the board of the Alliance for Therapeutic Choice and Scientific Integrity (ATCSI) voted unanimously to endorse new terminology that more accurately and effectively represents the work of Alliance therapists who see clients with unwanted same-sex attractions. The board has come to believe that terms such as reorientation therapy, conversion therapy, and even sexual orientation change efforts (SOCE) are no longer scientifically or politically tenable."[21]   The board then set forth a list of reasons this language change was chosen. *Id.*

82.     Plaintiff does not engage in aversive techniques; nor is she aware of any practitioner who engages in such practice with clients seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. Plaintiff does not imply that categorical change in attractions is a therapeutic goal or create unrealistic expectations for clients. However, much of what the Counseling Censorship Law prohibits counseling is outside of this intention.

83.     Plaintiff began her career focusing on trauma. This focus led her to focuses on adjacent and co-occurring clinical issues such as addictions, attachment, and then personality disorders.

---

21 *See Why the Alliance Supports SAFE- Therapy* https://bit.ly/3efpp8A (last visited Sept. 1, 2022).

Subsequently, plaintiff has desired to focus on other adjacent and potentially co-occurring clinical issues like eating disorders and sexuality. Prior to the Counseling Censorship Law, Plaintiff helped clients freely discuss sexual attractions, behaviors, and identity by talking with them about gender roles, identity, sexual attractions, root causes of desires, behavior and values. Since the Counseling Censorship Law, she has continued to have these discussions freely with some clients but has intentionally avoided conversations with clients that may be perceived as violating the Law. The limitations imposed by the Law have prevented Plaintiff from being able to fully explore the topic of sexuality with minors.  Thus, the minors in her care are prevented from being able to fully explore the topic with her, and potential minors seeking counseling that fully explores their sexuality are prevented from becoming clients.

84.     Speech is the only tool that Plaintiff uses in her counseling with minors seeking to discuss their sexuality. (Plaintiff is not currently engaging in discussions with minor clients if they have concerns about their sexual attractions or sexual orientation due to the Law). She sits down with her clients and talks to them about their goals, objectives, religious or spiritual beliefs, values, desires, and identity to help them (1) explore and understand their feelings and (2) formulate methods of counseling that will most benefit them.

85.     Plaintiff does not begin counseling with any predetermined goals other than those that the clients themselves identify and set. This is consistent with the clients' fundamental right of self-determination.

86.     Often a client does wish to address unwanted sexual attraction, behaviors, or identity or they are content with a sexual identity other than that of their biological sex. When that is the case, Plaintiff focuses on helping the client and parents to heal any wounds or frustrations and

to begin to work on loving and accepting the minor client despite any challenges that arise from sexual attractions, behaviors, or identity.

87.     Plaintiff does not seek to "cure" clients of same-sex attractions or to "change" clients' sexual orientation; she seeks only to assist clients with their stated desires and objectives in counseling, which sometime includes clients seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with one's physical body.

88.     The only relevant considerations in Plaintiff's counseling are that same-sex attractions, behaviors, identity, or a sense that one must change one's physical body as a solution to gender dysphoria are (a) sometimes an experience over which the client has anxiety or distress, and (b) the client seeks to eliminate that anxiety or distress.

89.     These are the same relevant considerations in all forms of mental health counseling. These considerations hold regarding many things for which clients seek counseling, including many that are not mental illnesses but that nevertheless impose great stress, anxiety, confusion, or grief on the client. In fact, it is commonly understood that quality counseling that is conducted with unconditional positive regard WILL include clinician stances such as challenge and confrontation in order to assist the client in building their own sense of self that is not dependent upon the counselor's (or anyone else's) approval or affirmation.

**E.      VAGUENESS PROBLEMS WITH THE COUNSELING CENSORSHIP LAW**

90.     Because of the difficulty in measuring sexual orientation and gender identity, the prohibitions in the Counseling Censorship Law are hopelessly vague and leave Plaintiff guessing at which practices are permitted and which are prohibited.

91.     The Counseling Censorship Law prohibits Plaintiff under any circumstances from engaging in any practice that seeks to reduce or eliminate same-sex sexual attractions, behaviors, or identity. This prohibition is virtually impossible for Plaintiff to comply with because it is well understood in the mental health profession that sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practice, identity, attractions, sexual fantasy, romantic attractions, and erotic desires.

92.     The Counseling Censorship Law does not specify which clients would be classified as seeking to "change" and those that would merely be deemed to be conforming their behavior with their original "sexual orientation." As Plaintiff's clients do not always immediately present wanting to "change," she is left to guess at which point any of her counseling practices would be deemed to constitute efforts to reduce or eliminate unwanted same-sex attractions.

93.     Sexual orientation is also nearly impossible to measure, and there is no agreement on whether sexual orientation is a categorical construct or exists on a continuum. A client's motives, attractions, identification, and behaviors may vary over time and circumstances with respect to one another, which makes them dynastically changing features of an individual's concept of self.

94.     Despite the difficulty in measuring and defining sexual orientation and in predicting normative perceptual changes in one's sexuality over time, Plaintiff must now put her professional licenses in jeopardy when even discussing something that could be **perceived** as "changing" sexual orientation or identity.

95.     The Counseling Censorship Law permits licensed counselors to provide counseling that provides "acceptance, support, and understanding" of a client's same-sex attractions, behaviors, or identity. This presents another major source of confusion, uncertainty, and vagueness for

27

Plaintiff.  It is impossible for Plaintiff to provide acceptance and support to a client who comes in for counseling and yet at the same time requests assistance in seeking to eliminate unwanted same-sex attractions, behaviors, or identity.

96.      Most of Plaintiff's clients do not initially request counseling specifically to reduce or eliminate unwanted same-sex attractions, behaviors, or identity.  Instead, they want help and counseling to understand the sources, causes, and origins of their feelings. Moreover, these feelings may not be known or discussed during the intake process and may arise during the course of therapy for other issues.  During the course of such counseling, without ever specifically setting out to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, some clients will experience a change in their sexual attractions, behaviors, or identity. This is true even if they never specifically sought to experience such a change or to eliminate their unwanted feelings.  Plaintiff is left to guess at whether counseling simply discussing the confusion, anxiety, conflict, or stress a client feels about their unwanted same-sex attractions, behaviors, or identity – without specifically seeking to reduce or eliminate such feelings – runs afoul of the Counseling Censorship Law' prohibitions.

97.      If Plaintiff is merely counseling an individual to understand the origins of their attractions or helping them to understand and resolve the conflict with their religious beliefs, she is unable to know whether such counseling may result in a spontaneous change for the minor client, even though it was not the topic or goal of her counseling.

98.      Thus, Plaintiff is left to guess at what topics are permissible when a minor client presents with anxiety, confusion, distress, or conflict over unwanted same-sex attractions, behaviors, or identity, and the Counseling Censorship Law provides no clear guideposts on such issues.

**F.     INDIVIDUALIZED EXEMPTIONS IN THE COUNSELING CENSORSHIP
        LAW**

99.     The Counseling Censorship Law also establishes a system of individualized exemptions.
The law permits counseling on the broad topic of sexual orientation, gender identity, and
attractions, behaviors, and identities of minors seeking counseling, but it prohibits such
counseling when the client desires to receive counseling to change, reduce, or eliminate same-
sex attractions, behaviors, or identity.

100.    However, the law permits counseling relating to change of gender identity when such a
client is "undergoing gender transition."

101.    Thus, the law prohibits counseling that which affirms an individual's desire to conform
their gender identity with their biological identity, but it provides an individual exemption for
identical counseling when a client seeks to change their gender identity and expression.

102.    The law permits counseling providing acceptance and support for a client with same-sex
attractions, behaviors, or identity, and it permits counseling providing acceptance and support
for a client's gender identity and expression.  But the law prohibits counseling providing
acceptance and support for a client whose attractions, behaviors, expressions, or identity do not
match her concept of self.

103.    Thus, the law exempts counseling affirming a minor transitioning from one gender to
another but prohibits such counseling for a client seeking to eliminate the confusion or identity
that does not match his or her biological makeup.

**G.     PLAINTIFF'S WORK**

104.    Plaintiff graduated with a Master of Arts in clinical mental health in 2014.  She is a
licensed professional counselor and licensed addiction counselor in the state of Colorado. She is

a practicing Christian. She adamantly disagrees with the proposition that a person can practice counseling while denying or omitting their philosophical and existential framework. While she does not believe it is possible to practice counseling in a philosophical vacuum, she highly respects client autonomy and therefore does not seek to impose her values or beliefs on her clients.

105.    Plaintiff has engaged in providing counseling and coaching to clients, court ordered coparenting classes, parent coordinator/decision making, and court ordered substance-abuse evaluations.

106.    Plaintiff currently works at Deeper Stories Counseling in Colorado Springs. Her duties include counseling assigned clients as well as supervising post-graduate clinicians. The owner of Deeper Stories allows clinicians to limit or expand caseloads depending on interest and specialties. Currently Plaintiff works with adults who are seeking Christian counseling and minors who are internally motivated to seek counseling (as opposed to being required to come to counseling by someone else.)

107.    Plaintiff has worked part time at the Cascade, Colorado location of Sandstone Care since December 2018.  Initially, Plaintiff worked in a program that offered 30 days of residential treatment for adolescents ranging from 13-18 years old.  Plaintiff created and facilitated the "family immersion program" which included parents (and sometimes siblings) coming to the facility for a "weekend" (Thursday, Friday and Saturday) during their adolescent's stay. During these weekends, Plaintiff would see up to three families, facilitating parent groups, family groups and overseein the families' stay at the facility. On weeks the family was not present, Plaintiff would facilitate online sessions. Since 2020, all sessions have been conducted online in a different format called the "family intensive program."

30

108.     Plaintiff is a client-directed counselor in that it is the client who sets the goals for counseling. Plaintiff does not impose an agenda on her clients; nor does she determine clients' goals for counseling. Clients set their own goals for counseling.  Plaintiff only works with voluntary clients who determine the goals that they have for themselves. Plaintiff does not coerce her clients into engaging in counseling but respects her clients' right of self-determination.  She treats each client with unconditional positive regard regardless of the client's personal beliefs, concept of self or feelings of wanted or unwanted same-sex attractions, behaviors, or identity.

109.     Plaintiff has had minor clients with homosexual attractions or behaviors who have expressed that they are happy identifying as gay, lesbian, bi-sexual, or gender non-conforming in various ways and do not want help for changing identity, attractions, or behavior. In such cases, Plaintiff asks if there are any other goals that the minor is interested in pursuing. In many cases, minors ask for help with social issues, family relationships, parent-child communication, or helping to facilitate the parents' coping with the sexual identity of the child. Plaintiff has helped a number of minors and parents with those goals.  She does not try to help minors change their attractions, behavior, or identity, when her minor clients tell her they are not seeking such change. In her residential work as a family counselor, adolescents may still be required to attend family sessions to develop a goal despite the absence of initial therapeutic goals since this is a required part of the residential program. However, in her outpatient settings, when a minor states they do not have a therapeutic goal or wish to explore one, counseling is terminated.

110.     Many of Plaintiff's clients are referred through churches or word of mouth. Many of her clients uphold a biblical worldview which includes the concepts that attractions do not dictate

behavior, nor do feelings and perceptions determine identity. Clients who identify as Christians holding to a biblical worldview believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity.

111. Clients who have same-sex attractions or gender identity confusion and who also prioritize their faith above their feelings are seeking to live a life consistent with their faith. Clients who have been living a life inconsistent with their faith or values often present with internal conflicts, depression, anxiety, addiction, eating disorders and so forth and are seeking resolution of such turmoil.

112. Plaintiff has never received any complaint or report of harm from any of her clients seeking and receiving counseling for any issue, including the many minors she has counseled.

113. Plaintiff began her career with an interest in serving underserved populations whom she perceived as having issues that are resistant to typical counseling or that prevented them from benefitting from typical talk therapy. This led her to specialize in trauma. This focus then led her to specialize also in addictions and then personality disorders. Recently she has taken more interest in specializations such as eating disorders, gender dysphoria and sexuality. However, after the mandates of the Counseling Censorship Law were imposed on her, Plaintiff has been unable to fully explore certain clients' bodily experiences around sexuality and gender and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect. In other areas such as trauma, addictions, personality disorders, and eating disorders, ethical and evidenced-based practice includes the clinician sometimes expressing doubts, confronting, challenging, questioning, etc. Yet for this specific issue and clientele, it appears the clinician is limited to an

"acceptance" only stance.  Limiting one's counseling approach in such a one-sided way would generally be considered unethical for any of the other above-mentioned counseling challenges.

114.    In addition to Plaintiff's current clients, there are potentially many future clients who will be adversely affected by the Counseling Censorship Law. Plaintiff has periodically received requests for counseling for both matters related to sexual attractions and gender identity. The Counseling Censorship Law will prevent future clients from getting help.

## H.    IRREPARABLE HARM TO PLAINTIFF AND HER CLIENTS

115.    Consistent with her First Amendment rights, Plaintiff wants to offer a counseling approach to clients and potential clients including minors that includes a full exploration of clients' reported orientation, identity, behaviors and feelings without the imposition of the Counseling Censorship Law's "acceptance-only" government mandate.  She asks for the same freedom in discussing these topics that she would have with minor clients surrounding other controversial topics such as eating disorders, addiction, and criminal behavior.

116.    Consistent with her First Amendment rights, Plaintiff wants to provide counseling, including certain types of voluntary counseling related to sexuality and gender, to minor clients and potential clients.

117.    Because of the Counseling Censorship Law, Plaintiff is prohibited from offering certain types of voluntary counseling related to sexuality and gender to minor clients and potential clients.

118.    Because of the Counseling Censorship Law, Plaintiff is prohibited from engaging in constitutionally protected speech, including offering certain types of counseling to clients and potential clients.  The law literally prohibits her from uttering certain words to her clients if such words are counter to the state's mandated orthodoxy.

119.    Because of the Counseling Censorship Law, Plaintiff has been chilled in her constitutionally protected expression.

120.    Because of the Counseling Censorship Law, Plaintiff has been and will be forced to deny voluntary counseling that fully explores sexuality and gender to her clients and potential clients in violation of her and her clients' sincerely held religious beliefs.

121.    Because of the Counseling Censorship Law, Plaintiff has suffered, is suffering, and will continue to suffer ongoing, immediate, and irreparable injury to her First Amendment rights to freedom of speech.

122.    Because of the Counseling Censorship Law, Plaintiff has suffered, is suffering, and will continue to suffer ongoing, immediate, and irreparable injury to her First Amendment rights to free exercise of religion.

123.    Because of the Counseling Censorship Law, Plaintiff's minor clients are prohibited from receiving voluntary counseling that fully explores sexuality and gender that the clients desire to obtain from a licensed professional with expertise in this area.  Plaintiff's minor clients have thus suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to receive information.

124.    Because of the Counseling Censorship Law, Plaintiff's clients have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to free exercise of religion.

125.    Plaintiff and her clients and potential clients have no adequate remedy at law to protect the ongoing, immediate, and irreparable injury to their First Amendment liberties.

### V.  FIRST CLAIM FOR RELIEF
### (First Amendment:  Free Speech)

126.    Plaintiff reiterates the above allegations.

127.    The Free Speech Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

128.    The Counseling Censorship Law, on its face and as applied, are unconstitutional prior restraints on Plaintiff's speech.

129.    The Counseling Censorship Law, on its face and as applied, unconstitutionally discriminate on the basis of viewpoint.  The Counseling Censorship Law authorizes only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity by forcing Plaintiff to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity.

130.    The Counseling Censorship Law, on its face and as applied, discriminates against Plaintiff's speech on the basis of the content of the message she offers.

131.    Defendants lack compelling, legitimate, significant, or even rational governmental interests to justify the Counseling Censorship Law' infringement of the right to free speech.

132.    The Counseling Censorship Law, on its face and as applied, is not the least restrictive means to accomplish any permissible government purpose sought to be served by the law. Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiff's speech, and mental health counseling organizations have urged legislatures to adopt informed consent provisions.

133.    The Counseling Censorship Law does not leave open ample alternative channels of communication for Plaintiff.

134.    The Counseling Censorship Law, on its face and as applied, unconstitutionally chills and abridges the right of Plaintiff to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

135.     The Counseling Censorship Law's prohibitions on licensed counselors' offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to someone who offers SOCE counseling, on its face and as applied, abridge Plaintiff's right to offer information about such matters.

136.     The Counseling Censorship Law' violations of Plaintiff's rights of free speech have caused, are causing, and will continue to cause Plaintiff and her clients to suffer undue and actual hardship and irreparable injury.

137.     Plaintiff has no adequate remedy at law to correct the continuing deprivation of her most cherished constitutional liberties.

## VI.  SECOND CLAIM FOR RELIEF
### (First Amendment:  Clients' Right to Receive Information)

138.     Plaintiff reiterates the above allegations.

139.     The First Amendment, as applied to the states by the Fourteenth Amendment, protects an individual's freedom of speech, and the corollary to that right, the right to receive information.

140.     Plaintiff's clients have sincerely held religious beliefs that shape their desire to receive SOCE counseling and the information that Plaintiff can provide on reducing or eliminating unwanted same-sex attractions, behaviors, and identity.

141.     The Counseling Censorship Law prevents Plaintiff's clients from receiving SOCE counseling and deprives them of the opportunity to even obtain information about SOCE counseling from licensed counselors.

142.     The Counseling Censorship Law is not supported by compelling government interests.

143.    Even if the Counseling Censorship Law were supported by compelling government interest, it is not narrowly tailored to achieve that purpose and therefore violates the fundamental rights of Plaintiff's clients to receive information.

144.    The Counseling Censorship Law, on its face and as applied, is not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

145.    The Counseling Censorship Law' violations of the fundamental rights of Plaintiff's clients have caused, are causing, and will continue to cause undue and actual hardship and irreparable injury.

146.    Plaintiff's clients have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

## VII.  THIRD CLAIM FOR RELIEF
### (First Amendment:  Free Exercise of Religion)

147.    Plaintiff reiterates the above allegations.

148.    The Free Exercise Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's right to free exercise of religion.

149.    Many of Plaintiff's clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

150.    Plaintiff also has sincerely held religious beliefs to provide spiritual counsel and assistance to her clients who seek such counsel. Plaintiff holds sincerely held religious beliefs that she should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with her religious beliefs and those of her clients.

151.    The Counseling Censorship Law, on its face and as applied, targets Plaintiff's and her clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith.  The Counseling Censorship Law causes a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

152.    The Counseling Censorship Law, on its face and as applied, has impermissibly burdened Plaintiff's and her clients' sincerely held religious beliefs.  Indeed, the law affirmatively compels them act in contradiction to those beliefs. The Counseling Censorship Law has also forced Plaintiff and her clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the State.

153.    The Counseling Censorship Law places Plaintiff and her clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the law.

154.    The Counseling Censorship Law also put substantial pressure on Plaintiff and her clients to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity.

155.    The Counseling Censorship Law, on its face and as applied, is neither neutral nor generally applicable, but rather specifically and discriminatorily targets the religious speech, beliefs, and viewpoint of those individuals who believe change is possible.  The law thus expressly constitutes a substantial burden on sincerely held religious beliefs that are contrary to the State's approved viewpoints on same-sex attractions, behavior, or identity.

156.    No compelling government interest justifies the burdens Defendants impose upon Plaintiff and her clients' rights to the free exercise of religion.

157.    Even if the Counseling Censorship Law were supported by compelling government interests, it is not the least restrictive means to accomplish any permissible government purpose which the Counseling Censorship Law seeks to serve.

158.    The Counseling Censorship Law, both on its face and as-applied, does not accommodate Plaintiff's sincerely held religious beliefs.

159.    The Counseling Censorship Law, both on its face and as-applied, specifically targets religion for disparate treatment and has set up a system of individualized exemptions that permits certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subjects.

160.    The Counseling Censorship Law, both on its face and as applied, constitutes a religious gerrymander.

161.    The Counseling Censorship Law' violations of Plaintiff's and her clients' rights to free exercise of religion and has caused, is causing, and will continue to cause Plaintiff and her clients to suffer undue and actual hardship and irreparable injury.

162.    Plaintiff has no adequate remedy at law to correct the continuing deprivation of her most cherished constitutional liberties.

## VIII.  FOURTH CLAIM FOR RELIEF
### (Fourteenth Amendment:  Due Process)

163.    The Fourteenth Amendment's guarantee of Due Process prohibits the government from imposing or threatening punishment based on laws that are so vague that they do not provide fixed legal standards as to what is prohibited and what is not, and so leave room for standardless or discriminatory enforcement.

164.    In fact, as detailed below, essentially all of the key terms in the Counseling Censorship Law are undefined in the law itself, and also undefined in science, and indeed have more in common with slogans than with a fixed standard identifying what counseling speech is prohibited and subject to punishment under such statute.

165.    As a result, the Counseling Censorship Law is unconstitutional on its face because it does not provide adequate standards or guidelines to govern the actions of Defendants who are the persons empowered by Colorado to enforce the law.  Instead, the law enables and authorizes those who are empowered to pursue enforcement actions in this highly controversial and politicized area to do so based on their personal predilections, rather than on any fixed legal standard, and likewise to pursue discriminatory enforcement.

166.    The vagueness and lack of fixed legal standards in the Counseling Censorship Law is all the more impermissible because it impacts a fundamental right.  Because of this vagueness and the unbounded discretion that it affords to those authorized to bring enforcement actions, counselors engaging with a client who raises concerns relating to gender identity, same-sex attractions, or sexual behaviors must be all the more fearful that they will be accused of violating the law. As a result, consciously or unconsciously, counselors including Plaintiff inevitably engage in a degree of self-censorship that infringes the freedom of speech of both counselor and client.

167.    The Counseling Censorship Law is unconstitutionally vague because it provides no standards or guidelines defining the line between speech that permissibly provides "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" and speech that unlawfully seeks to "change" that person's gender identity or sexual orientation.

168.     Given that "development" necessarily involves "change," the purported distinction is incoherent, and thus leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

169.     The prohibition on seeking to "change an individual's . . . gender identity" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because the term "gender identity" is undefined in the law and is vague.

170.     "Gender identity" has no clear definition. In a 2016 rule interpreting Section 1556 of the Patient Protection and Affordable Care Act, the Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) at 31,384.

171.     A publication sponsored by the ACLU, Human Rights Campaign, and National Education Association asserts that gender identity encompasses any "deeply-felt sense of being male, female, both or neither," and can include a "gender spectrum" "encompassing a wide range of identities and expressions." *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools*, at 6-7.

172.     The National Center for Lesbian Rights contends that "Gender is comprised of a person's physical and genetic traits, their own sense of gender identity and their gender expression" and similarly asserts that gender identity "is better understood as a spectrum." That source goes on to say that an individual may have an "internal sense of self as male, female, both or neither," and that "each person is in the best position to define their own place on the

gender spectrum."[22] Indeed, the medical text *Principles of Transgender Medicine and Surgery*, declares that "Gender identity can be conceptualized as a continuum, a Mobius, or patchwork."[23]

173.    An individual who is unhappy with or uncertain about his or her "sense of being male, female, both or neither," or who wishes to evaluate and "define their own place on the gender spectrum," or who does not wish to live life with an identity as amorphous as a Mobius strip or a "patchwork," may well wish the aid of a professional counselor. But what conversation will comprise permissible "development" of that individual's place on that disorienting Mobius strip, and what will be condemned as an unlawful effort to "change" the individual's "gender identity," is unknowable.

174.    Because the Counseling Censorship Law fails to define "gender identity," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

175.    The prohibition on seeking to "change an individual's sexual orientation" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions, because the term "sexual orientation" is undefined in the law and is vague in practice.  There is no agreement in the scientific literature as to the definition of "sexual orientation," or to what extent "orientations" may overlap or blend from one to another. The APA Handbook of Sexuality and Psychology cautions that "Sexual orientation is usually

---

[22] Asaf Orr et al., National Center for Lesbian Rights, *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools* 5, (2015), https://bit.ly/3KFFpwI (last visited Sept. 1, 2022).

[23] *Principles of Transgender Medicine and Surgery* 43 (Randi Ettner, Stan Monstrey & Eli Coleman 2eds., 2nd ed. 2016).

considered a multi-dimensional construct" in which "aspects of sexual orientation . . . are not necessarily concordant." (556).  Professors Diamond and Rosky warn that "it is important to note that sexual orientation is not easy to define or measure," and "is a multifaceted phenomenon" which cannot be simplified to mere "sexual attractions," but instead incorporates (among other components) "sexual attractions, . . . sexual behavior, and sexual identity," while "identity and behavior are structured by social context, social constraints, and social opportunities." Lisa M. Diamond & Clifford J. Rosky, *supra*, 3.  This, say Diamond and Rosky, "obviously poses a problem for research on the causes of sexual orientation." *Id*. It also poses a severe problem for a counselor, therapist, or client who wishes to know what type of counseling or therapeutic goals might be condemned as seeking to change "sexual orientation."

176.    Because the Counseling Censorship Law fails to define "sexual orientation," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

177.    The Counseling Censorship Law is further impermissibly vague because it prohibits any practice that "*attempts* . . . to change an individual's sexual orientation or gender identity."  The law fails to provide any standards or guidelines as to whether this refers to the subjective intent of the client, or that of the counselor, again leaving unfettered discretion on this critical question to any person authorized to bring an enforcement action and inviting discriminatory enforcement.

178.    Indeed, a client's personal intention in raising a subject relating to sexuality may or may not be known to the counselor and may change from one meeting to the next. Consequently, a

counselor might face sanctions on the basis of the shifting subjective thoughts and goals of his client that are beyond the counselor's knowledge.

179.    The Counseling Censorship Law further fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because it provides no definitions of terms "gender expressions" and "identity exploration and development" and provides no information at all as to what "behaviors" a counselor may or may not help a client attempt to change.

180.    In the absence of any clarity on these terms, almost any counseling conversation that relates to gender, intimate relationships, or sexuality could be accused of seeking to "change . . . sexual orientation or gender identity." Thus, the failure of the Counseling Censorship Law to define these terms additionally leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

181.    Meanwhile, the sanctions faced by counselors for violating the Counseling Censorship Law are severe, ranging up to the revocation of her licenses, fines and the loss of her livelihood.

182.    For these reasons, the Counseling Censorship Law is so vague on its face that it deprives licensees of Due Process rights protected by the Fourteenth Amendment.

183.    The deprivation of these rights constitutes irreparable injury.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.      That this Court issue preliminary and permanent injunctions enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the Counseling Censorship Law

B.      That this Court render a Declaratory Judgment declaring the Counseling

Censorship Law and Defendants' actions in applying the Counseling Censorship Law

unconstitutional under the United States Constitution.

C.      That this Court award Plaintiff the reasonable costs and expenses of this action,

including attorney's fees, in accordance with 42 U.S.C. § 1988.

D.      That this Court grant such other and further relief as this Court deems equitable

and just under the circumstances.

Respectfully submitted this 5th day of September 2022.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*


**VERIFICATION**

I, Kaley Chiles, am over the age of 18 and the Plaintiff in this action.  The statements

and allegations about me or which I make in this VERIFIED COMPLAINT are true and

correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to

testify as to their truthfulness, I would and could do so competently.  I declare under penalties

of perjury, under the laws of the United States, that the foregoing statements are true and

correct.

Executed this 1st day of September 2022.

_____
Kaley Chiles