## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2287-STV**

KALEY CHILES,

      Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies; *et al*.,

      Defendants.

_____

## MOTION FOR PRELIMINARY INJUNCTION
_____

## CERTIFICATION

On September 22, the undersigned conferred with counsel for Defendants regarding this motion. Defendants oppose this motion.

## INTRODUCTION

On February 28, 2022, the prestigious National Academy of Medicine of France issued a press release in which it stated

> When [transgender medical care is provided], it is essential to ensure medical and psychological support . . . **especially since there is no test to distinguish between persisting gender dysphoria and transient adolescent dysphoria. Moreover, the risk of over-diagnosis is real, as evidenced by the growing number of young adults wishing to detransition**. It is, therefore, appropriate to extend the phase of psychological care as much as possible.[1]

(emphasis added)

_____

[1] National Academy of Medicine, France, 2/28/22 Press Release, available at https://bit.ly/3CL86Xm (last visited Sept. 1, 2022).

Suppose a 17-year-old woman who had decided to transition were to come into Ms. Chiles' office for counseling and Ms. Chiles' did nothing but read to her this passage from the National Academy's press release.  Suppose further that upon receiving this information the young woman decided not to transition.  By providing indisputably true[2] information to her client, Ms. Chiles would have violated the Counseling Censorship Law (defined below). Incredibly, Ms. Chiles would have violated the law even if the young woman did not change her mind.  The mere act of providing the true information to her client is unlawful under Colorado law.  And for the offense of having provided true information to her client, the State could revoke Ms. Chiles' licenses and destroy her livelihood.  The statute is a flagrantly unconstitutional abridgement of free speech.

Plaintiff does not wish to impose her personal views about sexuality on her clients.  She does not believe that is her role as a counselor. Instead, she wants to provide information, perspective and empathy to her clients who may be grappling with deeply personal and emotional issues of human sexuality.  Whether any of her clients exercise their autonomy to embrace or reject a particular sexual identity is, for Plaintiff, beside the point.  For her, the choice her clients make is not as important as ensuring that whatever the choice is, it is fully informed.

Unfortunately, Plaintiff's desire fully to inform her clients has been thwarted by the Counseling Censorship Law. The State of Colorado has outlawed the act of providing to her clients certain true information about human sexuality.  Even if a client were to seek that information unbidden and voluntarily, Plaintiff would not be able to provide it without risking

---

[2] Note that for purposes of this hypothetical, it is irrelevant if the National Academy's analysis is correct.  It is indisputably true that this prestigious institution advanced the analysis, and it is information upon which a reasonable person could rely.

losing her licenses and her livelihood.  The government has no business forcing its way into these deeply private and personal private conversations.

Counselors "help [clients] make deeply personal decisions, and their candor is crucial" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* , 138 S. Ct. 2361, 2374 (2018) ("*NIFLA*") (internal quotation marks omitted). For those decisions to be best for the client, the client needs "an unconstrained flow of information from" a counselor who speaks candidly. Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201, 235 (1994). The State's heavy-handed censorship violates the Constitution and the Counseling Censorship Law should be enjoined.

## FACTS

### A.    Plaintiff's Practice

Plaintiff is a licensed professional counselor and licensed addiction counselor. Verified Complaint ("Compl.") ¶ 104. Plaintiff is a client-directed counselor in that it is the client who sets the goals for counseling. Compl. ¶ 108. Plaintiff does not impose an agenda on her clients or determine clients' goals for counseling. *Id*. She treats each client with unconditional positive regard regardless of the client's personal beliefs, concept of self or feelings of wanted or unwanted same-sex attractions, behaviors, or identity. *Id*.  Plaintiff does not engage in aversive techniques. Compl. ¶ 82. She does not imply that categorical change in attractions is a therapeutic goal or create unrealistic expectations for clients. *Id*.

**Speech** is the only tool that Plaintiff uses in her counseling with minors seeking to discuss their sexuality. Compl. ¶ 84. She sits down with her clients and talks to them. *Id*. She asks about their goals, objectives, religious or spiritual beliefs, values, desires, and identity in order to: (1) help them explore and understand their feelings and (2) formulate methods of

counseling that will most benefit them. *Id*. Consistent with her clients' fundamental right to self-determination, Plaintiff does not begin counseling with any predetermined goals other than those that the clients themselves identify and set. Compl. ¶ 85.

Plaintiff has had minor clients who have expressed that they are happy identifying as gay, lesbian, bi-sexual, or gender non-conforming in various ways and do not want help for changing identity, attractions, or behavior. Compl. ¶ 109. In such cases, Plaintiff asks if there are any other goals that the minor is interested in pursuing. *Id*. In many cases, minors ask for help with social issues, family relationships, parent-child communication, or helping to facilitate the parents' coping with the sexual identity of the child. *Id*. If, however, such clients do not have other therapeutic goals, counseling is terminated. *Id*.

Sometimes Plaintiff's clients desire to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with their physical body. Compl. ¶ 87. The only relevant considerations in Plaintiff's counseling of these clients are that same-sex attractions, behaviors, and identity are (a) sometimes an experience over which the client has anxiety or distress, and (b) the client seeks to eliminate that anxiety or distress. Compl. ¶ 88.  These are the same relevant considerations in all forms of mental health counseling.  Compl. ¶ 89. These same considerations would hold if a client were seeking counseling for any situation that caused stress, anxiety, confusion, or grief. *Id*.

Importantly, "never challenge" is not a sound counseling practice. *Id*. Indeed, sometimes the opposite it true; it is commonly understood that counseling that is conducted with unconditional positive regard will nevertheless sometimes include clinician stances such as challenge and confrontation in order to assist the client in building their own sense of self that is not dependent upon the counselor's (or anyone else's) approval or affirmation. *Id*.

**B.**    **Research Findings**

    **1.**    **The banned speech does not result in increased suicides.**

The legislators who sponsored the bill that became the Counseling Censorship Law asserted that their goal was to reduce the risk of suicide by minors.  *See, e.g.*, House Committee on Public Health Care & Human Services, February 13, 2019 (available at https://bit.ly/3qzptD2), timestamp 1:00:20 to 1:01:04 (prime sponsor Rep. Michaelson Jenet). But any claim that science supports the conclusion that SOCE counseling increases the risk of suicide among minores is based on flawed studies that have been completely debunked by recent, high quality research. *See*, Sullins, D.P., *Sexual Orientation Change Efforts Do Not Increase Suicide: Correcting a False Research Narrative*, ARCH SEX BEHAV, https://doi.org/10.1007/s10508-022-02408-2 (September 6, 2022) (last visited 9/21/22). Dr. Sullins states: "Until recently, claims of elevated suicidal risk from SOCE exposure were based primarily on small-sample qualitative studies . . . None of these studies included any measures of suicidality but inferred its presence and scope from narrative comments. **The causal connection to SOCE was presumptive and speculative**." *Id.*, 2 (emphasis added).  More recent studies have been flawed in that the researchers committed the "fallacy of association," i.e., they conflated correlation and causation and erroneously associated suicidality with SOCE even though a majority of respondents expressed suicidality before experiencing SOCE treatment. *Id.*, 2, 10.  Correcting for these errors, it was revealed that there is no "positive association of SOCE with suicidality in the Generations data." *Id.*, 10. Sullins concludes: "After accounting for preexisting suicidal behavior sexual minorities who underwent SOCE treatment **were not at higher risk of suicidality**. **Indeed, some of them may have been placed at much lower suicidal risk**. Judicial or legislative restrictions on SOCE participation

could deprive sexual minorities of an effective resource for reducing suicidality, thereby putting them at substantially higher suicide risk." *Id.*, 14 (emphasis added).

### 2. Sexual orientated and gender identity are fluid over time.

Many academics and practitioners and even transgender activists have observed that gender identity is not necessarily either binary or fixed for life. Compl. ¶ 56. Indeed, in formally promulgating a rule in 2016, the United States Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth," and disparaged "the expectation that individuals will consistently identify with only one gender" as an inaccurate "sex stereotype." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) at 31, 384 and 31,468. *Id.*

In addition, at least for pre-adolescents who experience gender dysphoria and receive therapeutic support but do not socially transition, "every follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition." J. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 JOURNAL OF SEX & MARITAL THERAPY 1, 1 (2019). Compl. ¶ 57. In fact, multiple studies have documented that for pre-pubertal children who suffer from gender dysphoria, the very large majority—estimates range between 61%-98% percent—will grow into comfort with a gender identity congruent with their biological sex by young adulthood, so long as they are not affirmed as children in a transgender identity. Ristori, J., & Steensma, T. D., *Gender dysphoria in childhood*, INTERNATIONAL REVIEW OF PSYCHIATRY, *28*(1), (2016) 15. *Id.*

For these reasons, failure to engage in multifaceted counseling has had tragic consequences.  Recently, the Tavistock and Portman NHS Trust – the leading British youth transgender clinic – was accused of rushing children onto puberty blocking drugs by former patients who feel they weren't challenged enough.  Compl. ¶ 65. And in July 2022 the U.K.'s National Health Service's ordered the Tavistock to be closed after a report found it was not safe for children.[3]  *Id.*

Similarly, authorities in Finland recently issued guidelines drastically reducing puberty blockers as a treatment for gender dysphoria because, as the new guidelines note, "[c]ross-sex identification in childhood, even in extreme cases, generally disappears during puberty."[4] Compl. ¶ 66.

In a widely quoted press release, the National Academy of Medicine of France stated:

When [transgender medical care is provided], it is essential to ensure medical and psychological support . . . **especially since there is no test to distinguish between persisting gender dysphoria and transient adolescent dysphoria. Moreover, the risk of over-diagnosis is real, as evidenced by the growing number of young adults wishing to detransition**.  It is, therefore, appropriate to extend the phase of psychological care as much as possible.[5]

Compl. ¶ 67 (emphasis added).

Sweden has issued a report noting,

The risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases. This judgement is based mainly on three factors: **the continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments, the new knowledge that detransition occurs among young adults, and the uncertainty that follows from the yet unexplained increase in the number of care seekers, an**

---

[3] Daily Mail, 7/28/22, https://bit.ly/3egeHPl (last visited Sept. 1, 2022).

[4] Wesley Smith, Finns Turn against Puberty Blockers for Gender Dysphoria, National Review, 7/21/21 https://bit.ly/3B4o5OO (last visited Sept. 1, 2022).

[5] National Academy of Medicine, France, 2/28/22 Press Release, https://bit.ly/3CL86Xm (last visited Sept. 1, 2022).

**increase particularly large among adolescents registered as females at birth.**"[6]

Emphasis added.

Meanwhile, there are no statistically significant studies that demonstrate that voluntary conversational counseling which aims to help the client towards a personally chosen goal of achieving or returning to comfort with his or her own biological sex is in any way harmful to the client. Compl. ¶ 74. To the contrary, a 2022 review concluded, "79 studies on SOCE do not provide scientific proof that they are more harmful than other forms of therapy, more harmful than other courses of action for those with SSA, or more likely to be harmful than helpful for the average client."[7] *Id*.

### 3.    "Sexual orientation" is a hopelessly vague term.

Professors Diamond and Rosky warn that "it is important to note that sexual orientation is not easy to define or measure," and "is a multifaceted phenomenon" which cannot be simplified to mere "sexual attractions," but instead incorporates (among other components) "sexual attractions, . . . sexual behavior, and sexual identity," while "identity and behavior are structured by social context, social constraints, and social opportunities." Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 52 JOURNAL OF SEX RESEARCH 3 (2016). This, say Diamond and Rosky, "obviously poses a problem for research on the causes of sexual orientation." *Id*. It also poses a severe problem for a counselor, therapist, or client who wishes to know what type

---

[6] The National Board of Health and Welfare of Sweden, *Care of children and adolescents with gender dysphoria Summary*, English translation, https://bit.ly/3B509uL (last visited Sept. 1, 2022).
[7] Peter Sprigg, (November 2020) *No Proof of Harm: 79 Key Studies Provide No Scientific Proof That Sexual Orientation Change Efforts (SOCE) Are Usually Harmful*, Family Research Council, https://bit.ly/3Q9e07u (last visited Sept. 1, 2022).

of counseling or therapeutic goals might be condemned as seeking to change "sexual orientation."

## ARGUMENT

**I.      The standard for granting a preliminary injunction**

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

It is well-settled that a showing of the infringement of a constitutional right is enough and requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In the context of constitutional claims, this principle collapses the first and second preliminary-injunction factors. *Id.*, at 806. The third and fourth factors also merge when the government is the opposing party. *Aposhian v. Barr*, 958 F.3d 969, 978, *citing Nken v. Holder*, 556 U.S. 418, 435 (2009).

Thus, in a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). This is because: (a) the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury; (b) when a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interests in having her constitutional rights protected; and (c) it is always in the public interest to prevent violation of a person's constitutional rights. *Id.* Indeed, in constitutional cases whether to grant the injunction often

turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (*per curiam*).

## II.   CHILES HAS STANDING TO BRING THIS PRE-ENFORCEMENT CLAIM

Defendants have not yet threatened to revoke Chiles' licenses.  The State may argue on that basis that she does not have standing to challenge the law.  This would not be correct.  The Tenth Circuit recently engaged in an extended analysis of a pre-enforcement First Amendment challenge to a statute.  See *Peck v. McCann*, 43 F.4th 1116, 1129-33 (10th Cir. 2022).  In that case, the plaintiff challenged a Colorado statute on First Amendment grounds, and the State argued she did not have standing to bring the challenge because she had not been prosecuted under the statute.  The Court disagreed and held that the plaintiff did have standing, because the "First Amendment context creates unique interests that lead [courts] to apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits."  *Id.*, 43 F.4th 1129. The court held that in a case such as this one in which the plaintiff argues that her speech rights have been chilled by fear of enforcement of a statute, the test for standing is as follows:

> [P]laintiffs in a suit for prospective relief based on a 'chilling effect' on speech can satisfy the requirement that their claim of injury be 'concrete and particularized' by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Peck v. McCann*, 43 F.4th 1116, 1129–30 (10th Cir. 2022), *quoting Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1088–89 (10th Cir. 2006) (*en banc*).

This standard is met in this case. As Plaintiff's career progressed, she took interest in specializations such as eating disorders, gender dysphoria and sexuality. Compl. ¶ 113.

However, after the mandates of the Counseling Censorship Law were imposed on her, Plaintiff has been unable to fully explore certain clients' bodily experiences around sexuality and gender and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect. *Id.*  The sanctions faced by counselors for violating the law are severe, ranging up to the revocation of her licenses, fines and the loss of her livelihood, Compl. ¶ 113, and Plaintiff reasonable believes she would have to put her professional licenses in jeopardy were she to engage in these constitutionally protected activities.  Compl. ¶ 94.  Plaintiff desires to counsel minors about issues of sexuality as she once did, but because of her reasonable fear of losing her license and livelihood because of the strictures of the law, her speech is chilled.  Therefore, she has standing to challenge the law.

## III.   The Counseling Censorship Law

C.R.S. § 12-245-202(3.5) states:

(a) 'Conversion therapy' means any practice or treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex.

(b) 'Conversion therapy' does not include practice or treatments that provide:

(I) Acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practice, as long as the counseling does not seek to change sexual orientation or gender identity; or

(II) Assistance to a person undergoing gender transition.

C.R.S. § 12-245-224(1) states in pertinent part:

"A person licensed, registered, or certified under this article 245 violates this article 245 if the person: . . .

(t) Has engaged in any of the following activities and practice: . . .

(V) Conversion therapy with a client who is under eighteen years of age.

## IV.     The government bears a heavy burden to justify its censorship

Normally, laws are presumed to be constitutional.  *U.S. v. Lynch*, 881 F.3d 812, 817 (10th Cir. 2018).  Exactly the opposite is true in a case such as this where the government has chosen to engage in censorship.  When the government restricts speech based on its content, the usual presumption of constitutionality is reversed, and the government bears the burden to rebut that presumption.  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); and *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002) (government bears burden).  Indeed, in cases such as this one, where the law censors based on content and viewpoint, far from being presumed constitutional, it is "presumptively invalid," *R.A. V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

The Supreme Court recently reiterated these core principles in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  The Court emphasized that to carry its burden of demonstrating the constitutionality of a censorship program, a government must generally point to historical evidence about the reach of the First Amendment's protections." *Id.*, 142 S. Ct. at 2130, *citing United States v. Stevens*, 559 U.S. 460, 468–471 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional" category of constitutionally unprotected speech).  In summary, the Supreme Court's precedents do not permit content-based speech restrictions such as those at issue in this case without "persuasive evidence" that a "long tradition of such restrictions exists."  *Otto v. City of Boca Raton, Fla.* ("*Otto II*"), 41 F.4th 1271, 1274 (11th Cir. 2022) (*denial of rehearing en banc*) (Grant, J., *concurring*). Colorado will not be able to supply any historical evidence –

much less persuasive evidence of a long tradition – showing that the words Chiles and her clients would speak to each other but for Colorado's censorship program fall outside the First Amendment's scope.

## V.    The Counseling Censorship Law unconstitutionally suppresses Kaley Chiles' speech – not her conduct and does so based on that speech's content and viewpoint.

### A.    The law censors truthful speech.

As set forth in the Introduction, *supra*, the State could invoke the Counseling Censorship Law to revoke Ms. Chiles' licenses for the offense of providing indisputably true information to her clients.  The First Amendment prohibits the government from abridging the freedom of speech. The constitutional protection afforded to speech is particularly robust when the speech in question is truthful.  "As a general matter, state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (internal quotation marks omitted).

"Under nearly every theory of free speech, the right to free speech is at its core the right to communicate – to persuade and to inform people through the content of one's message." Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277, 1304 (2005). The conversations Chiles has with her clients are just that: words entitled to full First Amendment protection. All she does is talk her clients.

### B.    Pure speech is not "conduct."

The government "cannot regulate [Chiles'] speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020);[8] *see also Jefferson Cnty. Sch. Dist. No.*

---

[8] *But cf. Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated by NIFLA* 138 S. Ct. 2361 (2018).  In *Pickup* the Ninth Circuit relied on the discredited speech/conduct dichotomy in part to uphold a California law similar to

*R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 857 (10th Cir. 1999) ("the School District cites no authority in support of the proposition that a decision to engage in protected speech at a particular time constitutes conduct that may be regulated"). Counseling "is speech, not conduct." *Brokamp v. D.C.*, 2022 WL 681205, at *1 (2022).  Though some laws that regulate conduct will incidentally affect speech, to try to bypass the First Amendment by calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *Wallschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (*en banc*). The Counseling Censorship Law prohibits Chiles from uttering words if those words might assist them in aligning their desires with their beliefs or their biology. And "[w]hen the government restricts professionals from speaking to their clients, it's restricting speech, not conduct." Volokh, *Speech as Conduct*, 90 Cornell L. Rev. at 1346.

In any other context, there would be no controversy about recognizing Chiles' speech as an information exchange indubitably entitled to First Amendment protection. Clients disclose their issues and goals to Chiles. Chiles listens and asks questions to help them.  If "the[se] acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001).Thus, Counseling Censorship Law impermissibly "sanction[s] speech directly" and not mere conduct. *Otto*, 981 F.3d at 866.

Similarly, the government cannot alchemize Chiles' speech into non-speech by labeling it as "treatment." The Court in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), repudiated this gambit.  In that case the government sought to revoke doctors' licenses for the offense of

---

the law at issue in this case.  In *NIFLA*, the Supreme Court rejected *Pickup's* core reasoning.  Surprisingly, despite the fact that its precedent had been specifically abrogated by the Supreme Court, the Ninth Circuit recently reaffirmed *Pickup's* holding.  *Tingley v. Ferguson*, 2022 WL 4076121 (9th Cir. 2022).

"recommending" the use of medical marijuana.  The government argued that the doctors' recommendation was treatment (i.e., prescribing) that could be regulated and not speech protected by the First Amendment.  The Court disagreed, stating:  "The government policy [] **strike[s] at core First Amendment interests** of doctors and patients. An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients."  Id., 309 F.3d at 636 (emphasis added).

With the Counseling Censorship Law, the State strikes at the core First Amendment interests of counselors and their clients.  As in *Conant*, an integral component of the counseling is the communication between a counselor and her client.  Counselors must be able to speak frankly and openly to clients, and any attempt to regulate pure speech by relabeling it "treatment" runs afoul of the First Amendment.  We must call words what they are: speech. *Otto*, 981F.3d at 866.

Nor can the government label Chiles' speech as incidental to conduct. As applied to talk counseling, the government will not be able to identify "any separately identifiable conduct" that its law would punish. *Cohen v. California*, 403 U.S. 15, 18 (1971). In this setting, the only conduct the government seeks to punish" is "the fact of communication," in violation of the First Amendment. *Id*. Such laws are subject to strict scrutiny.  The Counseling Censorship Law, "which prohibit[s] talk therapy on a particular – and particularly controversial – subject, [is] no exception to this rule."  *Otto II*, 41 F.4th at 1272.

To hold otherwise would allow the government to mislabel "wide swaths of protected speech" as associated with some trivial (or in this case nonexistent) conduct, label the speech as a mere "mechanism" that delivers the conduct, and freely censor the speech. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). Under this logic, what would stop the

government from suppressing a newspaper editorial as a "mechanism" incidental to "the mechanical operation of a printing press[?]" *Id* ., *citing Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974). "Simply put, it is never enough for the government to show how speech can also be framed as conduct." *Otto*, 981 F.3d at 866 (emphasis added). "Speech is not conduct just because the government says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d at 752.

If the conversations between Chiles and her clients can be dismissed as conduct instead of speech, then so can "protesting," "debating," and "book clubs." *Otto*, 981 F.3d at 865. All include some incidental activity, even though at their core they are words. "But the law does not require us to flip back and forth between perspectives until our eyes hurt." *Id* . at 865-66. Instead, the law is simple: "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Wallschlaeger*, 848 F.3d at 1307 (cleaned up).

The Supreme Court has consistently held that the government cannot characterize speech as conduct to untie its regulatory hands. For instance, *in Holder v. Humanitarian Law Project* , 561 U.S. 1 (2010), the plaintiffs challenged a federal statute that forbade providing "material support" to terrorist organizations. The government defended the statute by arguing "that the only thing truly at issue . . . is conduct, not speech," but the Supreme Court rejected that contention because "the conduct triggering coverage under the statute consists of communicating a message." *Id*. at 26-28.

In *NIFLA*, the Supreme Court held that so-called professional speech does not categorically receive less constitutional protection than any other speech. *Id*., 138 S. Ct. at 2371-72. And it warned lower courts not to "exempt a category of speech from the normal prohibition on content-based restrictions." *Id*. at 2372 (cleaned up). The Court began its

consideration of professional speech by including both the "doctor-patient discourse" and speech between counselor and client as examples of communications subject to First Amendment protections – an analysis that cannot be reconciled with relabeling such speech as unprotected conduct. *NIFLA*, 138 S. Ct. at 2374-75. Then, responding to the suggestion that such "professional speech" should receive lessened protection, the Court noted that it has never recognized such a less-protected category, and emphasized its "reluctan[ce] to mark off new categories of speech for diminished constitutional protection," going so far as to associate governmental efforts to control "the content of doctor-patient discourse" with Nazi, Romanian, and Soviet totalitarian regimes. *Id.* at 2372, 2374. By recognizing the "doctor-patient" discourse as protected speech, and by declining to create or recognize a less-protected category of "professional speech," *NIFLA* foreclosed the "speech as conduct" reasoning of cases such as *Pickup, supra*. It is a semantic dodge to argue that *NIFLA* applied only to professional speech and not to professional conduct, if the conduct in question is speech.

      **C.**      **The law is not content-neutral and it discriminates based on viewpoint.**

"The Supreme Court has held that facially '[c]ontent-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Peck v. McCann*, 43 F.4th 1116, 1134 (10th Cir. 2022), *quoting Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A restriction is content-based if it facially draws distinctions based on a speaker's message; it cannot be justified without reference to speech's content; or it was adopted because of disagreement with the message conveyed. *Reed*, 576 U.S. at 163-164. *See also Peck*, 43 F.4th 1134-35 (statute "is a content-based restriction on speech in that it targets and prohibits speech based on its content . . . As such, it is subject to strict

scrutiny").  If a law goes further and suppresses speech based "not [only on] subject matter, but [also on] particular views taken by speakers on a subject," then that law discriminates based on viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), which is a particularly "egregious form of content discrimination," *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015).

Laws that censor based on content and viewpoint are "**presumptively invalid**." *R.A. V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (emphasis added).  They so ''blatant[ly]'' violate the First Amendment, they rarely survive review, *Rosenberger*, 515 U.S. at 829.  As the Eleventh Circuit observed in *Otto*, "[t]he answer to the content-based-or-not question turns out to be . . . easy." *Id.*, 981 F.3d at 861.  The Counseling Censorship Law singles out disapproved speech based on both content and viewpoint.

A simple test to determine whether a speech restriction is content-based is to ask whether enforcement authorities must examine the content of the message that is conveyed.  *Id.* at 862, *quoting McCullen v. Coakley*, 573 U.S. 464, 479 (2014). To enforce the law at issue in this case, the government must examine what a counselor says.  The law is implicated only if the counselor discusses "sexual orientation or gender identity" in a particular manner. C.R.S. § 12-245-202(3.5)(a).  A counselor could talk about other struggles – like anxiety or addiction – without triggering the law.  Likewise, if the counselor's speech somehow "seeks to change an individual's sexual orientation or gender identity," then the law punishes that speech. C.R.S. § 12-245-224(1). But if the counselor instead "provide[s] acceptance, support, and understanding'' of the client's "identity exploration and development," then the counselor does not violate the law. C.R.S. § 12-245-202(3.5)(b)(I).  Because the law's triggers depend on "the topic discussed," it regulates speech based on content. *Reed* , 576 U.S. at 163.

A law goes further and suppresses speech based on viewpoint when it targets "the specific motivating ideology or the opinion or perspective of the speaker." *Id*. at 168-69. The Colorado law completely prohibits speech by counselors from one "ideology'' or "perspective," even if that perspective is shared by both counselor and client.

In *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018), the Supreme Court made the following statement that has profound implications with regard to this case:

> Unions can also speak out in collective bargaining on controversial subjects such as [] **sexual orientation and gender identity**[.] These are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public. We have often recognized that **such speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection**.

*Id*. 138 S. Ct. at 2476 (cleaned up; emphasis added).

This one citation alone should be dispositive.  Speech concerning the controversial subject of sexual orientation and gender identity "occupies the highest rung of the hierarchy of First Amendment values and merits special protection."  Yet, the State of Colorado, instead of allowing a free and robust exchange of ideas regarding these topics, has imposed a rigid orthodoxy that it enforces with the threat of severe economic sanctions.  The statute is hopelessly an profoundly unconstitutional.

To be sure, the law does not ban all conversations about gender identity and sexual orientation. Rather, it permits counselors to talk about these topics in a way that the government believes provides "acceptance, support, and understanding."  C.R.S. § 12-245-202(3.5)(a).  At the same time, it prohibits any speech that might tend to cause a change in a client's gender identity or sexual orientation. In doing so, the law codifies a particular viewpoint, namely, that "change in areas of sexual orientation, sexual behaviors . . . or gender identity is either

impossible or undesirable," *Otto*, 981F.3d at 864, while prohibiting counseling from the viewpoint that both felt gender identity and sexual orientations can, for at least some individuals, change to align with an individual's biology and beliefs. In doing so, the law discriminates based on viewpoint and is therefore presumptively unconstitutional.

## VI. Chiles has standing to assert the free-speech rights of her clients to receive desired counsel.

The Counseling Censorship Law materially intrudes on Chiles' clients' protected "right to receive" desired information and counsel. *See Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). "[T]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd . of Ed uc., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (emphasis in original).

The Colorado statute prevents citizens who voluntarily seek help with their gender-identity and sexual-orientation struggles from "obtaining candid and reliable information about a possible avenue" of counseling. *Conant*, 309 F.3d at 643 (Kozinski, J., concurring). Even if a client wants professional counsel and support as he seeks to align his identity or attractions with the teachings of his faith, the law demands instead that the counselor provide counseling intended to accept, support and understand his identity but not to change it. Thus, the law violates the clients' First Amendment rights.

Chiles has standing to assert her clients' free-speech claims.  The facts alleged match the criteria that courts have held authorize third- party standing in contexts that likewise involve profoundly sensitive topics relating to human sexuality, such as contraception and abortion. Chiles has a close relationship with her clients who possess the right at issue. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Her counseling sessions typically focus on topics that are

sensitive and intimate, where "candor is crucial." *NIFLA*, 138 S. Ct. at 2374. She develops a deep bond of trust with clients as together they explore how to meet the clients' objectives.

Meanwhile, there are multiple obstacles that prevent clients from "protecting their own interests. *Kowalski*, 543 U.S. at 130. First, though the law prevents clients from receiving the counsel that they desire, its burdens "fall[ ] directly and personally on the" counselor. *Conant*, 309 F.3d at 639 (Kozinski, J., *concurring*). Clients thus "are not themselves subject to prosecution and, to that extent, are denied a forum in which to assert their own rights." *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972). Second, it is emotionally very difficult or even impossible for these clients to step forward to vindicate their own rights to engage in therapeutic conversations with Chiles. These clients already experience emotional turmoil, and it is hardly speculative to predict that putting their personal difficulties into the spotlight of litigation would cause additional anguish and harm. *Id.*

Finally, where First Amendment rights are threatened, the rules for representative standing are relaxed. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Courts find standing "when enforcement of the challenged restriction against the litigant would . . . indirectly [violate] third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975); *see also Va. State Bd . of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (advertisers may assert readers' right to receive information). This concern is present here.

## VII.   The Counseling Censorship Law abridges the ability to give and receive counsel consistent with one's faith in violation of the Free Exercise Clause.

### A.      Governing legal standards

The First Amendment prohibits the government from burdening the free exercise of religion. If the government enacts a law that targets religious beliefs or practices, such a law doubtlessly violates this core protection. *Emp. Div., Dep't of Human Res. of Ore. v. Smith*, 494

U.S. 872, 877 (1990). The Free Exercise clause is violated if the government has burdened a plaintiff's sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022).

**B.    The Law is not neutral because it is based on religious hostility and targets a religious practice.**

The Constitution requires the government to commit itself to "religious neutrality." *Masterpiece Cakeshop. Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1724 (2018). Even "subtle departures from neutrality" are suspect. *Masterpiece Cakeshop*, 138 S. Ct. at 1731.  The law at issue in this case is not neutral. When the Colorado General Assembly enacted the law, it was well known that counseling from the now-prohibited viewpoint is primarily sought "for religious reasons" and provided by those who believe in Christian faith based methods. Compl. ¶ 40.  Counseling from the viewpoint and with the goals prohibited by the law is primarily a "religious . . . practice." Researchers Diamond and Rosky noted that "the majority of individuals seeking to change their sexual orientation report doing so for religious reasons rather than to escape discrimination." *Id*. The American Psychological Association similarly reported that "most [sexual orientation change efforts] currently seem directed to those holding conservative religious . . . beliefs, and recent research . . . includes almost exclusively individuals who have strong religious beliefs." Compl. ¶ 39. And the American Counseling Association asserted that "conversion therapy . . . is a religious . . . practice." Compl. ¶ 37. Thus, the law's ban falls "almost exclusively on" counselors and clients who hold "particular religious beliefs." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020).

When a law targets a religiously motivated practice, it is no cure that the law also applies to some secular conduct. "[F]acial neutrality is only the first, and by no means the determinative, step in a Free Exercise inquiry." *New Hope*, 966 F.3d at 163. A law can

implicate "multiple concerns unrelated to religious animosity" that "mask" its real target: religion. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993); *New Hope*, 966 F.3d at 163. Even if a state treats comparable secular conduct "as poorly as or even less favorably than the religious exercise at issue," that does not answer the neutrality question. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (*per curiam*). When faced with a Free Exercise issue, courts must dig beneath the surface to guard against even "subtle" departures from neutrality that can be cleverly masked by "facial neutrality." *Lukumi*, 508 U.S. at 534.

Nor can the government excuse or disguise its targeting of a primarily religiously motivated practice or viewpoint by claiming that Colorado is exercising its police powers. The government might argue the law is designed to protect the wellbeing of minors. But such a purpose overgeneralizes the issue. Even in pursuit of legitimate interests, the government cannot in a selective manner impose burdens on persons motivated by religious belief. *Lukumi*, 508 U.S. at 543. So too here.

The government's attempt to impose its views in an area of profound religious, philosophical, and scientific debate is itself a violation of neutrality. As the Supreme Court has recognized, sexual orientation and gender identity are sensitive political topics that "undoubtedly matters of profound value and concern to the public." *Janus*, 138 S. Ct. at 2476. On one side of that debate are major historic faiths, including Judaism, Christianity, and Islam, which have long taught that the only moral context for sexual relationships is within a heterosexual marriage. But Colorado now forces counselors and clients with these religious convictions to advocate only the contrary viewpoint, one that insists on "acceptance" rather than working to bring one's heart, desires, and conduct into line with the teachings of one's

own faith. It is not the government's role to decide this religious debate, but rather "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (internal quotation marks omitted). "The need to prevent the government from picking ideological winners and losers is as important" here "as it is in any other context." *Wallschlaeger*, 848 F.3d at 1328 (W. Pryor, J., *concurring*). When the government abandons its duty – when it is the one deciding which ideas should prevail – the people lose. *NIFLA*, 138 S. Ct. at 2375.

### C. The law is not generally applicable because its use of vague terms invites individualized exemptions permitting secular conduct that equally undermine the asserted governmental interest.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (cleaned up).  The Counseling Censorship Law is framed in vague terms that invite enforcement authorities to pass individualized judgment and make individualized exemptions for secular counselors of whose attitudes they approve. The law favors speech that provides "[a]cceptance, support, and understanding for the facilitation of . . . identity exploration and development."  C.R.S. § 12-245-202(3.5)(b)(I).  Simultaneously the law prohibits speech that 'seek[s] to change sexual orientation or gender identity."  *Id.*  But "exploration and development" can amount to or result in "change." The line between the allowed and the prohibited rests at the enforcement authority's "sole discretion." *Fulton*, 141 S. Ct. at 1879. And given the history and context reviewed above, it is no reach to expect that "change" that results from secular, "value-neutral" counseling will be treated as exempt and lawful, while "change" that results from counseling informed by faith-based convictions about identity and sexual morality will be treated as

unlawful. Certainly, the law's ambiguities allow ample room for that result, and that possibility "renders [the law] not generally applicable . . . because it invites the government to decide which reasons for not complying with the [law] are worthy of solicitude." *Id.* (cleaned up).

**VIII.   The law triggers strict scrutiny in any event because it infringes on two rights.**

This Court should also subject the law to strict scrutiny because it implicates both free-exercise and free-speech rights. A "hybrid-rights claim" invokes strict scrutiny. *Smith*, 494 U.S. at 881-82; *See also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 655–56 (10th Cir. 2006) (recognizing hybrid claim doctrine).  Under this doctrine, a party establishes a violation of the Free Exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right.  *Id.*, 451 F.3d at 655-56.  A plaintiff need only demonstrate that the companion constitutional claim is "colorable."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). As demonstrated above, Chiles has surpassed this low threshold.

**IX   The law violates the free-exercise rights of Chiles' clients, and she has standing to pursue their claims.**

The Counseling Censorship Law violates the free-exercise rights of Chiles' clients. "[T]he majority of individuals seeking to change their sexual orientation report doing so for religious reasons rather than to escape discrimination." Compl. ¶ 40. Some clients voluntarily want help to change their sexual attractions so they can live consistently with the teachings of their faith traditions. Compl. ¶ 111.  By preventing these individuals from having candid conversations with counselors that will help them pursue these faith-informed goals, the government infringes their free exercise of religion.  This is true even if the government finds these individuals' beliefs to be "abhorrent."  Religious beliefs need not be acceptable, logical,

consistent, or comprehensible to others in order to merit First Amendment protection. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (cleaned up).  For the same reasons noted above, Chiles has standing to pursue her clients' free-exercise claims.

**X.     The Counseling Censorship Law cannot survive strict scrutiny.**

**A.      Governing legal standards**

The law violates both Chiles' free-speech and free- exercise rights. That makes it presumptively unconstitutional. *R.A.V*, 505 U.S. at 382. The government thus bears the burden to show that the law survives strict scrutiny review, the most demanding test known to constitutional law. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). To do so, the government must demonstrate that the law is narrowly tailored to serve compelling state interests. *Reed*, 576 U.S. at 163 (free speech); *Fulton*, 141 S. Ct. at 1881 (free exercise). Colorado can demonstrate neither.

**B.      Viewpoint discrimination does not serve <u>any</u> legitimate governmental interest.**

The law's text and legislative history confirm that, in enacting the law, the government's primary interest was suppressing a viewpoint with which the government disagrees. But "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "While the law is free to promote all sorts of conduct," "it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."  Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 579 (1995).  The government has no business "picking ideological winners and losers." *Wallschlaeger*, 848 F.3d at 1328 (W. Pryor, J., concurring). No matter how much the government dislikes the ethics, goals, and religious

beliefs that motivate clients to seek counseling for unwanted gender identity and sexual

attraction issues the government may not prevent them from seeking this information.

"However noxious [a person's] ideas might [be] to the authorities, the freedom to learn about

them, fully to comprehend their scope and portent, and to weigh them against the tenets of the

conventional wisdom, may not be abridged.  *Eisenstadt v. Baird*, 405 U.S. 438, 457 (1972)

(Douglas, J., concurring).  It follows that the government has absolutely no interest in

suppressing disapproved views of human sexuality (far less a compelling interest).

Similarly, the government does not have an interest in protecting its Chiles' clients from

making what it deems to be "bad decisions" with the information she provides to them.

*Thompson v. W States Med . Ctr.*, 535 U.S. 357, 374 (2002). The State might believe that

volitional change away from transgender identification, or away from same-sex attractions, is

not possible or desirable. And it might believe that those who pursue volitional change are

making a mistake that may harm them. But the government cannot stop those clients from

voluntarily seeking emotional changes that the clients believe will increase well-being solely

because, in the government's eyes, such change is a bad decision. *Id.* The Supreme Court has

consistently rejected such an approach as illegitimately "paternalistic." *Id*. at 375. "It is

precisely this kind of choice, between the dangers of suppressing information, and the dangers

of its misuse if it is freely available, that the First Amendment makes for us." *Va. State Bd . of*

*Pharmacy* , 425 U.S. at 770.

No matter how many "professionals "agree with the government' s viewpoint, that does

not give the government an interest in silencing the other side of the debate. "[M]ajority

preferences must be expressed in some fashion other than silencing speech on the basis of its

content." *R.A.V*., 505 U.S. at 392. So "[s]trict scrutiny cannot be satisfied by professional

societies' opposition to speech." *Otto*, 981 F.3d at 869. After all, "it is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes." *Otto*, 981F.3d at 869. One example stands out. *Id*. For many years, "the American Psychiatric Association considered homosexuality a paraphilia, disorder, or disturbance." *Id*. Today that position is, "to put it mildly, broadly disfavored." *Id*. This example demonstrates why "[n]eutral principles," rather than the ever-shifting tides of "professional consensus," must govern this case and others like it. *Id*. at 869-70. "Professional opinions and cultural attitudes may have changed, but the First Amendment has not." *Id*. at 870.

**C.**    **The government cannot show the law serves a "compelling" governmental interest.**

Colorado cannot show that the law serves a compelling governmental interest on the ground that speaking certain words would be "harmful." Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574. Ideas may have consequences, but those consequences cannot support censorship unless they present a high and immediate risk of physical harm. *See Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (*per curiam*). Even then, the "degree of imminence" that physical harm will occur must be "extremely high before" speech can "be punished." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978). And the government would need "actual facts" that show that a counselor and her client speaking words to each other causes physical harm. *Id*. at 843. Instead, the government has produced only conjecture, and conjecture does not give the state an interest in suppressing an idea it considers harmful.

The government does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011).[9]  Minors are entitled to a significant measure of First Amendment protection, and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from **ideas or images that a legislative body thinks unsuitable for them**." Id. (emphasis added).

In *Brown,* the Supreme Court reviewed a California law regulating minors' access to violent video games.  The Court found that the law burdened speech and that strict scrutiny applied.  California asserted it had a compelling interest in restricting minors' access to these games because these games were harmful to minors.  The Court evaluated social science evidence regarding alleged harm to minors to assess that claim and found it wanting.  The Court rejected this evidence because it suggested a mere correlation between watching the video games and the harmful effects alleged by the state.  *Id*., 564 U.S. at 800.  The evidence did not prove the video games directly caused the harmful effects.  *Id*.  This "fallacy of association" is precisely the problem with the research supporting the government's purported interest in this case.  See the detailed discussion on page 5 above.

The legislators who sponsored the bill that became the Counseling Censorship Law asserted that there is a correlation between minors' hearing words that did not unambiguously affirm their sexual identify and increased risk of suicide.[10]  Under *Brown*, that evidence is

---

[9] The State cannot rely on cases approving so-called "harmful to minors" statutes.  *Brown*, 564 U.S. at 793. Obscenity is not a protected category of speech, and those statutes ban exposing minors to materials that are obscene from their perspective.  *Id*.

[10] See, e.g., House Committee on Public Health Care & Human Services, February 13, 2019 (available at https://bit.ly/3qzptD2), timestamp 1:00:20 to 1:01:04 (prime sponsor Rep. Michaelson Jenet).

insufficient to establish a compelling governmental interest, because as discussed in detail on

page 5 above, that research suffers from the exact "fallacy of association" condemned in

*Brown*.  Indeed, as discussed above, later, higher quality research reached the opposite

conclusion.

Colorado "bears the risk of uncertainty, *Id*., 564 U.S. at 799-800.  Therefore,

"ambiguous proof will not suffice."  *Id*.  The State must show that the words they have

prohibited **directly** cause the harm they seek to prevent.  The State has failed to make such a

showing.  Indeed, the most current evidence is that just the opposite is true.  The government's

suppression of speech and compelled over-affirmation is more likely to be harmful than

providing true information.  And this is why, as discussed above, European health agencies are

turning away from an "affirm at all costs" approach to counselling.  Compl. ¶¶ 65-68.

> **D.**      **The law is both overinclusive and underinclusive.**

"A narrowly tailored regulation . . . does not sweep too broadly (is not overinclusive)

[and] does not leave significant influences bearing on the interest unregulated (is not

underinclusive)" *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005); *accord*

*Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227-28 (9th Cir. 2019). Colorado's law fails

on both counts.

The Colorado statute sweeps more broadly than necessary. "Precision must be the

touchstone when it comes to regulations of speech," but Colorado's law widely misses this

mark. *NIFLA*, 138 S. Ct. at 2376 (cleaned up). The sponsors of the law insisted that its purpose

was to stop unscrupulous counselors from psychologically abusing minors by forcing them to

convert to a different sexual identity against their will.  For example, Senator Stephan Fenberg

was the prime senate sponsor, and he testified that the purpose of the bill was to prevent

counselors from using "harmful practices such as rejection and shame and psychological abuse to try to **force** young people into being somebody different from who they are." Senate Committee on State, Veterans, & Military Affairs, March 18, 2019, https://bit.ly/3RDpRfX, timestamp 3:43:08-20 (emphasis added).  Similarly, on the senate floor, Senator Fenberg stated "minors should not be subjected to this by a licensed professional, which is assuming it is essentially **against their will**." Senate Second Reading Debate, March 21, 2019, https://bit.ly/3B2FcPO, timestamp 1:11:23-31 (emphasis added).

If the State wanted to stop coercive therapy of minors, it could have done so without suppressing voluntary speech between counselors and clients, such as that in which Plaintiff engages with her clients.  In fact, an amendment was offered that would have limited the law to coercive practices.  *Id.*, timestamp 1:15:20.  Senator Gardner explained that the amendment "makes this a bill that talks about coercive means, things that are not consensual."  *Id.*, timestamp 1:19:58 -20:15.  He argued that the bill was overbroad because it swept in constitutionally protected speech by prohibiting the voluntary speech choices of free individuals:

> We have in this country had discussions about people's identity, gender identity, and orientation that suggests that it may for some be fluid, it may be changeable, it may be something that they not only would seek support of but they might make a choice about.  And if they did, they ought to be able to seek the therapy to help them not only clarify their choice but then to convert to the choice that they as a free human being have made.

*Id.*, timestamp 1:21:01-32. The bill sponsor opposed the amendment designed to limit the reach of the bill to coercive practices and the amendment failed.  *Id.*, timestamp 1:22:47-49 and 1:25:25-27.

The law is also underinclusive with respect to its purported purpose, as even the State's own witness testified.  Dr. Robert Werthwein is the Director of the Office of Behavioral Health

in the Colorado Department of Human Services, and he testified at the House hearing on the

bill.  In response to the question "are we leaving any professions out?" from Representative

Singer, Dr. Werthwein stated:  "I believe we are; those are unlicensed professionals." House

Committee on Public Health Care & Human Services, February 13, 2019 (available at

https://bit.ly/3qzptD2), timestamp 1:09:56 to 1:10:11.  Such an exclusion from the effects of the

law is inexplicable, because counseling by unlicensed professionals would surely have the same

psychological effect (whatever that disputed effect may be) as speech by licensed counselors.

This further undermines any contention that the law "brook[s] no departures" from achieving its

goals. *Fulton*, 141 S. Ct. at 1882.

XI. **The Counseling Censorship Law violates Due Process because it invests enforcement authorities with unfettered discretion to punish speech with which they may disagree.**

Due process prevents the government from enacting a law so vague that "its

prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A

law "can be impermissibly vague . . . if it authorizes or even encourages arbitrary and

discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Due process concerns are entwined with and heightened by First Amendment concerns.

Vague laws "raise[] special First Amendment concerns" because they empower the government

to silence viewpoints with which it disagrees. *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

Where First Amendment freedoms are at stake, a great "degree of specificity and clarity of laws

is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020).  When "[d]efinitions of

proscribed conduct . . . rest wholly or principally on the subjective viewpoint of a law

enforcement officer," such laws "run the risk of unconstitutional murkiness." *Id* . at 666.

Multiple ambiguities at the center of the Counseling Censorship Law combine to leave so much to the subjective viewpoint of enforcement authorities that the law impermissibly empowers them to silence only speech with which they disagree.  The law purports to prohibit speech that seeks to change gender identity or sexual orientation.  But it excepts speech that encourages "exploration and development."  C.R.S. § 12-245-202(3.5)(b)(I).  But "development" is indisputably a type of "change," and "exploration" implies at least openness to change. Counseling conversations that encourage "exploration and development" could sound identical to counseling that encourages "change." The law provides no clarification nor means of differentiation. This leaves it too easy for enforcement officials to tag as prohibited only counseling that facilitates "change" or development in a direction of which they disapprove. Almost certainly, that will mean punitive action against any speech directed towards achieving comfort with a gender identity aligned with a client's biology, but approval of any speech directed towards achieving a gender identity at odds with a client's biology.

Consider a young client who currently expresses a transgender identity at school but feels conflicted and unstable and seeks counseling. The counselor encourages that client to "explore" what the client's struggles surrounding gender mean and how that client wants to live. The client takes the counselor's advice and, after both thought and prayer, decides to "change" her gender identity back to align with her biological sex. Together, the client and counselor celebrate this result. Did the counselor's advice run afoul of the law? The law does not clarify. Ostensibly, the counselor merely encouraged "exploration," but that "exploration" led the client to "change," and the counselor could be punished because under the law government officials are left with a free rein to discriminate between favored "change" and disfavored "change."

As a result of these ambiguities, whether the counselor's speech qualifies as encouraging "exploration" or "change" is left to the subjective judgments of enforcement authorities. *Edge,* 929 F.3d at 667. Counselors like Chiles are thus left guessing as to when their speech crosses the line "and wrong guesses will yield severe consequences." *Wallschlaeger*, 848 F.3d at 1319. With the counselor's license and livelihood at risk, "a statute written in muted shades of gray will not suffice." *Id.*

## CONCLUSION

Kaley Chiles wants to help her clients achieve the lives and the personal goals that they have set out for themselves based on their own beliefs and wishes. She can no longer do so under Colorado's unconstitutional Counseling Censorship Law. That law forces Chiles to make a choice. She must either forego discussing sexual identify issues with a minor (even if a particular minor urgently wants to do so) lest she somehow violate the law.  Her only alternative would be to counsel those clients according to the government's approved orthodoxy, regardless of what she or the client want. The Constitution does not countenance the invasion of these deeply intimate discussions.  Accordingly, Chiles respectfully requests the Court to enjoin the State from enforcing the Counseling Censorship Law against her.

Respectfully submitted this 22nd day of September 2022.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
Voice: (303) 205-7870
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard

Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington