**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2287-CNS-STV**

**KALEY CHILES**,

Plaintiff,

v.

**PATTY SALAZAR**, in her official capacity as Executive Director of the Department of Regulatory Agencies; et al.

Defendants.

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................................2

BACKGROUND ....................................................................................................3

I. Conversion therapy is ineffective and dangerous to minors.............................3

II. Colorado's Minor Conversion Therapy Law ...................................................4

PRELIMINARY INJUNCTION STANDARD.......................................................6

ARGUMENT ........................................................................................................8

I. Plaintiff's First Amendment Freedom of Speech claim fails because the Law regulates

    professional conduct, not speech. ...................................................................8

    A. Plaintiff's complaint does not propose treatment that would violate Colorado's Law. ..........9

    B. Colorado's Law regulates professional conduct.................................................11

    C. Preventing the harms caused by conversion therapy is a legitimate state interest that

        is not only important, but compelling, and reaches only the offending conduct. ...............19

II. Plaintiff fails to establish third-party standing on behalf of any minor clients and

    asserts unclear and undefined claims that are not likely to succeed on the merits. .................23

    A. Plaintiff lacks standing to bring a claim on behalf of her alleged minor clients. .................23

    B. The Law does not reduce the information available to any person seeking

        knowledge concerning conversion therapy. ........................................................25

    C. The Law does not infringe upon any of Plaintiff's minor client's First Amendment

        right to free exercise of religion. ....................................................................26

# TABLE OF CONTENTS

**PAGE**

III. Plaintiff has failed to establish likelihood of success on her own First Amendment Free Exercise claim because the Law is neutral and generally applicable and therefore subject to rational basis review. ............................................................................................27

   A. The Law is neutral because it is directed at a therapy practice and does not restrict religious exercise.........................................................................................................28

   B. The Law is generally applicable because it does not contain a mechanism for individualized exemptions and prohibits conversion therapy whether or not the licensed practitioner would employ such therapy for secular or religious reasons.............30

   C. Plaintiff has not brought any colorable companion claim that would trigger the hybrid-rights doctrine for her claims....................................................................................33

IV. Plaintiff cannot establish any Due Process violation under the Fourteenth Amendment because the Law is clear. ...........................................................................................34

V. The remaining preliminary injunction factors all weigh in favor of Defendants....................37

   A. Plaintiff has not shown an irreparable injury because Plaintiff's proposed conduct does not violate the Law....................................................................................................37

   B. The balance of equities and the public interest weigh in the Defendants' favor.................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

PAGE

**CASES**

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10ᵗʰ Cir. 2021) ............................................. 34

*Adventist Health Sys./Sunbelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 3:20-CV-

00101, 2021 WL 973455 (S.D. Iowa Mar. 12, 2021) ............................................. 39

*Ashaheed v. Currington*, 7 F.4th 1236 (10th Cir. 2021) ................................................ 27

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ....................................................................... 7

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) .................................... 22

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) .............. 25

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067 (10th Cir. 2009) .... 7, 39

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) .................................................................... 38

*Bethel Ministries, Inc. v. Salmon*, No. CV 19-01853, 2020 WL 292055 (D. Md. Jan. 21,

2020) .................................................................................................................. 39

*Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) ....................................................... 36

*Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) .............................. 15

*Cf. Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ..................................................... 22

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,

561 U.S. 661 (2010) ........................................................................................... 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ................. 27, 29

*Collins v. Texas*, 223 U.S. 288 (1912) ........................................................................... 13

*Crane v. Johnson*, 242 U.S. 339 (1917) ......................................................................... 13

*Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214 (11th Cir. 2022) ...................... 16

iv

# TABLE OF AUTHORITIES

**PAGE**

*Dent v. West Virginia*, 129 U.S. 114 (1889) ............................................................. 12

*Denver Homeless Out Loud v. Denver*, 32 F.4th 1259 (10th Cir. 2022) ................................. 7, 37

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)......................................... 11, 17

*Doe ex rel. Doe v. Governor of New Jersey,* 783 F.3d 150 (3d Cir. 2015) ................................. 24

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith,* 494 U.S. 872 (1990)............................... 30, 31, 33

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) ......................... 15

*Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017)........................................... 34

*Ferguson v. People*, 824 P.2d 803 (Colo. 1992)........................................................... 19

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019) ................... 7

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)............................................ 28, 30, 31, 33

*Grace United Methodist Church v. City of Cheyenne,* 451 F. 3d 643 (10th Cir. 2006) .............. 28

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)......................................................... 34

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116 (3rd Cir. 2020) ....................................................................................................... 15

*Griswold v. Connecticut*, 381 U.S. 479 (1965)........................................................... 25

*Harmon v. City of Norman*, 981 F.3d 1141 (10th Cir. 2020) ...................................... 7, 9

*Heller v. Doe*, 509 U.S. 312 (1993) ...................................................................... 17

*Hill v. Colorado*, 530 U.S. 703 (2000) .............................................................. 34, 35

*Hines v. Quillivan*, 982 F.3d 266 (5th Cir. 2020) ....................................................... 15

*Holder v. Humanitarian L. Project,* 561 U.S. 1 (2010) ................................................. 34

*Hyman v. City of Louisville*, 132 F. Supp. 2d 528 (W.D. Ky 2001)............................... 36

# TABLE OF AUTHORITIES

**PAGE**

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................................... 38

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) .......................................................... 20

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ...................................... 27, 29

*King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014) ................................... 25

*Kowalski v. Tesmer,* 543 U.S. 125 (2004) ............................................................ 24, 38

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ................................................ 25

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) ............................. 28

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 138 S. Ct. 2361 (2018) ................................. passim

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 7

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ........................................................... 3, 36

*Ohralik v. Ohio Bar Ass'n*, 436 U.S. 447 (1978) ............................................ 11, 12, 19

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) .................................... 16, 17

*Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013) ...................................................... 18

*Pickup v. Brown*, 740 F.3d 1208 (2014) .................................................................. 17

*PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010) ........................... 22, 23, 40

*Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833 (1992) ........................... passim

*Powers v. Ohio*, 499 U.S. 400 (1991) ..................................................................... 23

*Reynolds v. Talberg,* 2020 WL 6375396 (W.D. Mich. Oct. 30, 2020) ......................................... 36

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ........................... 18

*Salazar v. Buono*, 130 S. Ct. 1803 (2010) ................................................................ 39

*Singleton v. Wulff*, 428 U.S. 106 (1976) ................................................................. 24

# TABLE OF AUTHORITIES

**PAGE**

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................... 18

*Swanson v. Guthrie Indep. Sch. Dist. No. I-L,* 135 F.3d 694 (10th Cir. 1998) ............................. 33

*Tandon v. Newsom,* 141 S. Ct. 1294 (2021) ................................................................ 31

*Taylor v. Roswell Indep. Sch. Dist.,* 713 F.3d 25 (10th Cir. 2013) ................................................ 33

*Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014) ......................................................... 22

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ...................................................... 17, 25, 30, 36

*United Pub. Workers v. Mitchell,* 330 U.S. 75 (1947) .................................................. 25

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt.*

    *Consultants, Inc.,* 883 F.2d 886 (10th Cir. 1989) ..................................................... 6

*United States v. Richter*, 796 F.3d 1173 (10th Cir. 2015) ....................................................... 34, 35

*United States v. Rutherford*, 442 U.S. 544 (1979) .......................................................... 4

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Couns., Inc.*, 452 U.S. 748 (1976) ........... 25

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)........................ 34, 35

*Virden v. City of Austin*, No. 1:21-CV-271, 2021 WL 2744572 (W.D. Tex. July 1, 2021),

    *aff'd* No. 21-50597, 2021 WL 4955613 (5th Cir. Oct. 25, 2021)........................................... 39

*Vizaline, L.L.C. v. Tracy*, 949 F.3d 927 (5th Cir. 2020) ............................................... 15

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................................... 36

*Watson v. Maryland*, 218 U.S. 173 (1910) ................................................................ 12

*Whalen v. Roe*, 429 U.S. 589 (1977)......................................................................... 15

*Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................................. 15

# TABLE OF AUTHORITIES

**PAGE**

**STATUTES**

A.B. 3371, 215th Leg., Reg. Sess. (N.J. 2013) ................................................................ 5

A00576, Reg. Sess. (N.Y. 2019) ..................................................................................... 5

H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2016) .................................................... 5

H.B. 2307, Reg. Sess. (Or. 2015) .................................................................................... 5

H.B. 386, Reg. Sess. (Va. 2020) ..................................................................................... 5

H.B. 664, 30th Leg., Reg. Sess. (Haw. 2019) ................................................................. 5

H.B. 6695, Reg. Sess. (Conn. 2017) ............................................................................... 5

H140, 19th Gen. Ct., Reg. Sess. (Mass. 2019) ............................................................... 5

H5277A, Reg. Sess. (R.I. 2017) ...................................................................................... 5

L.D. 1025, 129th Leg., Reg. Sess. (Me. 2019) ............................................................... 5

S.132, Reg. Sess. (Vt. 2016) ........................................................................................... 5

S.B. 1028, Reg. Sess. (Md. 2018) ................................................................................... 5

S.B. 1172, Reg. Sess., (Cal. 2012) ................................................................................. 5

S.B. 121, Reg. Sess. (N.M. 2017) .................................................................................. 5

S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017) .................................................................. 5

S.B. 270, 29th Leg., Reg. Sess. (Haw. 2017) ................................................................. 5

S.B. 5722, Reg. Sess. (Wash. 2018) ............................................................................... 5

S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018) .................................................... 5

U.S. Const. art. XIV ........................................................................................................ 2

viii

# TABLE OF AUTHORITIES

**PAGE**

## COLORADO STATUTES

§ 12-20-102, C.R.S. ................................................................................................. 5

§ 12-40-404, C.R.S. ................................................................................................. 5

§ 12-240-121, C.R.S. ............................................................................................. 18

§ 12-245-101 to 806, C.R.S. .................................................................................... 5

§ 12-245-101, C.R.S. ................................................................................................ 5

§ 12-245-202(3.5)(a), C.R.S. ................................................................. 6, 10, 11, 37

§ 12-245-202(3.5)(b)(I), C.R.S. ............................................................................... 9

§ 12-245-202(3.5)(b), C.R.S. ............................................................................... 6, 9

§ 12-245-202(3.5), C.R.S. ...................................................................................... 26

§ 12-245-204(3.5), C.R.S. ...................................................................................... 36

§ 12-245-217, C.R.S. ................................................................................... 5, 21, 30

§ 12-245-224(1)(t)(V), C.R.S. ......................................................................... 5, 28

§ 12-245-224(t)(IV), C.R.S. ................................................................................... 13

§ 12-245-224, C.R.S. ................................................................................................ 5

§ 12-245-226, C.R.S. ................................................................................................ 5

§ 12-245-603, C.R.S. .............................................................................................. 13

§ 12-245-702, C.R.S. ................................................................................................ 5

§ 12-245-703, C.R.S. ................................................................................................ 5

§ 12-245-803, C.R.S. .............................................................................................. 14

§ 24-34-301(3.5), C.R.S. ........................................................................................ 35

# TABLE OF AUTHORITIES

**PAGE**

§ 24-34-301(7), C.R.S. ................................................................................................ 35

18 U.S.C. § 249(c)(4) ................................................................................................ 36

H.B. 19-1129 .............................................................................................................. 2

**RULES**

4 CCR 737-1:1 at 17 ............................................................................................ 21, 32

4 CCR 744-1:1 at 18 ............................................................................................ 21, 32

4 CCR 744-1:1 at 6 ................................................................................................... 5

**OTHER AUTHORITIES**

4 William Blackstone, Commentaries, 130 ............................................................... 12

Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts*, 1-2 (Feb. 2021),

    https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ................... 3

Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT*

    *Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J.

    Homosexuality 159 (2020) ................................................................................... 4

Geraldine Macdonald, et al., *The effectiveness, acceptability and cost-effectiveness of*

    *psychosocial interventions for maltreated children and adolescents: an evidence*

    *synthesis*, Health Tech. Assessment, No. 20.69,

    https://www.ncbi.nlm.nih.gov/books/NBK385382/ ............................................. 14

Nissa M. Strottman, *Public Health and Private Medicine: Regulation in Colonial and*

    *Early National America*, 50 Hastings L.J. 383, 389 ............................................. 12

*Office of Suicide Prevention Annual Report 2020-2021* .......................................... 14

**TABLE OF AUTHORITIES**

PAGE

*Prohibit Conversion Therapy for A Minor: Hearing on HB 19-1129 Before the Sen.*

    *Comm. On State, Veterans, & Military Affairs*, 70th Sess. (2019) ......................................... 29

*See* Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity*

    *Conversion Efforts and Psychological Distress and Suicide Attempts Among*

    *Transgender Adults*, 77 JAMA Psychiatry 68, 73 (2020) ........................................................ 4

Wendy E. Parmet, *Health Care and the Constitution: Public Health and the Role of the*

    *State in the Framing Era*, 20 Hastings Const. L.Q. 267, 287, 291 (1992) ............................. 12

## INTRODUCTION

To protect minors from documented harms inflicted by an ineffective form of therapy, in 2019, the State of Colorado passed and codified House Bill 19-1129 (the "Minor Conversion Therapy Law," or the "Law"). The Law is based in medical consensus that conversion therapy, which seeks to change a person's sexual orientation or gender identity, is ineffective, unnecessary, and dangerous. Exposure to conversion therapy has been found by multiple studies to increase the risk of suicidality of minors. In Colorado, suicide is the leading cause of death among minors. Colorado has a compelling interest in reducing the risk of harm to minors, including the fatal risks of suicidality. As a result, through the Law, Colorado has prohibited mental health practitioners licensed and registered with the state from practicing conversion therapy on minors.

Plaintiff challenges the Law, asserting that it infringes her constitutional rights to Freedom of Speech and Free Exercise of Religion, along with her minor clients' same constitutional rights, as well as a due process claim under the Fourteenth Amendment. The claims asserted are not likely to succeed on the merits for three reasons: 1) the Minor Conversion Therapy Law regulates professional conduct, not speech; 2) Plaintiff fails to establish third-party standing on behalf of her clients; 3) the Minor Conversion Therapy Law is neutral and generally applicable and is therefore subject to rational basis review. Nor has Plaintiff established an irreparable injury and the balance of equities and the public interest tip in the State of Colorado's favor. For these reasons, Plaintiff's Motion for Preliminary Injunction should be denied.

## BACKGROUND

### I.   Conversion therapy is ineffective and dangerous to minors.

The State of Colorado has compelling public health and safety interests in protecting minors from what are well-known, dangerous, and clinically unnecessary harms inflicted by the practice of conversion therapy. Conversion therapy needlessly seeks—and unequivocally fails— to "promot[e] a particular sexual orientation and/or gender as a preferred outcome." Declaration of Dr. Judith Glassgold ("Decl.") ¶ 18. The leading associations that develop the standard of care for medical and mental health care for children all reject conversion therapy as both ineffective and harmful. Decl. ¶ 16.

Human sexuality and gender identity are not afflictions that require remedy. The U.S. Supreme Court has found that "psychiatrists and others [have] recognized that sexual orientation is both a normal expression of human sexuality and immutable." *Obergefell v. Hodges*, 576 U.S. 644, 661 (2015). The American Psychological Association has reaffirmed that "diversity in gender identity and expression is part of the human experience." Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts*, 1-2 (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf. Normal diversity in sexuality and gender identity renders the practice of conversion therapy unnecessary.

Along with its ineffectiveness, conversion therapy also inflicts harm, including increased rates of suicidality. Conversion therapy's harmfulness has been confirmed in at least twelve research studies, four systematic reviews, and two independent evaluations of conversion therapy and the attendant research. Decl. ¶ 14. Documented harms include loss of sexual feeling, depression, anxiety, increased negative self-esteem, negative changes in family relationships,

loss of faith, and suicidality. *Id.* at ¶¶ 65-68. One recent study found that more than 60 percent of young adults who had undergone conversion therapy as minors reported attempting suicide. Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. Homosexuality 159 (2020). The American Medical Association established that exposure to conversion therapy at any time in a transgender person's life was "associated with increased odds of lifetime suicide attempts." *See* Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68, 73 (2020). Every major medical and psychological association in America rejects the use of conversion therapy in their professional guidelines as falling well below the standard of care and unsafe for minors under any circumstances. Decl. ¶ 15.

A treatment is determined "unsafe if its potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit." *United States v. Rutherford*, 442 U.S. 544, 556 (1979). "Studies dating across two decades have evaluated [conversion therapy] and identified it as a potentially harmful treatment." Decl. ¶ 61. Further study on the documented harms would likely violate ethical guidelines that prevent "studying an intervention that has no benefits and poses a risk of harm." *Id.* at ¶ 58. The danger of fatality, among other harms, caused by the practice of conversion therapy is not offset by any benefit.

## II.   Colorado's Minor Conversion Therapy Law

The Minor Conversion Therapy Law shields minors from the extreme dangers of conversion therapy. By prohibiting the practice of conversion therapy on minors, Colorado has advanced its compelling interests in public health and safety. Colorado is not the first state to

place limitations upon the practice of conversion therapy by mental health professionals; multiple states have implemented similar prohibitions.[1]

The Minor Conversion Therapy Law amended Colorado's Mental Health Practice Act ("MHPA"), at COLO. REV. STAT §§ 12-245-101–806. The Legislature established the MHPA as the statutory framework to "safeguard the public health, safety, and welfare of the people of this state and in order to protect the people of this state against the unauthorized, unqualified, and improper application of psychology, social work, marriage and family therapy, professional counseling, psychotherapy, and addiction counseling." C.R.S. § 12-245-101 (2022). The MHPA may not be construed to apply to "a person engaged in the practice of religious ministry," under C.R.S. § 12-245-217. All other professions listed in C.R.S. § 12-245-217 who practice psychotherapy are required to comply with the Minor Conversion Therapy Law either by statute or administrative rule. C.R.S. §§ 12-20-102, 12-40-404, 12-245-224, 12-245-226, 12-245-702, 12-245-703; *see also* 4 COLO. CODE REGS. § 744-1:1.6.

The Law amended C.R.S. § 12-245-224, to include "[c]onversion therapy with a client who is under eighteen years of age" as a prohibited activity under the MHPA. C.R.S. § 12-245-224(1)(t)(V). The MHPA was also amended to define "conversion therapy" as "any practice or

---

[1] States that have passed similar laws concerning conversion therapy include: S.B. 1172, Reg. Sess., (Cal. 2012); H.B. 6695, Reg. Sess. (Conn. 2017); S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018); S.B. 270, 29th Leg., Reg. Sess. (Haw. 2017)(prohibiting sexual orientation change efforts therapy upon minors) and H.B. 664, 30th Leg., Reg. Sess. (Haw. 2019)(amending to include gender identity change efforts); H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2016); L.D. 1025, 129th Leg., Reg. Sess. (Me. 2019); S.B. 1028, Reg. Sess. (Md. 2018); H140, 19th Gen. Ct., Reg. Sess. (Mass. 2019); S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017); A.B. 3371, 215th Leg., Reg. Sess. (N.J. 2013); S.B. 121, Reg. Sess. (N.M. 2017); A00576, Reg. Sess. (N.Y. 2019); H.B. 2307, Reg. Sess. (Or. 2015); H5277A, Reg. Sess. (R.I. 2017); S.132, Reg. Sess. (Vt. 2016); H.B. 386, Reg. Sess. (Va. 2020); S.B. 5722, Reg. Sess. (Wash. 2018).

treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce romantic attraction or feelings toward individuals of the same sex." C.R.S. § 12-245-202(3.5)(a). The definition of conversion therapy "does not include practices or treatments that provide: [a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity; or [a]ssistance to a person undergoing gender transition." C.R.S. § 12-245-202(3.5)(b).

The Minor Conversion Therapy Law allows:

- Mental health providers to communicate with the public about conversion therapy;
- Mental health providers to express their views to patients, whether children or adults, about conversion therapy, sexual orientation, or gender identity, or any other topic;
- Mental health providers to administer conversion therapy to any person who is 18 or older;
- Mental health providers to refer minors to religious ministers;
- Those engaged in religious ministry, regardless of licensure or registration as a mental health provider, to administer conversion therapy to children or adults; and
- Minors to seek conversion therapy from mental health providers in other states.

The Minor Conversion Therapy Law has been in effect for over three years.

## PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir. 1989). "Because it constitutes drastic relief to

be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established." *Id*. A plaintiff seeking a preliminary injunction must establish each of these factors: that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. The last two factors—assessing the harm to the opposing party and weighing the public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 434-35 (2009); *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277-78 (10th Cir. 2022).

In claims about a law's implication of First Amendment rights, the plaintiff has the initial burden of showing that the First Amendment applies to their conduct. *Harmon v. City of Norman*, 981 F.3d 1141, 1147 (10th Cir. 2020). Only if the plaintiff can make this threshold showing does the burden shift to the government to show the law's constitutionality. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

There are three types of injunctions that are disfavored and require a "strong showing" by the movant that they can satisfy a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). These disfavored injunctions fall into three categories: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. *Id*. In seeking such an injunction, the movant must "make[ ] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).

## ARGUMENT

Applying the standard for granting a preliminary injunction demands the denial of Plaintiff's Motion for Preliminary Injunction because Plaintiff has failed to meet any of the factors.

First, Plaintiff has failed to show a likelihood of success on the merits on any of the claims arising under the First or Fourteenth Amendments.

### I.    Plaintiff's First Amendment Freedom of Speech claim fails because the Law regulates professional conduct, not speech.

Plaintiff's first claim concerns her First Amendment right to Freedom of Speech, asserting that the Minor Conversion Therapy Law limits her desired therapeutic practice and therefore infringes that constitutional right. However, Plaintiff fails to demonstrate that the treatment she wishes to provide to minor clients would violate the Law. By her own assertions, Plaintiff does not seek to engage in these harmful therapeutic interventions. Even if she did, such conduct is regulated by the Law and the MHPA to protect minors from known dangers and harms. This does not infringe Plaintiff's right to free speech.

Plaintiff remains free to engage in conversations about "behavior, practice, identity, attractions, sexual fantasy, romantic attractions, and erotic desires" regardless of the object of a client's attraction or their gender identity. Compl. ¶ 91. The Law is a regulation of professional conduct that has been narrowly tailored to address only therapeutic interventions known to seriously harm minors.

### A.      Plaintiff's complaint does not propose treatment that would violate Colorado's Law.

At the outset of her claims, Plaintiff misinterprets what therapeutic conduct would violate the Minor Conversion Therapy Law and the complaint fails to meet its initial burden showing that the First Amendment applies to her proposed conduct or limits her constitutional rights to free speech. *Harmon*, 981 F.3d at 1147.

First, Plaintiff mischaracterizes the Law as preventing minors from seeking the counseling she wishes to provide, including "counseling to address conflict about, or questions concerning, [a client's] unwanted same-sex attractions, behaviors, and identities." Compl. ¶ 4. This is not correct. The Law explicitly states that conversion therapy "does not include practices or treatments that provide: [a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices... ." C.R.S. § 12-245-202(3.5)(b). Plaintiff can and should provide acceptance, support, and understanding for a minor client's distress arising from conflicts and concerns over their "unwanted" same-sex attractions, behaviors, and identities.

Nor does the Law discriminate between counseling designed to support heterosexual clients or LGBTQ clients wishing to explore sexual attraction, behaviors, or identity. The Law permits all minor clients to receive supportive counseling that reduces distress related to sexual attractions, gender identities, and any related conflicts. The Law makes clear that "sexual-orientation-neutral interventions" are permitted to address unlawful or unsafe sexual practices. C.R.S. § 12-245-202(3.5)(b)(I).  The Law would not interfere with support for a minor client who seeks to reduce or eliminate sexual behaviors, unless the therapy condoned some sex and

criticized other sex on the basis of sexual orientation. For example, minor clients who wish to abstain from sexual activity—whether for family planning, health, or religious reasons—can and should be supported by therapy that addresses sexual attraction and behaviors.

The Law prohibits only one type of harmful therapeutic practice "that attempts or purports to change an individual's sexual orientation or gender identity." C.R.S. § 12-245-202(3.5)(a). It is only therapeutic intervention that promotes a particular sexual orientation or gender as a preferred outcome that is prohibited. This narrow conduct proscription allows Plaintiff to support minor clients, while avoiding outcome-determinative interventions known to be ineffective and to cause significant harm. Far from endorsing any governmental ideological beliefs, the Law prohibits preferred-outcome interventions regardless of, and without reference to, a client's sexual orientation or gender identity.

Second, Plaintiff's Complaint does not indicate that the services she provides to her minor clients violate the Law. Plaintiff states that she "does not seek to 'cure' clients of same-sex attractions or to 'change' clients' sexual orientation." Compl. ¶ 87. Plaintiff denies using aversive techniques, and states that she "does not imply that categorical change in attractions is a therapeutic goal." *Id.* "Plaintiff does not begin counseling with any predetermined goals," and provides supportive therapy with clients who are content with their sexual identity. *Id.* at ¶¶ 85-86. Taking her allegations as true, Plaintiff's practice is in accord with Colorado's Law. Plaintiff can and should help minor clients "understand the sources, causes, and origins of their feelings," all of which conforms to both Colorado's Law and the relevant standards of care. *Id.* at ¶¶ 83, 96.

The interventions Plaintiff wishes to employ also do not violate the Law, as they do not seek to reduce or eliminate same-sex sexual attractions, behaviors, or gender identity. The

practice described in Plaintiff's Complaint falls outside of the definition of conversion therapy in C.R.S. § 12-245-202(3.5)(a). Plaintiff appears to misunderstand the Law and the standard of care guidelines governing her practice as carving out a taboo topic of speech rather than governing a type of harmful therapeutic intervention.

### B. Colorado's Law regulates professional conduct.

But even if Plaintiff intended to violate Colorado's Minor Conversion Therapy Law, her claim would still fail on the merits. As a regulation of professional conduct, even one that incidentally includes speech, the Law satisfies the minimal level of scrutiny required.

Because the Law concerns licensed and registered mental health providers under the MHPA, Plaintiff's free speech claims are controlled by *Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, which held that "States may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 138 S. Ct. 2361, 2372 (2018). Professional conduct that involves speech is "afforded less protection" under the Free Speech Clause. *Id.*

The Supreme Court has directed lower courts to two explanatory cases describing the types of constitutional regulations of professional conduct that incidentally involved speech. *Id.* at 2373. First, in *Planned Parenthood of Southeastern Pa. v. Casey*, the Court upheld an informed consent statute because it regulated speech "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." 505 U.S. 833, 884 (1992) (overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022)). Second, in *Ohralik v. Ohio Bar Ass'n*, the Court held that preventing lawyers from soliciting clients in person following an accident was a reasonable regulation of professional conduct that incidentally involved speech. 436 U.S. 447, 456 (1978).

*Ohralik* outlines the appropriate First Amendment analysis for such professional conduct regulations. There, the Court held that soliciting potential legal clients was conduct "entitled to some constitutional protection … subject to regulation in furtherance of important state interests." *Id.* at 459. The Court held the regulation was supported by "a legitimate and important state interest" in "the prevention of harm before it occurs." *Id.* at 462, 464. Under these circumstances, it was "not unreasonable, or violative of the Constitution, for a State to respond with what in effect is a prophylactic rule." *Id.* at 467. A reasonable rule of professional conduct supported by a legitimate and important state interest to prevent harm is sufficient for a regulation to withstand First Amendment scrutiny.

Public health ordinances can be traced back to the American colonies, some enacted as early as 1629; by the mid-eighteenth century "public health regulations had become a common feature of colonial life." Wendy E. Parmet, *Health Care and the Constitution: Public Health and the Role of the State in the Framing Era*, 20 Hastings Const. L.Q. 267, 287, 291 (1992) (citing 4 William Blackstone, Commentaries, 130). As epidemics tended to be localized, cities took the lead in creating boards of health to regulate public health threats. Nissa M. Strottman, *Public Health and Private Medicine: Regulation in Colonial and Early National America*, 50 Hastings L.J. 383, 389. By the early nineteenth century, state legislatures took on this responsibility. *Id.* at 389; *Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889) (upholding licensure requirements for doctors).

Following the Civil War, the state's authority to regulate health treatment was "too well settled to require discussion." *Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("There is perhaps no profession more properly open to such regulation than that which embraces the practitioners

of medicine."); *see also Collins v. Texas*, 223 U.S. 288, 296-97 (1912) (upholding license requirements for osteopaths who required scientific training to diagnose patients); *Crane v. Johnson*, 242 U.S. 339, 340 (1917) (upholding licensing requirements for "drugless practitioner" who "does not employ either medicine, drugs, or surgery in his practice" but rather "faith, hope, and the processes of mental suggestion and mental adaptation.").

The MHPA provides similar health regulations that prohibit professional conduct known to harm minors, including both conversion therapy and "rebirthing as a therapeutic treatment." C.R.S. § 12-245-224(t)(IV). Plaintiff mischaracterizes the issue by contending that conversion therapy is like political speech and should be immune from state regulations. The Law does not prevent Plaintiff from speaking on the value of conversion therapy, her beliefs about sexual orientation, gender identity, sexual behavior, or any other topic—whether controversial or commonplace—either in therapy or in the public square. Although conversion therapy may involve more words than physical interventions, this does not transform the proscribed mental health treatment from conduct into protected speech. The Law regulates conduct, therapeutic treatment, not speech.

Plaintiff is licensed with the State of Colorado to practice as a Licensed Professional Counselor and a Licensed Addiction Counselor and offers mental health therapeutic services through such licensure. The MHPA defines the "practice of licensed professional counseling," as applying conducting evaluation, assessment, testing, diagnosis, treatment or intervention, planning, consultation, education, supervision, psychotherapy, research, referral, crisis intervention. C.R.S. § 12-245-603. It defines "the practice of addiction counseling" as clinical evaluation, clinical intake, treatment planning, service coordination, counseling, recovery

management, case management, education, documentation require for a clinical record, professional and ethical practices, clinical supervision, and intervention. C.R.S. § 12-245-803. Services such as assessments, diagnosis, treatment planning, interventions, and education requires extensive training and expertise to conduct, and all are part of both medical and mental health care, even when they incidentally involve speech.

It would be a mistake to suggest that mental health therapy is simply a conversation. To the contrary, whether used alone or along with pharmaceutical or physical interventions,[2] therapy is a treatment designed to promote and restore mental and emotional health. Colorado is acutely concerned with mental and emotional health, particularly as it relates to minors, for whom suicide is the leading cause of death. Colo. Dep't of Pub. Health and Env't, *Office of Suicide Prevention Annual Report 2020-2021*, 38.

In sum, laws governing professional conduct do not implicate the First Amendment simply because they encompass incidentally involved speech; regulations of medical care, in particular may permissibly include speech that is part of the practice of medicine. As such, these regulations are not analyzed under traditional content- and speaker-based First Amendment scrutiny. They may be—and typically are—limited to a certain class of speakers and to specific topics relating to a particular profession. *See NIFLA*, 138 S. Ct. at 2373 ("Indeed, the

---

[2] A list of therapeutic interventions for minors includes eye movement and desensitization and reprocessing (EMDR) involving physical bilateral stimulation; play/activity interventions, arts therapy, and animal therapy, all of which involve physical as well as verbal therapeutic treatments. Geraldine Macdonald, et al., *The effectiveness, acceptability and cost-effectiveness of psychosocial interventions for maltreated children and adolescents: an evidence synthesis*, Health Tech. Assessment, No. 20.69, https://www.ncbi.nlm.nih.gov/books/NBK385382/.

requirement that a doctor obtain informed consent to perform an operation is firmly entrenched in American tort law." (internal quote removed)); *Casey*, 505 U.S. at 884 ("To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.") (citing *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and *Whalen v. Roe*, 429 U.S. 589, 603 (1977)). All informed consent laws, for example, are both speaker- and content-based: they compel one type of speaker, health providers, to communicate content-based messages to their patients about their treatment.

Every Circuit that has considered *NIFLA*'s analysis of professional conduct regulations that incidentally involve speech has similarly started their analysis by asking whether the regulation is one governing the conduct of professionals. *See Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 140 (3rd Cir. 2020) (rational basis applied to a professional conduct regulation prohibiting reliance on wage history in determining salary); *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 933 (5th Cir. 2020) (occupational licensing requirements for surveyors are not immune from First Amendment scrutiny but turn on "the traditional taxonomy that 'draw[s] the line between speech and conduct' … ."); *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (a regulation on telehealth use by veterinarians turns on whether it "restricts speech only incidentally to their regulation of non-expressive conduct," which was a question for the trial court); *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (a ban on the practice of law by corporations was "a regulation of professional conduct that incidentally burdens speech … ."); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("no heightened First Amendment scrutiny applies because, as

*NIFLA* instructed, an informed-consent law like the *Casey* statute is a regulation of professional conduct that only incidentally burdens professional speech.").

Two Circuits have specifically addressed medical and mental health professional conduct regulations and their impact on speech under *NIFLA*. The Eleventh Circuit recently held that a person providing nutrition advice engages in more than just speech, and a "statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225 (11th Cir. 2022). "Assessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system, and integrating information from a nutrition assessment are not speech. They are 'occupational conduct'; they're what a dietician or nutritionist does as part of her professional services." *Id.* at 1225-26. The court held that the burden on the nutritionist's professional speech was "an incidental part of regulating the profession's conduct." *Id.* at 1226. Similarly, assessing a client's counseling needs, diagnosing a client, developing a therapy plan, and providing therapeutic treatment are not speech. This is professional conduct.

Another panel of the Eleventh Circuit, however, previously reached a different conclusion regarding mental health therapeutic treatment when it skipped the important first question: whether the municipal ordinance prohibiting conversion therapy treatment regulated professional conduct. *See Otto v. City of Boca Raton*, 981 F.3d 854, 861, 865 (11th Cir. 2020) (striking a conversion therapy prohibition because "[w]hat the governments call a 'medical procedure' consists—entirely—of words."). Instead, the court decided "the first question we need to consider is whether the ordinances are content-based regulations." *Id*. Finding the

ordinances were content-based, the court applied strict scrutiny. *Id.* But the professional conduct analysis should not be tossed aside.

*Otto* misunderstands the importance of *NIFLA's* holding; for if states may not prohibit or mandate certain types of professional conduct that include more than "some speech at their margins," then regulations compelling healthcare workers to provide content-specific information on family planning to patients, such as in *Casey*, would also need to withstand strict scrutiny. *Id.* at 865. However, *NIFLA* closed that door when it maintained the informed consent requirements in *Casey* as an example of the type of professional conduct regulation that should be upheld under less scrutiny. 138 S. Ct. at 2373; *see also Dobbs*, 142 S. Ct. at 2284 ("A law regulating abortion, like other health and welfare laws, is entitled to a 'strong presumption of validity.' It must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)).

The Ninth Circuit also recently applied *NIFLA's* professional conduct test to a California law nearly identical to Colorado's and upheld the prohibition on providing conversion therapy. *Tingley v. Ferguson*, 47 F.4th 1055, 1077-78 (9th Cir. 2022). The court explained that "[m]ost medical treatments require speech … but a state may still ban a particular treatment it finds harmful; otherwise any prohibition of a medical treatment would implicate the First Amendment and unduly limit the states' 'power to regulate licensed professions.'" *Id.* (quoting *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) (abrogated on other grounds by *NIFLA*, 138 S. Ct. at 2371). Following the path laid out by *NIFLA*, *Tingley* held that California's prohibition on conversion therapy was a reasonable regulation of professional conduct that incidentally

involved speech. *Id.* The court held that the regulation was supported by a legitimate and compelling state interest "to protect the 'physical and psychological well-being' of minors. *Id.*

Colorado's prohibition on conversion therapy for minors should similarly be analyzed in accordance with *NIFLA* as a proper regulation of professional conduct. The starting point for this Court's analysis should be whether the Law aims to regulate a type of treatment. Here, the Law proscribes a type of therapeutic treatment that is both ineffective and harmful to minors. That course of professional conduct—even if carried out through aversive techniques, role play, or language—only incidentally involves speech.

Nor does the Law regulate anything other than treatment. It covers only licensed and registered mental health practitioners, and psychiatrists who practice psychotherapy. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); C.R.S. §§ 12-240-121. It applies equally to all minor clients to prevent conversion therapy on heterosexual and LGBTQ minor clients alike, so it does not single out "disfavored speech by disfavored speakers." *Sorrell*, 564 U.S. at 565. The Law is not motivated by ideology or the perspective of the mental health practitioner; it applies to all regulated therapy providers. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers."); *see Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 955 (1995); *accord Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013).

 Simply put, the incidental speech used in conversion therapy is part of a treatment designed to effectuate a particular clinical result. The Law regulates treatment only, and it does

so in a viewpoint neutral manner. As such, its regulation does not implicate the First Amendment any more than the informed consent requirement upheld in *Casey*. .

### C. Preventing the harms caused by conversion therapy is a legitimate state interest that is not only important, but compelling, and reaches only the offending conduct.

Colorado's Supreme Court has held that the state has a legitimate interest "in regulating and maintaining the integrity of the mental-health profession." *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992). Colorado's Law prohibiting conversion therapy should be analyzed under the test outlined in *Ohralik*: to withstand First Amendment scrutiny, the law must be a reasonable rule of professional conduct supported by a legitimate and important state interest. 426 U.S. at 459. And here, Colorado's narrow rule is supported by an important, and even compelling, interest: the prevention of harmful therapy known to increase suicidality in minors.

First, conversion therapy is ineffective. Research studies on clients who received conversion therapy "did not report significant change to other-sex attractions," and the American Psychological Association "found no research demonstrating that [conversion therapy] has an impact on childhood or eventual adult sexual orientation." Decl. ¶¶ 64, 67. "Researchers found that participants' same-sex attractions and arousal persisted despite the individuals' efforts to change." *Id*. at ¶ 70.

Second, conversion therapy is harmful. Negative side effects of conversion therapy include "loss of sexual feeling, depression, suicidality, and anxiety," as well as "negative changes in relationships with family; increased negative self-esteem and self-worth; increased self-blame," and "loss of faith." *Id*. at ¶¶ 65-68. A study of members from the Church of Latter

Day Saints who underwent conversion therapy experienced "increased distance from God and their faith institutions, worsening of family relationships, and increased suicidality." *Id.* at ¶ 72.

The high rate of suicidality among clients, especially minors, who have received conversion therapy is especially concerning. "Specifically, those who had participated in [conversion therapy were] associated with twice the odds of lifetime suicidal ideation, 75% increased odds of planning to attempt suicide, and 67% increased odds of suicide attempt resulting in moderate injury." *Id.* at ¶ 80. A study of 13- to 25-year-old clients who received conversion therapy were found to be "more than twice as likely to report having attempted suicide and having multiple suicide attempts. *Id.* at ¶ 75. Among this group, conversion therapy was "the strongest predictor of multiple suicide attempts." *Id.* at ¶ 76. The harmful effects of conversion therapy were consistent across age groups, transgender or cisgender clients, and regardless of where the participants lived. *Id.* at ¶¶ 79-83 (citing American, Canadian, and New Zealand studies).

When passing health care regulations, Colorado may reasonably rely on the overwhelming medical consensus that conversion therapy is ineffective and harmful. *Id.* at ¶ 16. While some practitioners may disagree with that overwhelming consensus, Colorado's law need only be reasonable; Colorado need not wait for complete unanimity or absolute certainty before acting to protect children from serious and, in some instances, life-threatening harms. "The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive[.]" *Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905). "[T]he

legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent" identifiable harms. *Id*.

To prevent the documented and verifiable harms, Colorado prohibits licensed and registered mental health professionals from using therapeutic interventions that promote a particular sexual orientation or gender as a preferred outcome. The Law is a reasonable regulation of professional conduct that is well supported by an important, well-established, and compelling interest in reducing suicidality, depression, anxiety, and negative family relationships for Colorado's youth.

Moreover, although it need not be, the Law is narrowly tailored to address only the harms inflicted by interventions involving conversion therapy. The Law does not prevent interventions or therapy designed to reduce distress over unwanted sexual attractions or identities. It does not penalize therapists whose minor clients' sexual orientation or gender identity evolves during their maturation; it is just the harm-creating interventions that try to change minors' sexual orientation or identity that are prohibited.

Nor does the Law extend beyond professional conduct to sweep in religious practice. It explicitly exempts "[a] person engaged in the practice of religious ministry." C.R.S. § 12-245-217. To ensure that ministerial counselors received the authorized exemption, the Board of Licensed Professional Counselor Examiners promulgated a rule for determining when a person is engaged in religious ministry rather than psychotherapy: "If the Board determines that this exemption applies, and the registrant was practicing religious ministry, the Board will have no jurisdiction to take any further action on the complaint." 4 COLO. CODE REGS. § 737-1:1.17 (2020); *see also* 4 C.C.R. 744-1:1:18.

Nor does the Law extend beyond the population most vulnerable to conversion therapy's harms: minors. "Indeed, states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1198 (10th Cir. 2010). Once a client reaches the age of majority, Plaintiff is not constrained from treating an adult client who wishes to undergo conversion therapy.

Nor could any alternative achieve Colorado's interest in preventing the harms of conversion therapy in youth. Informed consent provisions would not safeguard minors who often lack the ability to form knowing, informed, and voluntary consent, particularly when the influence of parents or therapists, no matter how subtle, could coerce a child into agreement despite the verifiable risks. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). Nor is there an emergent or time-limited need for youth to undergo the risks of conversion therapy that would merit interjecting judicial review or competing interest statutes. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

 For all these reasons, the Law advances a compelling interest in a manner that would survive any level of scrutiny, and easily satisfies the scrutiny that applies to professional conduct regulations. Plaintiff's interest in subjecting children in subjecting children to conversion therapy "must be weighed against the state's interest in protecting a child's health and safety[.]" *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014) (balancing the state's interest against parental rights to familial association with respect to directing a child's healthcare).

Here, Colorado's Law is narrowly tailored to address only conversion therapy engaged in with minors and the harm it inflicts upon those minors. When weighed against any theoretical burden on speech that might be implicated by the narrow regulation on conversion therapy,

Colorado's compelling interest in preventing deaths by suicide "is at its zenith," and would satisfy even strict scrutiny. *Jensen*, 603 F.3d at 1198.

**II.     Plaintiff fails to establish third-party standing on behalf of any minor clients and asserts unclear and undefined claims that are not likely to succeed on the merits.**

Plaintiff asserts that the Minor Conversion Therapy Law has infringed upon her minor clients' First Amendment rights to receive information and to exercise their religious beliefs. Compl. ¶¶ 122-23. This claim cannot succeed on the merits, as: (1) Plaintiff does not have third-party standing to bring this claim on behalf of her alleged minor clients; (2) Plaintiff's minor clients' First Amendment rights to receive information have not been violated by the passage of the Law; and (3) Plaintiff's minor clients' First Amendment rights to free exercise of religion have not been violated by the passage of the Law.

**A.     Plaintiff lacks standing to bring a claim on behalf of her alleged minor clients.**

To establish third-party standing on behalf of her minor clients, Plaintiff must have (1) "suffered an 'injury in fact,'...giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; (2) the litigant [has] a close relation to the third party"; and (3) there [exists] some hinderance to the third party's ability to protect his or her own interests" *Powers v. Ohio*, 499 U.S. 400 (1991). Here, Plaintiff has not properly established whether she holds a close relationship to a specific third-party minor presently, so she does not have standing. There is also no demonstrated hinderance to any potential third-party minor's ability to protect his or her own interests. Without a demonstrably close relationship, nor a shown hinderance to a third-party minor, Plaintiff fails to establish third-party standing under applicable Colorado law. Any potential claims can and must be brought by Plaintiff's alleged minor patients.

In *Kowalski v. Tesmer*, attorneys attempted to invoke an attorney-client relationship to demonstrate requisite closeness for third-party standing. 543 U.S. 125, 131 (2004). The attorneys' assertion of third-party standing relied "on a future attorney-client relationship." *Id*. at 130-31. The Supreme Court found that third-party standing cannot be established with clients that plaintiffs may have in the future. *Id*. at 131. There must be an existing close relationship for third-party standing. *Id*. In this case, Plaintiff fails to sufficiently assert the existence of any current close relationship to an actual third-party minor seeking conversion therapy. All language concerning Plaintiff's minor clients is speculative and alludes to multiple therapist-client relationships that may exist or could exist in the future. Compl. ¶¶ 120, 123-24. Without sufficient evidence of a close relationship between Plaintiff and any specific client, Plaintiff does not have third-party standing in this First Amendment claim for minor clients' right to information.

Plaintiff has also not asserted or provided evidence of any hinderance that would keep any future minor clients from raising their own claims, allowing her to establish third-party standing. Although in a case like this, it may be reasonable that persons may be "chilled from" asserting claims themselves "by a desire to protect [their privacy] from the publicity of a court suit," the Supreme Court has explained to avoid such publicity and to maintain privacy, a "suit may be brought under a pseudonym, as so frequently has been done." *Singleton v. Wulff*, 428 U.S. 106, 117 (1976). If a minor client wished to assert their own claims, they could do so by pseudonymous filing. *See, e.g., Doe ex rel. Doe v. Governor of New Jersey,* 783 F.3d 150, 154 (3d Cir. 2015). There is no demonstrated hinderance upon any alleged minor client to raise their own claims.

In *Tingley*, the Ninth Circuit found that the plaintiff family therapist in that matter could not establish third-party standing, explaining that "[w]ithout more detail about his current clients, their desired information, or how the law has specifically deprived them of access to this information, an opinion adjudicating the alleged rights of these third parties would be plainly advisory." 47 F.4th at 1069 (citing *United Pub. Workers v. Mitchell,* 330 U.S. 75, 89 (1947)); *see also King v. Governor of New Jersey*, 767 F.3d 216, 244 (3d Cir. 2014). Here, Plaintiff has similarly provided no details about her current minor clients allegedly impacted by the Law. Plaintiff also does not supply information about her alleged minor clients' desired information or how the Law has specifically deprived them of access to information or limited their free exercise of religion. Compl. ¶¶ 123-24.

> **B.    The Law does not reduce the information available to any person seeking knowledge concerning conversion therapy.**

The Supreme Court has long acknowledged a First Amendment right to receive information and ideas, and that freedom of speech necessarily protects the right to receive information. *See Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Couns., Inc.*, 452 U.S. 748, 756-57 (1976). A "[s]tate may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982); *see Griswold v. Connecticut*, 381 U.S. 479 (1965).

By enacting the Minor Conversion Therapy Law, however, Colorado has not restricted the knowledge available to anyone. Any minor who may seek to engage therapeutically with Plaintiff has the same access to information about conversion therapy as was available before the adoption of the Law. This Law prohibits licensed mental health professionals from providing a

form of therapeutic intervention to minors that has been found scientifically ineffective and dangerous. The Law, however, does not disallow exchange of information and ideas about the subject.

The Law does not prevent Plaintiff from speaking on her perception of the value of conversion therapy, her beliefs about sexual orientation, gender identity, sexual behavior, or any other topic with an inquiring patient. Rather, Plaintiff is prohibited from engaging in "any practice or treatment . . . that attempts or purports to change an individual's sexual orientation or gender identity." C.R.S. § 12-245-202(3.5). Plaintiff's minor clients also can still obtain the information they seek concerning conversion therapy and be referred by Plaintiff to a provider of conversion therapy, for example, a religious minister. The Law regulates professional conduct, not the exchange of any information about conversion therapy.

Plaintiff's minor clients have the same amount of information available as was available before the Minor Conversion Therapy Law. The proscription upon a mental health practitioner's conduct does not limit the conversations and resources available to minor clients seeking to know and learn more about conversion therapy, sexual orientation, gender identity, or sexual behavior. Plaintiff therefore demonstrates no infringement upon her minor clients' First Amendment right to receive information.

### C. The Law does not infringe upon any of Plaintiff's minor client's First Amendment right to free exercise of religion.

Plaintiff ambiguously asserts that because of the Law, her "clients have suffered . . . injury to their First Amendment rights to free exercise of religion." Compl. ¶ 124. As stated above, Plaintiff does not allege to have current or former minor clients who have sought conversion therapy. The Complaint also contains no reference to what kind of religious beliefs

26

any potential minor clients may hold that may be infringed upon, or how the Law would cause such infringement. The Law does not preclude minor clients from exercising their religious beliefs. Minor clients can freely engage with their faith and seek guidance or treatment from religious ministers. Without further specification or evidence on what right to free exercise of religion may have been infringed upon, this portion of Plaintiff's claim on behalf of her minor clients fails to succeed on the merits.

III.   **Plaintiff has failed to establish likelihood of success on her own First Amendment Free Exercise claim because the Law is neutral and generally applicable and therefore subject to rational basis review.**

The Free Exercise Clause of the First Amendment, applicable to states under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. "A law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "A law that is 'neutral' and 'generally applicable' is constitutional if it is rationally related to a legitimate government interest." *Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021).

Plaintiff bears the burden of showing an infringement of her rights under the Free Exercise Clause by showing that Colorado has burdened her sincere religious practice pursuant to a policy that is not neutral or generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022). Only if Plaintiff carries this burden do Defendants need to show that their actions were justified. *Id.*, at 2421. Plaintiff cannot establish that the Minor Conversion Therapy

Law is not neutral or generally applicable; therefore, the Law is subject to rational basis review. *Grace United Methodist Church v. City of Cheyenne,* 451 F. 3d 643, 649 (10th Cir. 2006).

Colorado has a legitimate interest in protecting minors from the harmful practice of conversion therapy that, among other harms, increases the rate of suicidality among the young people subjected to it. Decl. ¶¶ 65-68, 72-80, 83. Colorado's prohibition upon licensed and registered mental health professionals engaging in conversion therapy for minors—while not prohibiting conversion therapy provided in the course of religious ministry—is rationally related to that interest. Accordingly, Plaintiff cannot demonstrate likelihood of success on the merits on her Free Exercise claim, and her motion for preliminary injunction should be denied.

> **A.    The Law is neutral because it is directed at a therapy practice and does not restrict religious exercise.**

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1728-29, 1731 (2018) (the government "cannot act in a manner that passes judgment upon or presupposed the illegitimacy of religious beliefs and practices," but must act with "neutral and respectful consideration"). Courts may look to the background of the statute and legislative history to assess neutrality. *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731. The Law prohibits the practice of conversion therapy on minors by licensed mental health providers but exempts religious ministers from this regulation. C.R.S. § 12-245-224(1)(t)(V). The Law does not target a religious practice; rather, it targets a dangerous mode of therapy, regardless of the religious or secular affiliations of the licensed practitioner employing it. The Law is patently neutral.

It is Plaintiff's burden to establish that the Law is not neutral; however, she has provided no support for her claims that the Law was enacted because of intolerance of religious beliefs or to restrict religious practice. *Kennedy,* 142 S. Ct. at 2421-22. The actual basis for the Law—to protect minors from a harmful type of therapy—is clear among the mental health professional community and in the legislative record. Conversion therapy is ineffective. Decl. ¶¶ 64, 67. The harms caused by conversion therapy, particularly for minors, are serious, common, and well-documented. *Id.* ¶¶ 65-68, 72-80, 83. The legislative history underscores the neutrality of the Law. In introducing the bill in committee, one of the bill's sponsors, described the purpose of the bill as follows:

> "This is simply about making sure that licensed practitioners in the state of Colorado are not offering a practice known as conversion therapy to young people under the age of 18. The reason is because all of the prevailing science and modern medicine tells us that not only does this practice not work, but it is not considered therapy in sort of the mainstream sense of what therapy is. In fact, there are many reasons to believe that it does the opposite and it actually harms young people … . It does not apply to what goes on inside of a church. It applies to folks who are licensed and regulated by the state of Colorado to provide therapy, mental health services, medicine, etc."

> *Prohibit Conversion Therapy for A Minor: Hearing on HB 19-1129 Before the Sen. Comm. On State, Veterans, & Military Affairs*, 70th Sess. (2019) (statement of Sen. Stephen Fenberg).

Plaintiff has not cited any evidence or statements in the legislative history revealing that the Law is a veiled attempt to target religious practice. Plaintiff refers to research and publications that, rather than show that Colorado's Law is a veiled abridgment of religious freedom, argue that conversion therapy is primarily–but not exclusively–sought for religious reasons. Compl. ¶¶ 39-41. Unlike the "religious gerrymander," present in *Church of the Lukumi Babalu Aye* involving a city ordinance targeting at a particular religion and particular religious

29

practice related to animal sacrifice, the religious practice of conversion therapy is not subject to the Law. 508 U.S. at 535-36. "Adverse impact will not always lead to a finding of impermissible targeting. For example, a social harm may have been a legitimate concern of government for reasons quite apart from discrimination." *Id.* at 535. That the Law regulates the professional conduct of licensed mental health professionals, who may hold their own personal religious beliefs, does not suffice for a successful Free Exercise claim.

The exemption for religious ministry further shows the Law was crafted to protect religious exercise, not curtail it. Conversion therapy provided in the practice of religious ministry is not subject to the Law. C.R.S. § 12-245-217; *see also Tingley,* 47 F.4th at 1085. A facially neutral law targeting a therapeutic practice employed by licensed professionals outside of religious ministry does not amount to a veiled attempt to target those motivated by religious belief. It is a regulation of licensed professionals engaged in conduct traditionally regulated by the state, offering protection to Colorado minors from a dangerous therapeutic practice.

     **B.**    **The Law is generally applicable because it does not contain a mechanism for individualized exemptions and prohibits conversion therapy whether or not the licensed practitioner would employ such therapy for secular or religious reasons.**

"A law is not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct by providing "'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877.

The Law does not contain a "system of individualized exemptions" such that it is not generally applicable. *See Emp. Div., Dep't of Hum. Res. of Or. v. Smith,* 494 U.S. 872, 884 (1990). Plaintiff must show more than a typical enforcement mechanism to show that "individualized exemptions" exist, rendering the Law not generally applicable. For example, in

30

*Fulton*, the Supreme Court recently held that the "sole discretion" given to the Commissioner of the Department of Human Services in Philadelphia to grant exceptions to the prohibition against rejecting prospective foster and adoptive parents based on sexual orientation undermined general applicability. 141 S. Ct. at 1878; *see also Smith,* 494 U.S. at 883-84 ("where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason."). There are no such discretionary or individual exceptions in the Law, eliminating discriminatory enforcement concerns.

Plaintiff incorrectly asserts that enforcement of the Law will invite "individualized exemptions." But her contention is based on her mischaracterization of the Law's scope, as explained above, and simply reiterates her argument that the Law is unconstitutionally vague. Mot. 24-25. The Minor Conversion Therapy Law is not unconstitutionally vague, as explained below, and the existence of enforcement mechanisms do not amount to a "system of individualized exemptions" under the Free Exercise Clause. Any law requires determinations of fact and applicability of the law by enforcement authorities. The Law delineates what does and does not constitute a violation. And the Law contains no discretionary exceptions and therefore is generally applicable.

And the Law exempts religious ministerial counseling from its reach, preventing religious hardship. A government regulation is not generally applicable when it treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom,* 141 S. Ct. 1294, 1296 (2021). The Law does the opposite. The existence of a carve-out that favors religious exercise underscores Colorado's balanced approach to prohibiting conversion therapy for minors. Not only does the MHPA exempt conversion therapy in the context of religious ministry, but the

administrative rules governing the professions divest the Boards of jurisdiction where a licensee is engaged in religious ministry. 4 C.C.R. § 737-1:1:17; 4 C.C.R. § 744-1:1:18. Far from "a system of individualized exemptions" that demonstrates a lack of neutrality towards religion, the conversion therapy law addresses the central issue – a harmful therapeutic practice – while exempting religious practice.

Plaintiff also argues that the Law establishes a system of individualized exemptions by permitting counseling relating to the change of gender identity when such a minor client is undergoing gender transition, but not if a minor's desire is to conform their gender identity with their biological identity. Compl. ¶¶ 99-103. But this is another mischaracterization of the Law. The Law provides that "assistance to a person undergoing gender transition" does not constitute "conversion therapy." C.R.S. § 12-245-202(3.5)(b)(II). This is not an individualized exemption, but an objective, categorical distinction that serves the purposes of the statute. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("The ["individualized exemption"] exception does not apply to statutes that, although otherwise generally applicable, contain express exceptions for objectively defined categories of persons.").

This definitional distinction is consistent with the aims of the statute to protect minors from a harmful therapeutic practice that promotes a particular gender identity that is different from the minor's existing identity as a preferred outcome. Allowing for the therapeutic care of a minor client who is *already undergoing* gender transition, however, is treatment that supports a minor client's existing gender identity in a manner that is neutral about sexual orientation and gender identity. Plaintiff alleges that some clients who transition later elect to identify as conforming to their biological gender. Compl. ¶¶ 59-72. But the Law does not prohibit a

therapist from supporting such clients. Should a prospective, future minor client who is already undergoing a gender transition that aligns their identity with a gender assigned at birth, similar supportive care provided in a neutral manner would be consistent with the Law's prohibition on the therapist (or the therapist with minor client) developing a therapeutic goal of change. Decl. ¶ 85, 92.

The Law does not create a system of individualized exemptions and is thus generally applicable. Plaintiff therefore cannot establish likelihood of success on the merits of her Free Exercise claim.

### C.    Plaintiff has not brought any colorable companion claim that would trigger the hybrid-rights doctrine for her claims.

Plaintiff contends that she has brought a "hybrid-rights" claim that triggers strict scrutiny. Mot. 25. But as stated above, the hybrid-rights doctrine does not apply here because the Law is a neutral law of general applicability and does not infringe on another constitutionally protected right. The Tenth Circuit requires a plaintiff to bring a colorable companion claim with a "fair probability or likelihood" of success on the merits to obtain the heightened scrutiny available under the hybrid-rights doctrine.[3] *Axson-Flynn*, 356 F.3d at 1297. *303 Creative LLC v. Elenis*, 6

---

[3] Defendants do not concede that the hybrid-rights doctrine is a recognized, separate constitutional standard, even in the Tenth Circuit. No U.S. Supreme Court opinion since the dicta in *Smith* has acknowledged the doctrine as controlling and the Tenth Circuit, while discussing the contours of the doctrine, has never applied it. *See Fulton,* 141 S. Ct. at 1915 ("It is telling that this Court has never once accepted a "hybrid rights" claim in the more than three decades since *Smith"*) (Alito, J., concurring); *303 Creative LLC,* 6 F.4th at 1188 (10th Cir. 2021) (cert granted on related issue, argument set for Dec. 5, 2022); *Taylor v. Roswell Indep. Sch. Dist.,* 713 F.3d 25, 33 (10th Cir. 2013); *Axson-Flynn v. Johnson,* 356 F.3d at 1295; *Swanson v. Guthrie Indep. Sch. Dist. No. I-L,* 135 F.3d 694, 699-700 (10th Cir. 1998).

F.4th at 1188 (10th Cir. 2021). Plaintiff's free speech and due process claims are not colorable

under this standard, so the hybrid-rights doctrine is inapplicable here.[4]

**IV.   Plaintiff cannot establish any Due Process violation under the Fourteenth Amendment because the Law is clear.**

"It is a basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A

statute can be impermissibly vague for two reasons: first, if the statute fails to provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.[5] *Hill v.*

*Colorado*, 530 U.S. 703, 732 (2000); *see also United States v. Richter*, 796 F.3d 1173, 1188

(10th Cir. 2015). However, "if the statutory prohibition involves conduct of a select group of

persons having specialized knowledge . . . the standard is lowered and a court may uphold a

statute which uses words or phrases having a technical or other special meaning, well enough

_____

[4] Even if this court were to apply the hybrid-rights doctrine, the Law satisfies strict scrutiny because Colorado's interest in protecting minors from therapeutic practices that increase suicidal ideation is compelling and the prohibition on licensed therapists from engaging in conversion therapy is narrowly tailored to achieve those interests. *See supra* Section I. The Law also survives under the lower standards of rational-basis review and intermediate scrutiny. *Id.*

[5] While Plaintiff's proposed conduct as stated in her complaint does not violate the Law – *supra* Section I – if this court were to find that Plaintiff intends to engage in conversion therapy as prohibited by the law, it is well-established that Plaintiff cannot also bring a successful vagueness challenge. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151-52 (2017) (finding that where plaintiffs proposed a pricing practice clearly proscribed by the statute, the law was not vague as applied to them); *Holder v. Humanitarian L. Project,* 561 U.S. 1, 20-21 (2010) ("But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail."); *see also Hoffman Estates,* 455 U.S. at 495 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."). And in any case, it is insufficient for the purposes of demonstrating likelihood of success on the merits to claim that Plaintiff may at some hypothetical point in the future be faced with a situation where she could engage in conduct that may violate the law.

known to enable those within its reach to correctly apply them." *Richter,* 796 F.3d at 1188 (internal citation omitted). Second, a statute can be impermissibly vague if it authorizes or even encourages arbitrary and discriminatory enforcement. *Hill,* 530 U.S. at 732.

A plaintiff "must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982). "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill,* 530 U.S. at 733 (internal citations omitted). Plaintiff's Complaint and Motion rely on a string of hypotheticals that do not address the dispositive question of whether a licensed mental health professional would reasonably understand what conduct is prohibited. Compl. ¶¶ 37, 74, 87, 92, 94, 96, 97; Mot. 2, 33. These hypotheticals do not help answer that question. Because the law is clear, Plaintiff cannot succeed in bringing a Due Process challenge.

While Plaintiff argues that "sexual orientation" and "gender identity" are vague terms, this claim is belied by the scientific evidence, state definitions, federal definitions, federal case law, and Plaintiff's own statements. "Sexual orientation" and "gender identity" are well-established concepts in psychology. Decl. ¶¶ 28, 31. Moreover, "gender identity" and "sexual orientation" are both defined in Colorado law. "Gender identity" is defined as "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth." C.R.S. § 24-34-301(3.5). "Sexual orientation" is defined as "an individual's identity, or another individual's perception thereof, in relation to the gender or genders to which the individual is sexually or emotionally attracted and the behavior or social affiliation that may result from the attraction." C.R.S. § 24-34-301(7). These terms are similarly

35

defined and regularly used in federal law and by federal courts without issue. *See, e.g.,* 18 U.S.C. § 249(c)(4) (defining "gender identity"); *Obergefell*, 576 U.S. 644; *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020). Courts have routinely rejected arguments that these terms are unconstitutionally vague. *See, e.g., Tingley,* 47 F.4th at 1089-90; *Reynolds v. Talberg,* 2020 WL 6375396, at *8 (W.D. Mich. Oct. 30, 2020); *Hyman v. City of Louisville*, 132 F. Supp. 2d 528, 546 (W.D. Ky 2001). Plaintiff herself uses these terms throughout her Complaint in ways that suggest she understands their meaning. *See, e.g.,* Compl. ¶¶ 4, 6, 52, 56, 81, 87.

"Conversion therapy" is also defined by the Law, C.R.S. § 12-245-204(3.5), and Plaintiff herself acknowledges conversion therapy as a distinct practice "which aims to help the client towards a personally chosen goal of achieving or returning to comfort with his or her own biological sex" and "to change sexual orientation." Compl. ¶¶ 37, 74, 87.

The Law also does not invite arbitrary and discriminatory enforcement. A statute need not have "perfect clarity or precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Plaintiff argues that there is no line between "acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" and speech that unlawfully seeks to "change" that person's gender identity or sexual orientation. Compl. ¶ 177; Mot. 24, 33. This is untrue. The Law prohibits an "attempt" made through a "practice or treatment" by *"*the practitioner." C.R.S. § 12-245-204(3.5). Throughout her complaint, Plaintiff acknowledges the distinction between exploring understanding of a person's sexual orientation and gender identity— Compl. ¶¶ 83, 84, 96—and creating a therapeutic goal of change— Compl. ¶¶ 86, 87. Further, "identity exploration" is a well-established concept with respect to psychotherapy and includes practices that encourage

exploration and integration without a predetermined outcome. Decl. ¶¶ 21-22, 32-35. The Law is aimed at therapeutic interventions that have a fixed outcome of changing sexual orientation or gender identity for a minor. Plaintiff understands this prohibition because she complains that she cannot offer conversion therapy to minor clients who seek "to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with their physical body." Compl. ¶ 87; Mot. 4.

The Law prohibits licensed and registered mental health professionals – who have specialized knowledge in the concepts at issue – from engaging in conversion therapy, which is defined, in part, as "any practice or treatment . . . that attempts or purports to change an individual's sexual orientation or gender identity." C.R.S. § 12-245-202(3.5)(a). Plaintiff cannot attempt to obfuscate the Law's meaning and application with hypotheticals if she desires to violate the Law with proscribed conduct.

## V.    The remaining preliminary injunction factors all weigh in favor of Defendants.

Plaintiff has not shown a likelihood of success on the merits on any of Plaintiff's claims. While that is often the determinative factor in deciding a motion for preliminary injunction and is enough to deny Plaintiff's request, Plaintiff also has failed to satisfy the remaining factors — whether Plaintiff has suffered an irreparable injury, that the balance of equities favors Plaintiff, and that an injunction is in the public interest. *Denver Homeless Out Loud*, 32 F.4th at 1279 ("movant must show all four factors before a preliminary injunction can issue").

### A.    Plaintiff has not shown an irreparable injury because Plaintiff's proposed conduct does not violate the Law.

The Complaint fails to allege conduct that would violate Colorado's Law, as explained in the first section. A plaintiff seeking prospective relief based on a "chilling effect" on speech can

satisfy the requirement that the plaintiff has a "concrete and particularized" claim of injury by showing evidence, including affidavits or testimony, that the plaintiff has engaged in the type of speech affected by the challenged action in the past, that the plaintiff has a present intention to engage in the speech, and a plausible claim that they are not engaging in the speech due to a credible threat. *Peck v. McCann*, 43 F.4th 1116, 1129-30 (10th Cir. 2022) (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088-89 (10th Cir. 2006)). For instance, the plaintiff in *Peck* had already violated the law at issue, which prevented the disclosure of non-identifying information about children who were victims of violence, and she expressed an intent to do it again in a sworn declaration. *Id.* at 1130. In contrast, Plaintiff here proposes therapeutic conduct that does not violate the Law, and the Motion is unaccompanied by any declaration from Plaintiff regarding her intent to violate the Law. Plaintiff has the burden to show that the Law infringes her First Amendment rights, and she has not carried that burden.

Nor does Plaintiff have standing to bring claims on behalf of alleged minor clients, or potential future minor clients. With no description of a specific incident, or establishment of a current therapist/client relationship, allegations about these minor clients that would constitute irreparable injury on their behalf are speculative. *See Kowalski*, 543 U.S. at 131; *supra* Section II.

### B.      The balance of equities and the public interest weigh in the Defendants' favor.

Plaintiff filed this lawsuit three years after the Minor Conversion Therapy Law took effect. A party must show "reasonable diligence" in requesting a preliminary injunction to establish that the balance of equities and public interest weigh in its favor. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (holding plaintiffs were not diligent when they waited

six years and three election cycles to challenge election maps). Courts consider a party's diligence when determining whether to grant a preliminary injunction because delay can cause a preliminary injunction to be "significantly more disruptive." *Bethel Ministries, Inc. v. Salmon*, No. CV 19-01853, 2020 WL 292055, at *13 (D. Md. Jan. 21, 2020) (denying preliminary injunction where the moving party waited two years); *see also Adventist Health Sys./Sunbelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 3:20-CV-00101, 2021 WL 973455, at *7 (S.D. Iowa Mar. 12, 2021), *aff'd*, 17 F.4th 793 (8th Cir. 2021) (denying preliminary injunction where plaintiffs waited a year to seek it); *Virden v. City of Austin*, No. 1:21-CV-271, 2021 WL 2744572, at *3 (W.D. Tex. July 1, 2021), *aff'd* No. 21-50597, 2021 WL 4955613 (5th Cir. Oct. 25, 2021) (denying preliminary injunction where plaintiff challenged ordinance in effect for three and a half years).

The balance of equities does not favor Plaintiff because she waited three years to seek to invalidate the Colorado Law. That delay has created a status quo where the Law is in effect, and to suspend it now will change the status quo.[6] Courts examine requests for preliminary injunctions with extra scrutiny and require a "strong showing" where, as here, an injunction would disrupt rather than preserve the status quo. *Beltronics*, 562 F.3d at 1071. Plaintiff has not made such a strong showing on the balance of harms.

"[A] court should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010). Here, the requested relief implicates the public's interest in keeping minors free from the harms caused by conversion

---

[6] Even if this Court were to grant Plaintiff's Motion, a preliminary injunction would only be effective as to Plaintiff.

therapy interventions. *See* Decl. ¶¶ 65-68 (detailing harms of conversion therapy). Colorado has a "solemn duty to protect the lives and health of the children within [its] borders." *Jensen*, 603 F.3d at 1198. The public's interest in keeping Colorado minors free from harm weighs heavily in Defendants' favor.

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction should be denied.

Respectfully submitted this 3rd day of November 2022.

PHILIP J. WEISER
Attorney General

/s/ Brianna Tancher

***Robert W. Finke***, #40756*
First Assistant Attorney General
Telephone: 720-508-6376
Email: robert.finke@coag.gov

***Janna K. Fischer***, #44952*
Assistant Attorney General
Telephone: 720-508-6374
Email: janna.fischer@coag.gov

***Abby Chestnut***, #51189*
Assistant Attorney General
Telephone: 720-508-6353
Email: abby.chestnut@coag.gov

***Brianna S. Tancher***, #55177*
Assistant Attorney General
Telephone: 720-508-6404
Email: brianna.tancher@coag.gov

***Melody Joy Fields***, #55866
Assistant Attorney General Fellow
Telephone: 720-508-6000
Email: melody.fields@coag.gov

Colorado Attorney General's Office

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203
*Counsel of Record for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
Voice: (303) 205-7870
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com

*s/ Leslie Bostwick*