IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-2287-CNS-STV

KALEY CHILES,

    Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies; *et al*.,

    Defendants.

___

**REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**
___

    Plaintiff submits the following reply in support of her motion for preliminary injunction.

**I. The Counseling Censorship Law Violates Plaintiff's Free Speech Rights**

    **A.    Government Imposed Orthodoxy is Repugnant to the Constitution**

    The State of Colorado has an officially approved viewpoint, and it has made it illegal for counselors to utter words that contradict that viewpoint. The pall of government-imposed orthodoxy has descended over Colorado. State mandated orthodoxy is repugnant to the Constitution, and Plaintiff renews her motion to this Court to enjoin it.

    The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002); *see also Thomas v. Collins*, 323 U.S. 516, 531 (1945) ("The First Amendment gives freedom of mind the same security as freedom of conscience . . . And the rights of free speech and free press are not confined to any field of human interest."). The Counselling Censorship law – like all censorship laws that discriminate on the basis of viewpoint – is presumptively

1

unconstitutional. *See Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("[T]he essence of viewpoint discrimination" is legal prohibitions that "reflect[] the Government's disapproval of a subset of messages it finds offensive."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (holding that viewpoint discrimination is an "egregious form of content discrimination" and therefore "presumptively unconstitutional"); *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) ("Both content- and viewpoint-based speech restrictions are presumptively invalid.").

### B.     The Government has no Answer to Plaintiff's Central Argument

Plaintiff began her motion by quoting from a February 28, 2022, press release issued by the National Academy of Medicine of France in which the Academy stated there is "no test to distinguish between persisting gender dysphoria and transient adolescent dysphoria" and "the risk of over-diagnosis is real, as evidenced by the growing number of young adults wishing to detransition." Motion 1. Plaintiff then demonstrated how the mere act of providing a minor client with this indisputably true information would violate the Counseling Censorship Law.

One would expect that the Government – when faced with an example of how the Law operates to censor true anodyne speech – would attempt to rebut this argument. Instead, the Government has no response. By its silence the Government has tacitly conceded that Plaintiff is correct when she asserts that on its face the Law operates to censor true anodyne speech and is therefore egregiously unconstitutional.

This case demonstrates why, "[b]road prophylactic rules in the area of free expression are suspect." *NAACP v. Button*, 371 U.S. 415, 438 (1963). The sponsors of this law testified that their purpose was to prevent psychological abuse, force, shame and conversion against a

2

minor's will.[1] And if that is all the Law did, this case would not have been brought, because Plaintiff has no interest in engaging in such practices. Compl.¶ 104 (Plaintiff highly respects client autonomy and does not seek to impose her values or beliefs). But of course, the Law does much more than prohibit force, abuse and aversion therapy. It sweeps within its prohibitions the dissemination of indisputably true and anodyne information, as even the government tacitly admits when it averted its gaze from the example at the beginning of the Plaintiff's motion.

### C. The Law Prohibits Plaintiff from Speaking Words She Desires to Speak

The Government cherry picks the Complaint to suggest that Plaintiff has not alleged she desires to engage in conduct that violates the Law. Resp. 8. This is not true. The Complaint clearly alleges that the Counseling Censorship Law prohibits Plaintiff from speaking words she desires to speak in contravention of her free speech rights. *See, e.g.*, Compl.¶ 5 (The Law infringes on Plaintiff's speech rights by prohibiting her from helping her clients eliminate or reduce unwanted same-sex attractions, behaviors, or identity even when the clients desire and freely consent to such counseling.); Compl.¶ 6 (The Law makes it illegal for her to provide help to minors with same sex attractions and/or gender identity conflicts.); Compl.¶ 83 (Prior to the Law, Plaintiff helped clients freely discuss sexual attractions, behaviors, and identity by talking with them. Since the Law, she has intentionally avoided such conversations with certain clients for fear of violating the Law.); Compl.¶ 84 (She is not currently engaging in discussions with minor clients if they have concerns about their sexual attractions or sexual orientation due to the Law.); Compl.¶ 95 (She cannot provide acceptance and support to a client who comes in for counseling and requests assistance in seeking to eliminate unwanted same-sex attractions); Compl.¶ 115 (Plaintiffs wants to counsel her clients without the imposition of the Law's

---

[1] Senate Committee on State, Veterans, & Military Affairs, March 18, 2019, https://bit.ly/3RDpRfX, timestamp 3:43:08-20; Senate Second Reading Debate, March 21, 2019, https://bit.ly/3B2FcPO, timestamp 1:11:23-31.

3

"acceptance-only" government mandate.). These are just examples. The Complaint contains numerous other allegations supporting Plaintiff's claim of unlawful censorship of her speech. The Government's assertion that the Complaint makes no such allegations is meritless.

### D. The "Conduct" Prohibited by the State is Uttering Prohibited Words

The State asserts that the Counseling Censorship Law prohibits "conduct" to which speech is merely incidental. Resp. 12-19. But even a cursory examination of the Law belies this assertion. Whatever else it might do, the main purpose of the Law is to allow words favored by the Government to be spoken while at the same time prohibiting the utterance of words the Government disfavors. Nothing could be more obvious. The Law allows counselors to utter words that accept and support an individual's current sexual orientation or gender identity. C.R.S. § 12-245-202(3.5)(b). At the same time, the Law prohibits a counselor from uttering words that seek to change an individual's sexual orientation or gender identity. C.R.S. § 12-245-202(3.5)(a).

"Speech is the **only** tool that Plaintiff uses in her counseling with minors seeking to discuss their sexuality." Compl.¶ 84 (emphasis added). Speaking words is not "incidental" to what Plaintiff does when she counsels minors. It is the only thing she does. Plaintiff has not brought this action because the Government has prohibited her from engaging in certain conduct. Rather, she has brought this action because the Government has prohibited her from expressing certain ideas.

The Government has established a favored viewpoint when it comes to expressing ideas regarding a person's current sexual orientation or gender identity. The favored viewpoint is that accepting and supporting an individual's current sexual orientation or gender identity is good

4

and therefore officially approved. The disfavored viewpoint is that attempting to change an individual's current sexual orientation or gender identity is bad and therefore prohibited.

The State asserts contrary to the plain meaning of the ordinary words used in the statute, that the law does not "single out 'disfavored speech by disfavored speakers.'" Resp. 18. This is not true. Indeed, it is difficult to imagine a law that is more blatantly unconstitutional under the viewpoint discrimination principles set forth in numerous cases such as *Rosenberger, supra*.

### E.     The State Misrepresents the Law

The State asserts:  "The Law does not prevent Plaintiff from speaking on . . . her beliefs about sexual orientation, gender identity, sexual behavior, or any other topic—whether controversial or commonplace—either in therapy or in the public square." This is simply untrue.  As discussed in the previous section, the Law prohibits speaking certain words about an individual's sexual orientation and gender identity. And Plaintiff could lose her licenses if she were to utter those words. It is unclear why the State would deny this obvious fact.

### F.     The Government Does Not Appear to Understand Plaintiff's Practice

In a misguided attempt to shoehorn Plaintiff's speech into its "conduct" rubric, the State writes:  "It would be a mistake to suggest that mental health therapy is simply a conversation. To the contrary, whether used alone or along with pharmaceutical or physical interventions, therapy is a treatment designed to promote and restore mental and emotional health. Colorado." Resp. 14. The State's argument appears to be that, since, broadly speaking, mental health treatment can involve all sorts of non-speech components, such as dispensing drugs and physical interventions, and no one disputes that the State can regulate these non-speech components, the State can regulate Plaintiff's speech. This is an obvious *non sequitur*.  Again,

5

Plaintiff's practice consists solely of speech. Compl.¶ 84. The fact that the State can regulate non-speech activities does not imply that the State can regulate pure speech.

### G. The Government Misunderstands *NIFLA*

Astoundingly, the Government cites *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), in support of its efforts to censor counselors. Resp. 11. But in that case, the Court categorically rejected California's interference with the counselor-client relationship. Indeed, the Court identified the very thing Colorado has done here – i.e., suppressing an unpopular idea – as one of the dangers associated with content-based regulation of professional speech. *Id*., 138 S. Ct. at 2374. The Court held that "'Doctors help patients make deeply personal decisions, and their candor is crucial.'" *Id., quoting Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1328 (C.A.11 2017) (en banc) (W. Pryor, J. concurring). Substitute "counselors" for "doctors" in that quotation and it applies perfectly to this case. The Court went so far as to compare efforts to censor counselors with the egregious violation of human rights committed by various authoritarian regimes. *Id*.

The also Court condemned California's attempt to pick ideological winners and losers – again, the very thing Colorado has done here – through the pretext of regulating professional speech. In a passage that bears quoting at length, the Court stated:

> Further, when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail. **Professionals might have a host of good-faith disagreements**, both with each other and with the government, on many topics in their respective fields. Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana; lawyers and marriage counselors might disagree about the prudence of prenuptial agreements or the wisdom of divorce; bankers and accountants might disagree about the amount of money that should be devoted to savings or the benefits of tax reform. The best test of truth is the power of the thought to get itself accepted in the competition of the market, **and the people lose when the government is the one deciding which ideas should prevail**.

6

*Id*., 138 S. Ct. at 2374–75 (internal quotation marks and citations omitted; cleaned up; emphasis added).

The statement about disagreements among professionals is particularly applicable to this case. In her Complaint and motion for preliminary injunction, Plaintiffs cited a number of professional opinions that support her viewpoint. In its response, the Government cites professionals that support the State-Approved Viewpoint. But this passage from *NIFLA* makes it clear that the Government's citation of opposing professional opinions is beside the point when it comes to the First Amendment analysis.  The Government and its experts believe one thing.  Plaintiff and the experts she cites believe another. *NIFLA* stands for the proposition that such differences are resolved in the marketplace of ideas, not by the Government picking winners and losers.  This is true even if there is some "consensus" among the experts. The great danger in making the Government the arbiter of truth is that holding a minority view or even departing from a consensus does not necessarily mean one is wrong. Yesterday's "misinformation" often becomes today's viable theory and tomorrow's established fact. *See United States v. Alvarez*, 567 U.S. 709, 752 (2012) (Alito, J., dissenting) ("Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken."); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views."). In *Otto v. City of Boca Raton*, Fla., 981 F.3d 854 (11th Cir. 2020), in which the Eleventh Circuit struck down a Florida city's version of Colorado's Counselor Censorship Law, the Court picked up on these principles in this particular context. It held "[s]trict scrutiny cannot be satisfied by professional societies' opposition to speech." *Otto*,

981 F.3d at 869. After all, "it is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes." *Otto*, 981F.3d at 869.

H. **The Government Misunderstands *Casey***

The State cites *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), in support of its case. The Supreme Court rejected a similar argument in *NIFLA*. In that case California cited *Casey*, just as Colorado does here, to support its regulation of counselor speech. The Court held that *Casey* stands for the proposition that the government may regulate speech that is incidental to performing a separate medical procedure, such as an abortion. *Id*., 138 S.Ct. at 2373. But when the government stands between a counselor and her client, it is not regulating speech that is incidental to conduct; it is regulating "speech as speech," which is repugnant to the First Amendment. *Id*., 138 S.Ct. at 2374.

I. **The Law Sanctions Speech Directly, Not Incidentally to Conduct**

The State argues that the Law regulates speech that is incidental to conduct and not the speech itself. This is not true. The Counseling Censorship Law regulates speech directly. As discussed above, it permits the expression of certain ideas and prohibits the expression of other ideas. As such, it regulates speech as speech. It does not regulate speech that is incidental to conduct. Citing *NIFLA*, the Eleventh Circuit rejected a similar argument in striking down a Florida city's counseling censorship ordinance. The Court wrote "the Supreme Court [] rejected an attempt to regulate speech by recharacterizing it as professional conduct. *See NIFLA*, 138 S. Ct. at 2373–74. So too here. The local governments cannot rescue their ordinances by calling the plaintiffs' speech conduct." *Otto*, 981 F.3d at 861. The Court rejected the "conduct" argument because the city was regulating speech as such, writing:

> The defendants' ordinances also target a message: the advice that therapists may give their clients. . . . **If speaking to clients is not speech, the world is truly

8

> **upside down**. These ordinances sanction speech directly, not incidentally – the only 'conduct' at issue is speech. Simply put, it is never enough for the government to show how speech can also be framed as conduct. Saying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation.

*Id*, 981 F.3d at 866 (internal citation and quotation marks omitted; emphasis added).

### J. The Government Misunderstands *Ohralik*

The government cites *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 447 (1978), in support of its censorship program. It is mistaken. Again, the Supreme Court addressed this very issue in *NIFLA*. In *NIFLA*, the Court identified *Ohralik* as a "commercial speech" case and distinguished it from state interference in the counselor-client relationship. *Id*., 138 S. Ct. at 2372 "In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, as was held in *Bates* and *Virginia Pharmacy*, it lowers the level of appropriate judicial scrutiny." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978). The State does not argue that Plaintiff's communications with her clients are merely business transactions, i.e., commercial speech that has long been held to receive less protection. Thus, it is difficult to understand why the State believes *Ohralik* supports its case.

### K. The State's Reliance on *Del Castillo* is Misguided

The State cites the Eleventh Circuit's decision in *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214 (11th Cir. 2022), in support of its "conduct" argument. The State's reliance on that case is misguided, because the Eleventh Circuit has clearly held that a counselor censorship law practically identical to the Law challenged in this case is an unconstitutional burden on speech and not a regulation of conduct. *Otto v. City of Boca Raton*,

9

Fla., 981 F.3d 854 (11th Cir. 2020). Indeed, *Del Castillo* cites *Otto* in support of its reasoning, and there is nothing in *Del Castillo* that is inconsistent with the holding in *Otto*. *Del Castillo* was a challenge to licensure as such. It was not a challenge to viewpoint discrimination. *Otto* held that licensure as such and viewpoint discrimination were separate issues. *Otto*, 981 F.3d at 866 (government's ability to regulate entry into a profession is a separate question from regulating the speech of professionals). Plaintiff does not challenge the licensure statute as such. It is, therefore, hard to understand why the State believes *Del Castillo* supports its argument.

### L.     The Ninth Circuit Can't Take a Hint

As the Eleventh Circuit recognized in *Otto*,[2] in *NIFLA* the Supreme Court not only addressed similar doctrinal issues to those before the Court, but also it directly criticized and abrogated two circuit court decisions approving bans on speech nearly identical to the Colorado ban challenged in this action. *See NIFLA*, 138 S.Ct. at 2371 abrogating *King v. Governor of New Jersey*, 767 F.3d 216 (3rd Cir. 2014) and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014). The precise issue before the Court today – i.e., whether a ban on speech such as those approved in *King* and *Pickup* violates the First Amendment – was not before the Court in *NIFLA*. And likely for that reason, the Court did not reach out and directly rule on the issue. But it is difficult to imagine a clearer indication of how the Court would rule on that issue were it before it than the fact that it abrogated not one but two circuit court decisions that got it wrong.

Undeterred by this clear guidance, in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), the Ninth Circuit – while recognizing that the Supreme Court had abrogated its decision

---

[2] *Id.*, 981 F.3d at 867.

10

in *Pickup*[3] – held that *Pickup* had not been abrogated enough to actually require a change in the result in that case and again upheld California's ban on speech. *Id.*, 47 F.4th 1075.

In this case, the State argues that the Eleventh Circuit got *NIFLA* wrong in *Otto* and the Ninth Circuit got it right in *Tingley*. Resp. 16-17. The State is wrong. The *Otto* decision is consistent with the reasoning of *NIFLA*, and *Tingley* was decided in the very teeth of the Supreme Court's clear guidance.

### M. The Government Identifies no Tradition of Speech Regulation to Support the Law

In *NIFLA*, the Court held: "This Court's precedents do not permit governments to impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." *Id.*, 138 S. Ct. at 2372. *See also Otto*, 981 F.3d at 866 (censorship law not a "traditional" exception to First Amendment protection). Thus, the Supreme Court does not permit content-based speech restrictions such as those at issue in this case without "persuasive evidence" that a "long tradition of such restrictions exists."

In her motion, Plaintiff made the following prediction: "Colorado will not be able to supply any historical evidence – much less persuasive evidence of a long tradition – showing that the words Chiles and her clients would speak to each other but for Colorado's censorship program fall outside the First Amendment's scope." Motion, 12-13. Plaintiff's prediction has been vindicated. The State did not even attempt to supply this Court with evidence of a long tradition of courts prohibiting counselors from advancing disfavored viewpoints regarding controversial social and political topics. This alone should be fatal to the State's case.

---

[3] *Id.*, 47 F.4th 1074.

### N.     The Counseling Censorship Law Fails Strict Scrutiny

The government has not demonstrated that the Counseling Censorship Law is narrowly tailored to serve a compelling state interest. This is not surprising, because that exacting standard is rarely met. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("Strict scrutiny is a demanding standard. It is rare that a regulation restricting speech because of its content will ever be permissible." (internal citation and quotation marks omitted)).

The State advances the proposition that minors should be protected from "harmful" ideas with which the State disagrees. Resp. 20. Obviously, the State believes the speech it has banned is harmful. That is the reason all censors since the beginning of time have used to ban speech with which they disagree. But speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

The State's expert asserts that speaking the prohibited words has been associated with suicide and other harmful effects. Resp. 19-20. But, as Plaintiff points out in her motion, many of the studies suffer from the failure to distinguish between correlation and causation. Motion, 5-6. Moreover, "[b]road prophylactic rules in the area of free expression are suspect." *николаNAACP v. Button*, 371 U.S. 415, 438 (1963). In other words, in order to justify a burden on freedom of speech, the government must show the speech results in actual harm to particular persons. It cannot justify suppressing ideas on the ground that persons who are exposed to the ideas might be at greater risk of negative outcomes. This is true even if the government purports to be attempting to protect children. *Brown*, 564 U.S. at 801. Finally, the fact that the First Amendment prohibits broad prophylactic suppression of speech does not mean that the government is powerless. If it were demonstrated that particular speech produced actual harm,

the State would be free to address that harm through longstanding torts for professional malpractice. *NIFLA*, 138 S. Ct. at 237, *citing Button*, 371 U.S. at 438.

### O.     The Law is Underinclusive

The Law is seriously underinclusive. The State admits that even though it believes the banned speech results in serious harm to children, certain people (e.g. ministers) are free to engage in it as much as they desire. Resp. 21. This is what the Supreme Court held about a California law that was purportedly designed to protect children against serious harm but left open similar loopholes:

> **Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.** . . .
>
> The Act is also seriously underinclusive in another respect . . . The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK. And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices. That is not how one addresses a serious social problem.

*Brown*, 564 U.S. at 802 (emphasis added).

The State says the Law addresses a very serious societal problem. Yet it is perfectly willing to allow certain counselors (such as ministers) to continue speaking the allegedly harmful words it prohibits Plaintiff from speaking. As the Court noted in *Brown*, this raises serious doubts about whether the State is pursuing the interest it invokes, rather than disfavoring a particular viewpoint.

### II.    Plaintiff has Standing to Assert Her Minor Clients' Claims

Not only did the *Tingley* court get the substance issue wrong, but also it erred on the third-party standing issue. The Counseling Censorship Law deprives Plaintiff's clients of their

13

right to receive information – a First Amendment corollary to the right to speak and express oneself. The State cites the law correctly. Resp. 25. But then it fails to apply the law properly.

The State argues that Plaintiff has not provided any information about how her minor clients are deprived of information. This is not true, as even a cursory examination of the Complaint reveals. *See, e.g*., Compl.¶ 110-11. Many of Plaintiff's clients are referred through churches or word of mouth. Compl.¶ 110. Many of her clients uphold a biblical worldview which includes the concepts that attractions do not dictate behavior, nor do feelings and perceptions determine identity. *Id*. Clients who identify as Christians holding to a biblical worldview believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity. *Id*.   Clients who have same-sex attractions or gender identity confusion and who also prioritize their faith above their feelings are seeking to live a life consistent with their faith. Compl.¶ 111. Clients who have been living a life inconsistent with their faith or values often present with internal conflicts, depression, anxiety, addiction, eating disorders and so forth and are seeking resolution of such turmoil. *Id*. Plaintiff wants to offer a counseling approach to clients and potential clients including minors that includes a full exploration of clients' reported orientation, identity, behaviors and feelings. Compl.¶ 115.  But She cannot do this because the Counseling Censorship Law's imposes an "acceptance-only" government mandate. *Id*. Thus, because of the Counseling Censorship Law, Plaintiff's minor clients are prohibited from receiving voluntary counseling that fully explores sexuality and gender that the clients desire to obtain from a licensed professional with expertise in this area. Compl.¶ 123.

The State also argues that the Law does not reduce the information available to her clients. Resp. 25. This is not true. Indeed, the whole purpose of the Law is to prevent clients from receiving certain types of information, including indisputably true and anodyne information, if that information could potentially change their views about their sexual orientation or gender identity." C.R.S. § 12-245-202(3.5)(a). It is difficult to understand why the State would suggest otherwise. The State seems to be making the argument that because Plaintiff continues to have the right to speak to her minor clients about certain topics (i.e., conversion therapy in the abstract), she has no reason to complain that the State has muzzled her with respect to speaking about other topics (i.e., a Biblical view of human sexuality). In *Otto*, the Court rejected this exact argument:

> The governments point out that the therapists have other, similar avenues of expression. To be sure, the therapists remain free to describe SOCE to the public or recommend that a client receive SOCE in another jurisdiction. But (contrary to the dissent's contention) the ordinances plainly prohibit the therapists from having certain conversations with clients. In any event, the constitutional problem posed by speech bans like this one is not mitigated when closely related forms of expression are considered acceptable. . . . The First Amendment does not protect the right to speak about banned speech; it protects speech itself, no matter how disagreeable that speech might be to the government.

*Id*., 981 F.3d at 863.

Finally, the State asserts: "By enacting the [] Law, however, Colorado has not restricted the knowledge available to anyone." Resp. 26. This is plainly untrue. Again, the whole purpose of the Law is to prohibit the dissemination of any information that might change an individual's sexual orientation or gender identity even if that information is true and anodyne, such as merely quoting from the press release issued by the National Academy of Medicine of France. If the Law did not prohibit the dissemination of such information, the State would have

explained how Plaintiff misinterpreted the Law with her press release example. That the State studiously ignored that example is telling.

Finally, the State argues that Plaintiff's clients' free exercise rights are not burdened. Resp. 27. Again, this is plainly untrue. As Plaintiff set forth in her Complaint (see above), her clients are often referred by churches and hold a Biblical worldview about human sexuality. Again, the whole purpose of the Law is to prohibit the propagation of a Biblical worldview of human sexuality. It is wrong for the State to suggest that its prohibition of the dissemination of ideas rooted in the Bible does not burden a person's free exercise rights.

### IV. The Law Burdens Plaintiff's Free Exercise Rights

#### A. The Law Creates a Religious Gerrymander

The State argues that Plaintiff has not demonstrated that her free exercise rights have been burdened by a Law that is not neutral. Resp. 27. This is not correct. Plaintiff's views regarding human nature, gender, ethics, morality, and counseling are informed by her Biblical faith. Compl.¶ 151. The Bible affirms that sexual attractions do not dictate behavior, nor do feelings and perceptions determine identity. Compl.¶ 110. Therefore, Christians holding to a biblical worldview believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity. *Id*. The Counseling Censorship Law is not neutral. Indeed, it is the very opposite of neutral and a direct attack on Plaintiff's religious beliefs. As such it is blatantly unconstitutional.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the City of Hialeah passed an ordinance that, while neutral on its face, was plainly intended to burden a particular religious practice. The Court had little trouble invalidating the law, holding

16

that if a law restricts practices because of their religious motivation, it is not neutral. *Id.*, 508 U.S. at 533. The law forbids suppression of particular religious beliefs. *Id.*, 508 U.S. at 534. A law is not neutral if it creates a religious gerrymander. *Id.*, 508 U.S. at 535.

The Counseling Censorship Law is unconstitutional because on its face it expressly creates the sort of religious gerrymander prohibited by *Church of the Lukumi Babalu Aye*. In counseling a minor client who seeks to prioritize their faith and live a life consistent with their faith, Plaintiff would assist the client with their stated desire to reduce or eliminate unwanted sexual attractions and grow in the experience of harmony with their physical body. Compl. ¶¶ 87, 110-11; 151. In assisting these clients with their self-chosen religious determination, Plaintiff would disseminate the Biblically based idea that they should resist same sex attractions and learn to live in harmony with their physical body. But the Law prohibits the dissemination of these religious ideas. Indeed, that is the very purpose of the Law. In doing so, the Law creates a religious gerrymander in which counseling that is consistent with a Biblical worldview is expressly prohibited, C.R.S. § 12-245-202(3.5)(a), but counseling that is directly contrary to a Biblical worldview is expressly permitted. C.R.S. § 12-245-202(3.5)(b). It is important to keep in mind that it makes no difference from a First Amendment perspective whether the Colorado General Assembly specifically intended to create a religious gerrymander. *Church of the Lukumi Babalu Aye.*, 508 U.S. at 559 (Scalia, J. concurring). Even if the Law were created with no motive to create a religious gerrymander, it "would nonetheless be invalid." *Id.*

### B. It is Irrelevant that the Law Does not Expressly Proscribe a Particular Religious Practice

The State argues that the Law does not create a religious gerrymander because it is facially neutral with respect to religious practice. Resp. 29-30. But this is the exact argument

17

rejected by the Supreme Court in *Church of the Lukumi Babalu Aye*. In that case, the City of Hialeah argued that its ordinance did not violate the plaintiffs' First Amendment free exercise rights because its regulation was facially neutral and applied equally to all butchers. The Court nevertheless invalidated the ordinance, because it specifically burdened a particular religious practice, even if it did so in facially neutral terms. *Id.*, 508 U.S. at 334 (facial neutrality is not determinative; subtle departures from neutrality are forbidden).

### V.     Plaintiff has Asserted a Hybrid Rights Claim

Under the hybrid rights doctrine, a party establishes a violation of the Free Exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right. *Id.*, 451 F.3d at 655-56. A plaintiff need only demonstrate that the companion constitutional claim is "colorable." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). In this case, Plaintiff has asserted a free speech claim that is far more than colorable. Indeed, it is compelling. And she has asserted a free exercise claim. Thus, the requirements of *Axson-Flynn* are met.

In response, the State asserts that Plaintiff's free speech claim is not even colorable. Resp. 34. This assertion is risible. It beggars belief that the State would assert that a claim that has recently prevailed in the Eleventh Circuit is not even colorable.

### VI.    The Law is Unconstitutionally Vague

Due process of law requires that legal prohibitions be clearly defined. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws may trap the innocent by failing to provide fair warning and lead to arbitrary and discriminatory enforcement, delegating basic policy decisions to police, judges, and juries. *Id.* at 109. A law is vague if it "does not give the

18

person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id*. at 108-09; *see Connally v. Gen. Constr. Co*., 269 U.S. 385, 391 (1926) ("[D]ue process clause requires a statute to be sufficiently clear so as not to cause persons of common intelligence … [to] guess at its meaning and differ as to its application[.]"). Vague laws are of particular concern in the First Amendment context because they "operate[] to inhibit the exercise of" First Amendment rights. *Grayned*, 408 U.S. at 109, *quoting Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).

The Counseling Censorship Law is unconstitutionally vague under these principles. Again, the example at the beginning of Plaintiff's motion is telling. Is providing true and anodyne information directly from a press release a violation of the law? Plaintiff is left to guess. Even the State does not appear to know the answer; at least it has chosen not to provide the Court with an answer if it has one.

## VII.   Plaintiff Has Met the Standard for Issuance of a Preliminary Injunction

The State argues that Plaintiff has not met the standard for issuance of a preliminary injunction. Resp. 39-40. But it is well-settled that a showing of the infringement of a constitutional right is enough and requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In the context of constitutional claims, this principle collapses the first and second preliminary-injunction factors. *Id*., at 806. The third and fourth factors also merge when the government is the opposing party. *Aposhian v. Barr*, 958 F.3d 969, 978, *citing Nken v. Holder*, 556 U.S. 418, 435 (2009).  Thus, in a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014). Plaintiff has

19

shown that she is likely to prevail on the merits of her claim. Therefore, she has met the standard for issuance of a preliminary injunction.

## VII. Conclusion

For the foregoing reasons, Plaintiff renews her motion for preliminary injunction and requests the Court to enjoin enforcement of the Counseling Censorship Law.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____

Barry K. Arrington