IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02287-CNS-STV

KALEY CHILES,

     Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; *et al.*,

     Defendants.

---

## ORDER

---

Before the Court is Plaintiff Kaley Chiles' Motion for Preliminary Injunction (ECF No. 29). Ms. Chiles is a licensed professional counselor (ECF No. 1 at 29-30 ¶ 104). Her clients include minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*Id.* at 31 ¶ 109). Ms. Chiles argues that Colorado's regulation of specific therapeutic practices unlawfully abridges what she can say to her minor clients (*See* ECF No. 29 at 2). It does not. As such, and for the reasons set forth below, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

# I. BACKGROUND[1]

Plaintiff Kaley Chiles is a licensed professional counselor in the state of Colorado, as well as a practicing Christian (ECF No. 1 at 6, 29-30 ¶¶ 28-29, 104). Ms. Chiles' client base includes minors seeking counseling related to same-sex attraction and gender identity (*Id.* at 31 ¶ 109). As a counselor, she does not engage in "aversive techniques," and she alleges that she previously "helped clients freely discuss" sexual attractions, gender identity, gender roles, and "root causes of [their] desires [and] behavior" (*Id.* at 24-25 ¶¶ 82-83).[2] Ms. Chiles only pursues the "goals" that her clients "themselves identify and set," rather than "any predetermined goals" for clients' counseling (*Id.* at 25, 31 ¶¶ 85, 108). According to Ms. Chiles, Colorado law prohibits her from "fully explor[ing]" certain clients' "bodily experiences around sexuality and gender," including any client's discussion of their own "unwanted sexual attraction, behaviors, or identity" (*Id.* at 25-26, 32 ¶¶ 86, 88, 113). Many of Ms. Chiles' clients do not initially request counseling to eliminate their attractions or identities (*Id.* at 28 ¶ 96). Instead, discussion of clients' unwanted attractions or identities "may arise" during their counseling with Ms. Chiles (*Id.*)

Colorado enacted its Minor Therapy Conversion Law in 2019. *See, e.g.,* C.R.S. §§ 12–245–202, 12–245–101. Under the Minor Therapy Conversion Law, mental health professionals may not engage in what is commonly known as "conversion therapy" for minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*See* ECF Nos. 1 at 5, 45 at 15). *See*

---

[1] The background facts are taken predominantly from Ms. Chiles' Verified Complaint, the parties' briefs, and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado*, 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022).

[2] "Aversion techniques" include treatments that "induc[e] nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual bec[omes] aroused to same-sex erotic images or thoughts" (ECF No. 45-3 at 31).

*also, e.g.,* C.R.S. § 12–245–202(3.5)(a). Ms. Chiles alleges that the Minor Therapy Conversion Law prohibits her ability to assist minor clients "seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with [their] physical bod[ies]" (ECF No. 1 at 26-27 ¶¶ 87, 91-92). Consequently, she has "intentionally avoided" certain conversations with her clients that she fears may violate the Minor Therapy Conversion Law (*Id.* at 25 ¶ 83).

Ms. Chiles sued Defendants, alleging the Minor Therapy Conversion Law violates her constitutional rights and bringing claims under the First and Fourteenth Amendments (*See generally* ECF No. 1). She filed her Motion for Preliminary Injunction in September 2022 (ECF No. 29). The Motion is fully briefed (*See* ECF Nos. 45, 49).

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,* 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). To prevail on a preliminary injunction motion, the movant bears the burden of showing that four factors weigh in their favor: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado,* 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). Where the government is the non-moving party, the last two preliminary injunction factors merge. *See Denver Homeless,* 32 F.4th at 1278 (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)). Preliminary

injunctions changing the status quo are "disfavored," and in these instances, the moving party's burden of establishing that they are likely to succeed on the merits is heightened. *See Free the Nipple*, 916 F.3d at 797 (quotation omitted).

### III. ANALYSIS

Having considered Ms. Chiles' Motion for Preliminary Injunction, the related briefing, and relevant legal authority, the Court denies Ms. Chiles' Motion.

### A.  Standing

Ms. Chiles argues that she has standing to pursue her claims, even though Defendants have "not yet threatened" to revoke her professional licenses (ECF No. 29 at 10). She also argues that she has third-party standing to sue on behalf of her clients (*See id.* at 20). The Defendants contend that Ms. Chiles lacks standing to bring this pre-enforcement action, and that she lacks third-party standing (*See* ECF No. 45 at 33, 48). The Court considers Ms. Chiles' standing to bring this suit herself and whether she has third-party standing to sue on behalf of her clients in turn.

#### 1.  *Ms. Chiles' Standing*

Ms. Chiles argues that she has standing to sue, given the gravamen of her First Amendment claims, even though Defendants have not yet enforced the Minor Therapy Conversion Law against her (ECF No. 29 at 10-11). Defendants contend that Ms. Chiles has failed to demonstrate that she intends to engage in conduct that violates the Minor Therapy Conversion Law (ECF No. 45 at 48). The Court agrees with Ms. Chiles that she has standing to sue.

For a federal court to exercise jurisdiction over a suit, the plaintiff must have standing to sue. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing consists of three elements, and a plaintiff—as the party invoking federal jurisdiction—bears the burden of satisfying

them. *See, e.g. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have suffered an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). If the plaintiff fails to meet this burden, "there is no case or controversy for the federal court to resolve," and the federal court cannot exercise jurisdiction over the plaintiff's claims. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation omitted); *see also* U.S. Const. art. III, § 2.

The analysis changes, however, in the First Amendment context. The First Amendment "creates unique interests that lead [courts] to apply the [constitutional] standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citation omitted). One way a plaintiff may establish standing for their First Amendment claim is by "alleging a credible threat of future prosecution plus an ongoing injury resulting" from the statute's "chilling effect" on the plaintiff's desire to exercise their First Amendment rights. *Id.* (quotations omitted). To determine whether a plaintiff's pre-enforcement First Amendment claim has alleged a "chilling effect" that sufficiently demonstrates the plaintiff has suffered an injury in fact, courts consider the following:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* at 1129–30.

Ms. Chiles alleges that the threat of the Minor Therapy Conversion Law's enforcement has created an ongoing injury resulting from the Law's "chilling effect" (*See, e.g.*, ECF No. 1 at 35 ¶ 134). In her preliminary injunction motion, Ms. Chiles argues that—given the nature of her First

Amendment claim—she has satisfied *Peck*'s factors to show that she has suffered an injury in fact (ECF No. 29 at 10). Therefore, the Court considers whether Ms. Chiles has satisfied these three *Peck* factors. For the reasons set forth below, she has.

### a.   Past Engagement

Ms. Chiles has engaged in the type of speech affected by the Minor Therapy Conversion Law.[3] The Minor Therapy Conversion Law implicates speech that purports to "eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." § 12–245–202(3.5)(a). Further, the Minor Therapy Conversion law contemplates practices that provide "understanding for the facilitation of an individual's coping." *Id.* at § 12–245–202(3)(b)(I). Ms. Chiles alleges her therapeutic practices have concerned these forms of speech. For instance, she alleges that she seeks to help clients "explore certain . . . bodily experiences," including any "unwanted sexual attraction[s]" that "may arise" during her counseling sessions (ECF No. 1 at 25-26, 28, 32 ¶¶ 86, 96, 112). Therefore, she has met her burden of showing that she has in the past engaged in the type of speech "affected" by the Minor Therapy Conversion Law. *Peck*, 43 F.4th at 1129–30.

### b.   Present Desire

Ms. Chiles has shown that she has a present desire to engage in speech affected by the Minor Therapy Conversion Law.[4] For instance, she states in the Verified Complaint that she has

---

[3] As discussed later, the Minor Therapy Conversion Law is a professional conduct regulation that imposes an incidental burden on speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

[4] Ms. Chiles did not submit an affidavit in support of her preliminary injunction motion. However, the Court construes Ms. Chiles Verified Complaint, submitted under "penalties of perjury," as an affidavit for purposes of its analysis of *Peck*'s second factor (ECF No. 1 at 45-46). *See also, e.g.*, *Controltec, LLC v. Anthony Doors, Inc*., No. 06-CV-00295-MSK, 2006 WL 8460951, at *1 (D. Colo. Feb. 22, 2006) (concluding that the moving party for a preliminary injunction "must show by Verified Complaint or Affidavit" facts to establish four preliminary injunction factors).

"intentionally avoided conversations with clients" that may be perceived as violating the Minor Therapy Conversion Law, including conversations related to her practice—counseling clients on their "sexual attractions, behaviors, and [gender] identity" (ECF No. 1 at 24-25 ¶ 83). Ms. Chiles wishes to "assist clients with their stated desires," including discussions with certain clients "seeking to reduce or eliminate unwanted sexual attractions" (*Id.* at 26 ¶ 87). Accordingly, she has established the specific content of her desired speech for future client interactions, and satisfied *Peck*'s second factor. *Cf. Peck*, 43 F.4th at 1131 (holding that "First Amendment plaintiffs generally need not state that they 'have specific plans to engage in XYZ speech next Tuesday' in order to show standing" (citation omitted)).

### c.  Credible Threat

In determining whether a First Amendment plaintiff has satisfied *Peck*'s third "credible threat" factor, courts consider the following:

> (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement.

*Peck*, 43 F.4th at 1132 (quotations omitted). No one "credible threat" factor is dispositive. *See id. See also Scott v. Hiller*, No. 21-CV-02011-NYW-KLM, 2022 WL 4726038, at *6 (D. Colo. Oct. 3, 2022) ("The fact that a prosecutor had never enforced the statute at issue is not dispositive." (citing *Peck*, 43 F.4th at 1133)). In short, the plaintiff must demonstrate "an objectively justified fear of real consequences." *Peck*, 43 F.4th at 1132 (quotations omitted).

Regarding the "past enforcement" factor, Ms. Chiles has failed to identify any past enforcement against the same conduct presented in her Verified Complaint. She argues only that

7

the Minor Therapy Conversion Law may impose "severe" sanctions if counselors violate it in the future (ECF No. 29 at 11). The "past enforcement" factor weighs against her for this reason.

Under the "prosecution" factor, Ms. Chiles admits that Defendants "are the persons empowered by Colorado to enforce" the Minor Therapy Conversion Law against her as a licensed professional counselor (ECF No. 1 at 40 ¶ 165; *see also id.* at 6-7 ¶¶ 31, 35). Therefore, the second element weighs against her. *See Peck*, 43 F.4th at 1132 (concluding second factor weighed against plaintiff where only "prosecutors c[ould] bring charges" under a statute).

Turning to whether the state has "disavowed" enforcement of the Minor Therapy Conversion Law, there is nothing in the preliminary injunction record to demonstrate that the Defendants "do not disavow an intent to prosecute" Ms. Chiles. *Peck*, 41 F.4th at 1132. Defendants' refusal to explicitly disavow enforcement of the Minor Therapy Conversion Law has "heavy weight" in the Court's assessment of Ms. Chiles' First Amendment claims. *Id.* at 1133. There is "nothing . . . to prevent [Defendants] or another [state entity] from" bringing charges in the future against Ms. Chiles under the Minor Therapy Conversion Law for statements that mirror those she has previously made to clients. *Id.*; *see also id.* at 1133 (concluding that a state's "refusal to provide such an assurance [that it will not enforce] undercu[t]" an argument that the plaintiff's "perception of a threat of prosecution is not objectively justifiable"). Therefore, the "disavowal" factor weighs in Ms. Chiles' favor.

Weighing the "credible threat" factors, Ms. Chiles has met her burden of showing that there is a credible threat that Defendants will enforce the Minor Therapy Conversion Law against her. *Peck*, 43 F.4th at 1129–30. Although only the third factor weighs in favor of Ms. Chiles, demonstrating that she suffers a credible threat of enforcement "is not supposed to be a difficult

bar to clear in the First Amendment pre-enforcement context." *Id.* at 1133. *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (9th Cir. 2022) ("The unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge" (quotations omitted)). Therefore, given the absence of Defendants' explicit disavowal to enforce the Minor Therapy Conversion Law and the "heavy weight" it places on the Court's assessment of whether Ms. Chiles' fears are credible, her fear of enforcement is "objectively justifiable" and therefore satisfies *Peck*'s "credible fear" factor. *See Peck*, 43 F.4th at 1133.

* * *

For the reasons set forth above, Ms. Chiles has satisfied *Peck*'s three factors. She has in the past engaged in the type of speech affected by the Minor Therapy Conversion Law, demonstrated that she has a present desire to engage in speech the Minor Therapy Conversion Law affects, and that she has no intention to engage in this speech based on a "credible fear" that the Minor Therapy Conversion Law will be enforced against her. *See Peck*, 43 F.4th at 1129–30. Accordingly, she has established the injury in fact requirement, and has standing to bring this pre-enforcement First Amendment action. *See id.* at 1133; *see also Spokeo*, 578 U.S. at 338.[5]

---

[5] Ms. Chiles contends that she has standing because she has satisfied *Peck*'s requirements (*See* ECF No. 29 at 10). However, *Peck* only concerned standing's injury in fact requirement—not Ms. Chiles' burden to satisfy the two remaining standing elements. *See Peck*, 43 F.4th at 1129 ("[O]nly the injury-in-fact requirement is at issue."). Nonetheless, the Court agrees with Ms. Chiles that she has met her standing burden (ECF No. 29 at 11). *See also Spokeo*, 578 U.S. at 338. As the Tenth Circuit explained in *Peck*, "the statute's alleged violation of [the plaintiff's] First Amendment rights is undisputedly traceable to the statute itself and could be redressed by [a court's] invalidation of the law." *Peck*, 43 F.4th at 1129. So too with the Minor Therapy Conversion Law's alleged chilling of Ms. Chiles'

2.  *Third-Party Standing*

Ms. Chiles argues that she has standing to "assert the free-speech rights" of her clients (ECF No. 29 at 20). Defendants contend that Ms. Chiles lacks third-party standing because she has not established that she "holds a close relationship" to a specific third-party minor, that there is no "demonstrated hinderance" to a potential client's ability to protect their own interest, and that Ms. Chiles has fundamentally failed to provide any details of how her clients are "impacted" by the Minor Therapy Conversion Law (ECF No. 45 at 33, 35). The Court agrees with Defendants that Ms. Chiles lacks third-party standing to sue on behalf of her clients.

The Ninth Circuit had recent occasion to address this issue in a nearly identical factual context. In *Tingley v. Ferguson*, the Ninth Circuit considered "whether [Washington] may prohibit health care providers operating under a state license from practicing conversion therapy on children." *Tingley*, 47 F.4th at 1063. The Ninth Circuit concluded that a licensed therapist seeking to enjoin Washington's conversion therapy statute lacked standing to "bring claims on behalf of his minor clients." *Id.* at 1066. The plaintiff lacked third-party standing, the Ninth Circuit reasoned, because he made only "generalized statements about the rights of his clients" being purportedly violated by Washington's conversion therapy statute. *Id.* at 1069. Although the plaintiff had a "sufficiently close relationship" with his clients, he failed to allege how Washington's law "specifically deprived" them of counseling information they sought, and as such his allegations that Washington's law affected his clients were "speculative." *Id.*

---

speech. Therefore, Ms. Chiles has met her burden as to the two remaining standing elements. *See Spokeo*, 578 U.S. at 338.

The Court finds *Tingley*'s reasoning persuasive. Ms. Chiles makes substantively the same arguments regarding her ability to sue on behalf of her clients as those the Ninth Circuit rejected in *Tingley*. For instance, Ms. Chiles contends that the Minor Therapy Conversion Law deprives her clients' "right to receive" counseling information regarding their sexual orientations or gender identities (ECF No. 29 at 20-21). Assuming Ms. Chiles had a close relationship with her clients, Ms. Chiles identifies nothing in her Verified Complaint or the preliminary injunction record that demonstrates how the Minor Therapy Conversion Law *specifically* deprives her clients of any information they seek. *See Tingley*, 47 F.4th at 1069. Moreover, *Tingley* explained, a therapist's minor clients seeking conversion therapy are free to bring their own lawsuits against conversion therapy laws, and may do so pseudonymously. *See id.*

Accordingly, the Court rejects Ms. Chiles' argument that she has standing to sue on behalf of her clients. "Without more detail about [her] clients, their desired information, or how the [Minor Therapy Conversion Law] has specifically deprived them of access to [conversion therapy] information," the Court refuses to "strain the limitations imposed on [it] by Article III to reach undeveloped claims brought on behalf" of Ms. Chiles' third-party minor clients. *Tingley*, 47 F.4th at 1069–70 (quotations omitted).

**B. Preliminary Injunction & Likelihood of Success on the Merits**

Because Ms. Chiles has standing to challenge the Minor Therapy Conversion Law, the Court turns to her arguments that the Minor Therapy Conversion Law should be enjoined (*See, e.g.,* ECF No. 29 at 3). Regarding the likelihood of success on the merits of her constitutional claims, Ms. Chiles makes two essential arguments. First, that the Minor Therapy Conversion Law unconstitutionally regulates speech rather than conduct, and therefore violates her free speech

rights (*Id.* at 13). Second, that the Minor Therapy Conversion Law violates her free exercise and due process rights (*Id.* at 22, 25). The Court considers and rejects these arguments in turn.

1. *First Amendment Free Speech Claim*

a. *Professional Conduct Regulation*

Defendants contend that the Minor Therapy Conversion Law—contrary to Ms. Chiles' argument—regulates professional conduct rather than speech. The Court agrees with Defendants that the Minor Therapy Conversion Law regulates professional conduct.

As an initial matter, the Court agrees with Defendants that the Minor Therapy Conversion Law is not so sweeping as Ms. Chiles argues (*See* ECF No. 45 at 18). For instance, she argues that "the [Minor Therapy Conversion Law] *prohibits* [her] from uttering words if those words might assist [her clients] in aligning their desires with their beliefs or their biology" (ECF No. 29 at 14 (emphasis added); *see also* ECF No. 1 at ¶ 4). But, as Defendants contend, the Minor Therapy Conversion Law imposes no prohibition on counselors' ability to assist clients with any concerns they raise regarding their sexuality or gender identity (ECF No. 45 at 19). Under the Minor Therapy Conversion Law, "conversion therapy" does *not* include "practices or treatments" that provide "[a]cceptance, support, and understanding *for the facilitation of an individual's coping*." § 12–245–202(3.5)(b)(I) (emphasis added). Ms. Chiles is free to facilitate conversations regarding any minor clients' distresses about their sexuality or gender that "may arise" during their counseling sessions (*See* ECF No. 1 at 28 ¶ 96). *See also* § 12–245–202(3.5)(b)(I). Indeed, several of Ms. Chiles' practices are consistent with and do not violate the Minor Therapy Conversion Law (*See* ECF No. 1 at 24-25, 31 ¶¶ 82-83, 85, 108). Ms. Chiles may engage in therapeutic practices related to any minor client's distress, under the limited condition that her therapeutic assistance to a

client's distress "does not *seek to change* sexual orientation or gender identity." § 12–245–202(3.5)(b)(I) (emphasis added); *see also id.* at § 12–245–202(3.5)(a) (defining "conversion therapy" as a practice that "attempts or purports to change" a client's sexual orientation or gender identity, including "efforts to *change* [a client's] behaviors or gender expressions" (emphasis added)). Simply put, the Court agrees with Defendants that the Minor Therapy Conversion Law narrowly prohibits therapeutic practices that promote particular sexual orientations or gender identities—not practices that support, facilitate, or assist minor clients' exploration of those orientations or identities (*See* ECF No. 45 at 18). *See* § 12–245–202(3.5)(b)(I) (excluding from the definition of "conversion therapy" practices that facilitate minor clients' "identity exploration and development" including "sexual-orientation-neutral interventions" so long as those practices do not "seek to change" a client's sexual orientation or gender identity).

But Ms. Chiles' challenges more than the scope of the Minor Therapy Conversion Law's regulations. Ms. Chiles challenges what the Minor Therapy Conversion Law fundamentally regulates. In her opinion, the Minor Therapy Conversion Law regulates "pure speech," rather than professional conduct, and is therefore subject to strict scrutiny (*See* ECF No. 29 at 13, 15). Defendants argue that the Minor Therapy Conversion Law regulates professional conduct, not speech, and therefore it survives Ms. Chiles' constitutional challenge (*See* ECF No. 45 at 21). The Court agrees with Defendants.

Regulations of professional conduct are constitutionally permissible. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978). And "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (citation omitted). When a state regulates

professional conduct that "incidentally involves speech," the First Amendment "afford[s] less protection" for the incidental professional speech. *Id.* (citations omitted). Although a state cannot "ignore constitutional rights" under the "guise of prohibiting professional misconduct," the First Amendment "does not prohibit restrictions directed [at] conduct from imposing incidental burdens on speech." *Id.* (citations omitted). *See also Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022), *cert. denied sub nom. Del Castillo v. Ladapo,* No. 22-135, 2022 WL 17408180 (U.S. Dec. 5, 2022) ("Because the [statute at issue] is a professional regulation with a merely incidental effect on protected speech, it is constitutional under the First Amendment." (quotations omitted)). "[P]rofessionals are no exception to this rule." *Id.* (citations omitted). *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022) ("To be sure, [a] physician's First Amendment rights not to speak are implicated by [an informed consent statute] . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation . . . ." (citations omitted)).

The Minor Therapy Conversion Law regulates professional conduct. It contemplates regulating a licensed professional counselor's therapeutic "practice[s] or treatment[s] . . . ." § 12–245–202(3.5)(a); *see also id.* at § 12–245–202(6) (defining "licensed professional counselor"). Under the Minor Therapy Conversion Law, specifically credentialed professionals and their practices are empowered to provide "[a]cceptance, support, and understanding for the facilitation" of clients' therapeutic needs, but prohibited from using their "practices or treatment" in order to "change sexual orientation or gender identity." *Id.* at § 12–245–202(3)(b)(I). A reading of the Minor Therapy Conversion Law's plain text confirms that, as Defendants argue, it is a professional

regulation and "prophylactic measure[] whose objective is the prevention of harm before it occurs." *Ohralik*, 436 U.S. at 464. *See also id.* ("[The] State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful [professional practices] by [professionals] whom it has licensed.").

To support her argument that the Minor Therapy Conversion Law is unconstitutional, Ms. Chiles' characterizes the work she performs as a licensed professional counselor as pure speech protected by the First Amendment—not regulable professional conduct (*See* ECF No. 29 at 13-14). To be sure, "what one thinks or believes, what one utters and says have the full protection of the First Amendment." *Speiser v. Randall*, 357 U.S. 513, 535–36 (1958) (Douglas, J., concurring). And Defendants do not—and cannot—dispute that Ms. Chiles speaks to her clients during counseling sessions (*See* ECF No. 45 at 23-24). But speech made in professional contexts is not always pure speech. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("*Casey* and [*National Institute of Family and Life Advocates*] recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the [professional] practice . . . ."). As Defendants argue, speech made in a professional context—particularly in the context of licensed professional counseling—is distinguishable from, for example, political speech (ECF No. 45 at 23). Ms. Chiles admits that she is a licensed professional counselor with a graduate degree in clinical mental health, and that her speech is made in the course of her work as a professional counselor (ECF No. 1 at 29-31 ¶¶ 104, 108). "[I]t has never been deemed an abridgment of freedom of speech . . . to [regulate] a course of [professional] conduct . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotations omitted).

Ms. Chiles cites *Otto v. City of Boca Raton, Florida* for the proposition that a government cannot "relabel" pure speech as conduct to avoid heightened First Amendment scrutiny (*See* ECF No. 29 at 13-14). *See also Otto*, 981 F.3d at 865 ("The government cannot regulate speech by relabeling it as conduct."). Against a similar factual backdrop, *Otto* concluded that ordinances prohibiting "therapists from engaging in counseling . . . with a goal of changing a minor's sexual orientation" ultimately warranted strict scrutiny because the ordinances were "content-based restrictions of speech," not regulations of therapists' professional conduct. *Id.* at 859, 861. The Court finds *Otto*'s reasoning unpersuasive and therefore rejects it. Central to *Otto*'s conclusion that its conversion therapy ordinance was a content-based speech restriction was the Eleventh Circuit's prior admonishment that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* at 861 (citing *Wollschlaeger v. Governor, Fla*., 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)). Perhaps. But the Eleventh Circuit's conclusion that strict scrutiny applied to the ordinances in *Otto* simply because "the ordinances depend[ed] on what [was] said" ignores that "what [was] said" depends on its professional context and whether a plaintiff is licensed to say it. *Id.* at 861. *Cf. Del Castillo*, 26 F.4th at 1225–26 ("Assessing a client's . . . needs, conducting . . . research, developing a . . . care system, and integrating information from [an assessment] are not speech. They are 'occupational conduct'. . . as part of . . . professional services." (citation omitted)).

As Defendants observe, other cases run contrary to *Otto* (*See, e.g.,* ECF No. 45 at 25-26). *See, e.g., Del Castillo*, 26 F.4th at 1225 ("A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." (quotation

16

omitted)). *Tingley*, in fact, reached the exact opposite conclusion as *Otto*: "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Furthermore, *Tingley* correctly characterized the nature of professional counseling practices related to minors' sexuality and gender identity. *See Tingley*, 47 F.4th at 1083 ("The work that [a therapist] does is different than a conversation about the weather, even if he claims that all he does is 'sit and talk.'"). "That the treatment technique of talk therapy is administered through words does not somehow render it any less of a healthcare treatment technique or any less subject to government regulation in the interest of protecting the public health." *Otto v. City of Boca Raton, Fla*., 41 F.4th 1271, 1294–95 (11th Cir. 2022)[6] (Rosenbaum, J., dissenting from the denial of rehearing en banc). Ms. Chiles errs in arguing otherwise (*See* ECF No. 29 at 15).[7]

### b. Rational Basis Review

The Minor Therapy Conversion Law is viewpoint neutral and does not impose content-based speech restrictions.[8] It is a public health law that regulates professional conduct. Any speech

---

[6] After a three-judge panel of the Eleventh Circuit decided *Otto v. City of Boca Raton, Florida*, 983 F.3d 854 (11th Cir. 2020), the Eleventh Circuit voted against hearing the case en banc. *See Otto v. City of Boca Raton, Florida*, 41 F.4th 1271 (11th Cir. 2022).

[7] Ms. Chiles contends that her speech is not incidental to her professional conduct because Defendants cannot identify any separate conduct—other than her speech—that the Minor Therapy Conversion Law regulates (ECF No. 29 at 15). The Court rejects this argument because it rests on a flawed premise, presupposing "speech" in the context of a licensed professional counselor's work is wholly separate from the work of counseling itself. However, "[t]he practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments." *Tingley*, 47 F.4th at 1082.

[8] Ms. Chiles argues that the Minor Therapy Conversion Law "discriminates based on viewpoint" because it prohibits "counseling from the viewpoint" that sexuality and gender identity can "change to align with an individual's biology and beliefs" (ECF No. 29 at 20; *see also id*. at 18). Not so. As explained above, the Court agrees with Defendants that the Minor Therapy Conversion Law is a professional conduct regulation that affects all regulated counselors and prohibits therapeutic *practices* attempting to change a minor's sexual orientation or gender identity. *See* C.R.S. § 12–245–202(3.5)(a). To the extent it affects speech incidental to a practitioner's therapeutic practice, it does so in order to regulate outcome-determinative counseling for *all* clients—including heterosexual-identifying clients. Moreover,

affected by the Minor Therapy Conversion Law is incidental to the professional conduct it regulates. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2372. Accordingly, the Court declines Ms. Chiles' invitation to apply strict scrutiny in its analysis of her First Amendment challenge (ECF No. 29 at 25).[9]

The Court applies rational basis review to its analysis of the Minor Therapy Conversion Law. *See, e.g., Tingley*, 47 F.4th at 1077–78 (applying rational basis review to conversion therapy law); *Otto*, 41 F.4th at 1276 ("The rational basis 'reasonableness' standard applies only to regulations of conduct that incidentally burden speech." (citing *National Institute of Family and Life Advocates*, 138 S. Ct. at 2373–74)) (Grant, J., concurring in the denial of rehearing en banc); *Ohralik*, 436 U.S. at 462. To survive the "light burden" of rational basis review, the Minor Therapy Conversion Law must be "rationally related to a legitimate state interest." *Tingley*, 47 F.4th at 1078 (quotations omitted); *see also Wilson v. Wichita State Univ.*, 662 F. App'x 626, 629 (10th Cir. 2016) ("Under the rational-basis standard, we will uphold an action so long as it is rationally related to a legitimate government purpose." (citation omitted)). Public health laws "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (quotation omitted). "[H]ealth and welfare laws [are] entitled to a strong presumption of validity." *Id.* (citation omitted).

---

this professional regulation applies to all licensed counselors. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers"); *see also id.* at 699 (distinguishing "singling out" those "who hold religious beliefs" from "those who engage in discriminatory conduct based on . . . religious beliefs" and stating that "all acts of [] discrimination are equally covered [and] [t]he discriminator's beliefs are simply irrelevant") (Stevens, J., concurring).

[9] Because the Minor Therapy Conversion Law is a professional conduct regulation that does not discriminate on the basis of content or viewpoint, Ms. Chiles' argument that Defendants bears the burden to "justify" its content-based restrictions is of no moment, and the Court need not indulge it (ECF No. 25 at 12).

The Court agrees with Defendants that the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 27-29). First, Defendants have a legitimate and important state interest in the prevention of "harmful therapy known to increase suicidality in minors" (*Id.* at 29; ECF No. 45-1 at 5-6). *See also Tingley*, 47 F.4th at 1078 (describing state interest in "protecting . . . minors against exposure to serious harms caused by conversion therapy" as "without a doubt" a "legitimate state interest" (citations and alterations omitted)); *Otto*, 41 F.4th at 1285–86 (describing therapeutic practices that are "sexual-orientation change efforts" as "types of talk therapy that significantly increase the risk of suicide and have never been shown to be efficacious") (Rosenbaum, J., dissenting from the denial of rehearing en banc). The legitimacy and importance of the interest underpinning the Minor Therapy Conversion Law is undisputable. Surely, a state's interest in protecting the psychological and physical health of its minor population cannot be doubted. *Cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) ("[S]afeguarding the physical and psychological well-being of a minor . . . is a *compelling one*." (emphasis added)).

Furthermore, Defendants have a legitimate interest in "regulating and maintaining the integrity of the mental-health profession," which includes regulating the efficacy and safety of its professionals' therapeutic practices—particularly the practices of mental health professionals who counsel minor clients. *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992). *See also Tingley*, 47 F.4th at 1078 ("[The state] also has a compelling interest in the practice of professions within [its] boundaries . . . regulating mental health . . . and affirming the equal dignity and worth of LGBT people." (quotations omitted) (first alteration added)).

Second, the Minor Therapy Conversion Law rationally serves these legitimate and important interests. *See Dobbs*, 142 S. Ct. at 2284. As the Ninth Circuit explained in *Tingley* and its analysis of Washington's conversion therapy law, a state acts "rationally when it decide[s] to protect the physical and psychological well-being of its minors by preventing state-licensed health care providers from practicing conversion therapy on them." *Tingley*, 47 F.4th at 1078 (quotations omitted). The preliminary injunction record demonstrates that conversion therapy is ineffective and harms minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (ECF No. 45 at 29-30, 39; *see also, e.g.*, ECF No. 45-1 at 22-24, 29-33). Colorado considered the body of medical evidence regarding conversion therapy and sexual orientation change efforts— and their harms—when passing the Minor Therapy Conversion Law and made the reasonable and rational decision to protect minors from ineffective and harmful therapeutic modalities (*See* ECF No. 45 at 30). *See also Tingley*, 47 F.4th at 1078–79 ("In relying on the body of evidence before it . . . [the state] rationally acted by amending its regulatory scheme for licensed health care providers to add [conversion therapy] to the list of unprofessional conduct for the health professions." (quotations omitted)).[10] Therefore—and for substantially the same reasons set forth in *Tingley*—the Minor Therapy Conversion Law survives rational basis review.

---

[10] Ms. Chiles argues that the medical evidence does not so readily support the Colorado legislature's concerns regarding conversion therapy (*See, e.g.*, ECF Nos. 25 at 5; 1 at 9-10 ¶¶ 43-44). The Court disagrees. The preliminary injunction record amply shows that the Minor Therapy Conversion Law comports with the prevailing medical consensus regarding conversion therapy and sexual orientation change efforts (*See generally* ECF No. 45-1). Moreover, even if Ms. Chiles identifies some medical evidence that runs contrary to the evidence Defendants marshal and consulted in passing the Minor Therapy Conversion Law, "the preponderating opinion in the medical community is against its use." *Tingley*, 47 F.4th at 1081 (quotations omitted). *See also id.* (affirming "the right of the government to regulate what medical treatments its licensed health care providers could practice on their patients according to the applicable standard of care and governing consensus at the time (even if not unanimous)").

Ms. Chiles argues that the Minor Therapy Conversion Law is "presumptively invalid" because—in order for it to survive her challenge—Defendants must identify "historical evidence" that a "long tradition" of similar speech restrictions exists (ECF No. 25 at 12). Again, Ms. Chiles is incorrect. As set forth above, the Minor Therapy Conversion Law is a professional conduct regulation and does not implicate legal frameworks that might otherwise apply to content-based speech restrictions under the First Amendment. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2373. On this basis, Ms. Chiles' reliance on *New York State Rifle & Pistol Association, Inc. v. Bruen* is misplaced. 142 S. Ct. 2111, 2130 (2022) ("When the government restricts *speech* [it] bears the burden of providing [the restriction's] constitutionality [by] generally point[ing] to historical evidence about the reach of the First Amendment's protections." (quotations omitted) (emphasis added)). Nonetheless, Defendants have identified a history of public health regulations with which the Minor Therapy Conversion Law is entirely consistent (*See* ECF No. 45 at 22-23). "It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, *particularly those which closely concern the public health*. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (emphasis added); *see also Dent v. State of W.Va.*, 129 U.S. 114, 122 (1889) ("The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations . . . . [a]s one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."); *Tingley*, 47 F.4th at 1080 ("There is a long (if

heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state border.").

Fundamentally, Ms. Chiles fails to overcome the "strong presumption of validity" the Court applies to the Minor Therapy Conversion Law. *Dobbs*, 142 S. Ct. at 2284 (citation omitted). As such, and for the reasons set forth above, she has failed to meet her burden of showing a likelihood of success on the merits of her First Amendment free speech claim. *See Beltronics*, 562 F.3d at 1070 (10th Cir. 2009).

### 2.   First Amendment Free Exercise Claim

Ms. Chiles argues that the Minor Therapy Conversion Law violates her First Amendment free exercise rights because it is neither neutral nor generally applicable, and therefore cannot survive strict scrutiny (*See* ECF No. 29 at 22, 24). Defendants contend that the Minor Therapy Conversion law is neutral and generally applicable (*See* ECF No. 45 at 38, 40). For these reasons, Defendants argue, rational basis review applies and the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 37). For the reasons set forth below, the Court agrees with Defendants.

### a.   Legal Standard Governing First Amendment Free Exercise Claims

The First Amendment's Free Exercise Clause, "applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) (quotation omitted); *see also* U.S. Const. amend. I. Laws prohibiting religion's free exercise may be subject to strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). "But such strict scrutiny does not always apply to free-exercise claims." *Church v. Polis*, No. 20-

1391, 2022 WL 200661, at *8 (10th Cir. Jan. 24, 2022), *cert. denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022). "[N]eutral" and "generally applicable" laws are not subject to strict scrutiny, even if they "incidentally burden[] religion." *Fulton*, 141 S. Ct. at 1876 (citation omitted); *see also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) ("Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." (citation omitted)); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). *Cf. Fulton*, 141 S. Ct. at 1882 ("[A] neutral and generally applicable law typically does not violate the Free Exercise Clause—no matter how severely that law burdens religious exercise." (citation omitted)) (Barrett, J., concurring).

Laws that are "both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge"—i.e., they are only subject to rational basis review. *Grace United Methodist Church*, 451 F.3d at 649 (citation omitted); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) ("Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review." (citation omitted)). With this legal standard in mind, the Court proceeds in its analysis of Ms. Chiles' free exercise claim.

### b.   Minor Therapy Conversion Law & Neutrality

Ms. Chiles argues that the Minor Therapy Conversion Law is not neutral because it is "based on religious hostility" and "targets a religious practice" (ECF No. 29 at 22). Defendants

contend that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law is not neutral because it is "directed at a therapy practice and does not restrict religious exercise" (ECF No. 45 at 38). The Court agrees with Defendants.

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted). Factors "relevant to the assessment" of government neutrality include:

- The "historical background" of the challenged decision or policy;

- Specific series of events "leading to the enactment" of the challenged policy; and

- Legislative or administrative histories

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (citation omitted).

According to Ms. Chiles, the Minor Therapy Conversion Law is not neutral because it was "well-known" at the time the Colorado General Assembly enacted the Minor Therapy Conversion Law that conversion therapy was primarily sought for religious reasons (ECF No. 29 at 22). Therefore, Ms. Chiles' argument goes, the Minor Therapy Conversion Law impermissibly burdens practitioners who hold particular religious beliefs (*See id.*). The Court disagrees. The Minor Therapy Conversion Law does not "restrict [therapeutic] practices because of their *religious* nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted) (emphasis added). As Defendants argue, the Minor Therapy Conversion Law targets specific "modes of therapy" due to their *harmful* nature— regardless of the practitioner's personal religious beliefs or affiliations (ECF No. 45 at 38). As the preliminary injunction record shows, the Minor Therapy Conversion law targets these therapeutic

modalities because conversion therapy is ineffective and has the potential to "increase [minors'] isolation, self-hatred, internalized stigma, depression, anxiety, and suicidality" (ECF No. 45-1 at 36 ¶ 68; *see also id.* at 34-35 ¶ 64). Against the background of a significant body of scientific research concerning conversion therapy's historical ineffectiveness and harmfulness, the Colorado General Assembly enacted the Minor Therapy Conversion Law to eliminate the harms minor clients suffered during conversion therapy (*See, e.g.*, ECF No. 45-1 at 5-6 ¶ 13).

Fundamentally, the Minor Therapy Conversion Law neutrally regulates professional conduct and professional practices. For this reason, Ms. Chiles' arguments that the Minor Therapy Conversion Law is not neutral because its regulation of specific therapeutic practices incidentally burdens her—or any other practitioners'—religious beliefs is unavailing. *See, e.g., Fulton*, 141 S. Ct. at 1876; *Grace United Methodist*, 451 F.3d at 649. The Minor Therapy Conversion law "is [not] *specifically directed* at" religious practices, nor are religious exercises its "object." *Kennedy*, 142 S. Ct. at 2442 (quotations omitted) (emphasis added); *see also Grace United Methodist*, 451 F.3d at 649–50 ("A law is neutral so long as its object is something other than the infringement or restriction of religious practices." (citation omitted)). Simply because some religious bases for conversion therapy may have been "well-known" at the time the Minor Therapy Conversion Law was enacted does not erase its facial neutrality or the backdrop of scientific evidence considered in the Law's passage.[11] There is nothing on the Minor Therapy Conversion Law's face that "refers to a religious practice without a secular meaning discernable from the language or context."

---

[11] Ms. Chiles identifies herself as a "practicing Christian" (ECF No. 1 at 29-30 ¶ 104). She also notes that conversion therapy may include "techniques based in Christian faith-based methods" and is provided by practitioners who "believe in Christian faith-based methods" of counseling (*Id.* at 7 ¶ 37; *see also* ECF No. 29 at 22). The preliminary injunction does not indicate—and the Court expresses no opinion on—whether any non-Christian practitioners, or Christians with religious beliefs that are dissimilar to Ms. Chiles' beliefs, engage in professional conduct that implicates the Minor Therapy Conversion Law.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). At bottom, the Minor Therapy Conversion Law is facially neutral, and nothing in the preliminary injunction record demonstrates that "suppression" of any religions or religious beliefs was the Minor Therapy Conversion Law's "central element." *Id.* at 534.

Ms. Chiles makes the additional argument that the Minor Therapy Conversion Law "attempt[s] to impose its views" on practitioners (ECF No. 29 at 23). Nonsense. As Defendants observe, the Minor Therapy Conversion Law exempts from its coverage forms of religious ministry (ECF No. 45 at 40). *See also* C.R.S. § 12-245-217(1) ("A person engaged in the practice of religious ministry is not required to comply with [the Minor Therapy Conversion Law]"); *Tingley*, 47 F.4th at 1085 ("The law's express protection for the practice of conversion therapy in a religious capacity is at odds with [the plaintiff's] assertion that the law inhibits religion."). This exemption underscores that the Minor Therapy Conversion Law intends to regulate therapeutic practices and the harms that flow from these practices, not individual practitioners' religious beliefs. *See id.* For these reasons, Ms. Chiles has not met her burden of showing the Minor Therapy Conversion law is not neutral.

### c.  *Minor Therapy Conversion Law & General Applicability*

Ms. Chiles argues that the Minor Therapy Conversion Law is not generally applicable because it contains "vague terms" that invite "individual exemptions" regarding practitioners' conduct (ECF No. 29 at 24). Defendants contend that the Minor Therapy Conversion Law is generally applicable because it "does not contain a mechanism for individualized exemptions" and prohibits conversion therapy for any reason (ECF No. 45 at 40). The Court agrees with Defendants.

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. A law will fail the "general applicability requirement" if the law "prohibits religious conduct while permitting secular conduct . . . ." *Kennedy*, 142 S. Ct. at 2422 (quotations omitted). Further, "[a] law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (quotations omitted). In the case of free exercise challenges based on a law's alleged system of "individualized exceptions," the law is generally applicable "as long as [it] remains exemptionless, and [therefore] religious groups cannot claim a right to exemption; however, when a law has secular exemptions, a challenge by a religious group becomes possible." *Grace United Methodist*, 451 F.3d at 650.

Ms. Chiles argues that the Minor Therapy Conversion Law impermissibly "invites enforcement authorities" to "make individualized exemptions" for secular counselors whose therapeutic practices are approved under the Law (ECF No. 29 at 24). The Court disagrees. The Minor Therapy Conversion Law is enforced against all practitioners who engage in defined forms of conversion therapy. *See* § 12-245-202. It does not invest in any agency the "sole discretion" to decide when enforcement of the Minor Therapy Conversion Law is warranted. *See Fulton*, 141 S. Ct. at 1879. Contrary to Ms. Chiles' contention that the Minor Therapy Conversion Law uses "vague terms," it clearly describes what practices do and do not violate the Law. *See id.; see also* § 12-245-202(3.5)(a), (b). The Minor Conversion Therapy Law's facial language does not provide a "formal and discretionary mechanism" for individual, discretionary exceptions. *See Tingley*, 47 F.4th at 1088. *Cf. Fulton*, 141 S. Ct. at 1878 ("[T]inclusion of a *formal system of entirely*

*discretionary exceptions* in [the law] renders [its requirements] not generally applicable." (emphasis added).[12] And to the extent that Ms. Chiles argues that the Minor Therapy Conversion Law favors certain forms of therapeutic counseling over others, it does not. The Minor Therapy Conversion Law simply prohibits specific therapeutic practices (*See* ECF No. 29 at 24).[13] The Minor Therapy Conversion Law's prohibition on specific therapeutic practices constitutes a "limited-yes-or-no inquiry" into whether a counselor's practice violates the Law. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("[T]hat kind of limited yes-or-no inquiry is qualitatively different from [a] kind of case-by-case system . . . ."); *see also id.* ("[The] 'individualized exemption' exception is limited . . . to systems that are *designed* to make *case-by-case* determinations . . . ." (emphasis added) (citation omitted). As such, Ms. Chiles has failed to meet her burden regarding the Minor Therapy Conversion Law's general applicability.

### d.   Rational Basis Review

Ms. Chiles has failed to meet her burden of showing the Minor Therapy Conversion Law is not neutral or generally applicable. Therefore, the Court applies rational basis, rather than strict scrutiny, review. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53 (10th Cir. 2013) ("[The] District's actions were based upon neutral rules of general applicability, [and are] subject to rational basis review." (citation omitted)). As discussed above, the Minor Therapy Conversion

---

[12] The Court agrees with Defendants that the Minor Therapy Conversion Law's exemption of religious ministries from its prohibitions further demonstrates that the Minor Therapy Conversion Law is generally applicable and does not treat secular activity "more favorably" than religious exercise (ECF No. 45 at 41). *See Tandon v. Newsom,* 141 S. Ct. 1294, 1297 (2021). *See also Lukumi*, 508 U.S. at 543 ("[The] government . . . cannot in a selective manner *impose* burdens only on conduct motivated by religious belief . . . ." (emphasis added)); *Kennedy*, 142 S. Ct. at 2422.

[13] At one point in her preliminary injunction motion, Ms. Chiles argues that the Minor Therapy Conversion Law is overinclusive and underinclusive (ECF No. 29 at 30-32). The Court rejects this argument. The Minor Therapy Conversion Law is a neutral and generally applicable law that regulates professional conduct—not pure speech—and clearly delineates what therapeutic practices it does and does not allow. *See* § 12-245-202(3.5)(a), (b).

Law is rationally related to a legitimate governmental interest and survives rational basis review. Ms. Chiles has failed to show a likelihood of success on the merits on her First Amendment free exercise claim.[14]

### 3. Due Process Claim

Ms. Chiles also challenges the Minor Therapy Conversion Law on due process grounds, contending that it is unconstitutionally vague and gives enforcement authorities "unfettered discretion to punish speech with which they disagree" (ECF No. 29 at 32). Defendants argue that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law violates the Fourteenth Amendment's Due Process Clause because the Law is clear and does not invite arbitrary enforcement (ECF No. 49 at 45-46). The Court agrees with Defendants.

First, the Minor Therapy Conversion Law is not unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it does not provide "a person of ordinary intelligence [with] fair notice of what is permitted" or is so "standardless" that it permits "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Ms. Chiles argues that the Minor Therapy Conversion Law is unconstitutionally vague because it is ambiguous and does not precisely define its key terms (*See* ECF No. 29 at 33). The Court disagrees. The Minor Therapy Conversion Law defines what is— and is not—considered "conversion therapy," and what therapeutic practices violate the Law. *See*

---

[14] Because Ms. Chiles has failed to show a likelihood of success on the merits of her free speech and free exercise claims, the Court need not address her argument that she has a "hybrid-rights" claim triggering strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1295 ("[T]he hybrid-rights theory at least requires a colorable showing of infringement of a companion constitutional right." (quotations omitted)).

§ 12-245-202(3.5)(a), (b). Colorado law elsewhere defines "gender identity" and "sexual orientation." C.R.S. § 24-34-301(3.5), (7). For these reasons, the Minor Therapy Conversion Law provides a person of ordinary intelligence with sufficient information to ably determine what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). *See also Williams*, 553 U.S. at 304; *Tingley*, 47 F.4th 1055, 1089–90 (rejecting argument that the phrases "sexual orientation" and "gender identity" were unconstitutionally vague); *id.* at 1090 ("[T]he terms of the statute provide a clear, dividing line: whether change [of a minor's gender identity] is the object."); *Reynolds v. Talberg*, No. 1:18-CV-69, 2020 WL 6375396, at *9 (W.D. Mich. Oct. 30, 2020) ("Phrases like 'sexual orientation' and 'gender identity' have also been held sufficiently definite to foreclose vagueness challenges . . . . If the phrase 'gender identity' is not too vague, then surely companion concepts like 'transgender' and 'gender expression' are not overly vague either." (citations omitted)).

Second, the Court rejects Ms. Chiles' argument that the Minor Therapy Conversion Law violates due process on the grounds that its enforcement is "left to the subjective judgments" of enforcement agencies (ECF No. 29 at 34). As discussed above in the Court's analysis of Ms. Chiles' free exercise claim, the Minor Therapy Conversion Law clearly delineates what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). The Minor Therapy Conversion Law is "sufficiently definite such that it does not encourage arbitrary enforcement" against specified therapeutic practices. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009). Its enforcement does not require an indeterminate, "wide-ranging inquiry" that "invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 597 (2015). As such, Ms. Chiles has not

met her burden of showing that the Minor Therapy Conversion Law is unconstitutional under the Fourteenth Amendment's Due Process Clause.

\* \* \*

For the reasons set forth above, Ms. Chiles has failed to meet her burden of showing a likelihood of success on the merits for all of her constitutional challenges to the Minor Therapy Conversion Law. Because a preliminary injunction "can issue only if each [preliminary injunction] factor is established," and Ms. Chiles has not met her burden on the "likelihood of success on the merits" factor, the Court need not determine whether she has met her burden for the remaining preliminary injunction factors. *See Denver Homeless*, 32 F.4th at 1277 (citation omitted).

The Court makes one final observation. Throughout her preliminary injunction motion, Ms. Chiles contends that she "listens and asks questions to help" her clients (ECF No. 29 at 14). According to Ms. Chiles, "[a]ll she does is talk to her clients" (*Id.* at 13). As the preliminary injunction record shows, this is disingenuous. "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Ms. Chiles cannot seriously compare her work as a professional counselor to "book club" discussions, given especially that she claims the relationship between "a mental health professional and her client" is based on a "deeply held trust from which a *critical* therapeutic alliance forms allowing the *professional* to provide *vital mental health care* to the client" (*Cf.* ECF No. 29 at 16; ECF No. 1 at 2 ¶ 1 (emphasis added)). The therapeutic work for which she obtained a graduate degree and professional licensure is incomparable to casual conversations about *New York Times* bestsellers. *See also Tingley*, 47 F.4th at 1082–83 ("Comparing the work that licensed mental health providers do to book club discussions or

conversations among friends minimizes the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation.").

"Children may identify as gay, straight, cisgender, or transgender." *Id.* at 1084. In the case of children who identify as lesbian, gay, bisexual, cisgender, transgender, or gender non-conforming, they are entitled to treatment—regardless of its outcome—that does not take a cavalier approach to their "dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). And at the bare minimum, they are also entitled to a state's protection from therapeutic modalities that have been shown to cause longstanding psychological and physical damage.

## IV. CONCLUSION

Consistent with the above analysis, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

DATED this 19th day of December 2022.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge