## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2287-STV**

KALEY CHILES,

      Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; *et al*.,

      Defendants.

_____

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS
_____

## INTRODUCTION

Counselors "help [clients] make deeply personal decisions." *Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374 (2018) (*NIFLA*). For those decisions to be "best for" the client, the client needs "an unconstrained flow of information from" a counselor who speaks candidly. Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 235-36 (1994).

Yet Colorado seeks to prevent Plaintiff Kaley Chiles from speaking. The State enacted a counseling censorship law that prevents counselors from providing particular counsel on deeply intimate matters, and it does so in content- and viewpoint-based ways, even if clients *want* to hear that counsel. The State defends its censorship by labeling Chiles' words as conduct. But other circuits have rejected identical attempts to "rescue . . . "unconstitutional laws] by calling the plaintiffs' speech conduct," *Otto v. city of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020), and so should this Court. The State's Motion to Dismiss [Doc. 52] should be denied.

## CHILES HAS STANDING

The State first moves to dismiss the Complaint on the ground that Chiles lacks standing. But the Court has already held that Chiles has standing to bring this pre-enforcement challenge under the standard set forth in *Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022). December 19, 2022 Order ("Prior Order") 9. And "[t]he law of the case doctrine provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279 (10th Cir. 2010). Accordingly, the Court's previous holding that Chiles has standing to bring her claims governs, and the State's Rule 12(b)(1) motion to dismiss Chiles' claims for lack of standing should be denied.

The Court previously held that Chiles does not have standing to assert her client's First Amendment claims. Prior Order 11. This, too, is law of the case, and Chiles will not re-argue the matter here. That said, Chiles does not waive this issue, and she incorporates the arguments in her motion for preliminary injunction regarding both her standing to bring a challenge on behalf of her clients and the substance of those claims, reserving the right to raise these matters on appeal, if necessary.

### THE COMPLAINT STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

I.    **The Prior Order is Not Law of the Case Regarding Defendants' Rule 12(b)(6) Motion**

Unlike standing, the Court's Prior Order does not establish the law of the case on the merits. In the Prior Order, the Court held that Plaintiff failed to establish a likelihood of success on the merits of her constitutional claims for purposes of her motion for preliminary injunction. Prior Order 11-12. Whether Chiles has established a likelihood of ultimately prevailing on her claims is not the same as whether those claims are plausible for purposes of a Rule 12(b)(6) motion to dismiss. In *Pollak v. Wilson*, 2022 WL 17958787 (10th Cir. 2022), the Tenth Circuit put it this way:

> Mr. Pollak has a heavier burden to secure th[e] 'extraordinary remedy[ ]' [of a preliminary injunction, *Benisek*, 138 S. Ct. at 1943, than to avoid dismissal of this suit. *See New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (there is a 'heavier burden' for a plaintiff to secure a preliminary injunction than to 'plead[ ] the plausible claim necessary to avoid dismissal'); *compare Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) ('[T]o receive a preliminary injunction, the plaintiff must establish . . . a substantial likelihood of prevailing on the merits' and the plaintiff's 'right to relief must be clear and unequivocal.' (quotations omitted), with *Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (in reviewing a Rule 12(b)(6) dismissal de novo, '[w]e accept all well-pleaded factual allegations in the complaint as true' and 'view them in the light most favorable to the nonmoving party') (quotations and alterations omitted).

*Id*. * 11 n.10.

Because the Rule 12(b)(6) before the Court is not the same preliminary injunction issue the Court addressed in its Prior Order, that order is not law of the case with respect to the Rule 12(b)(6) issue.[1]

## II.    Standard of Review

The State has moved to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) for failure to plead a claim on which relief may be granted. The Federal Rules require a complaint to contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (internal citation and quotation marks omitted). The rules do not require detailed factual allegations. *Id*., *citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2009). For purposes of the motion to dismiss, the Court must accept "all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Tavernaro v. Pioneer Credit Recovery, Inc*., 43 F.4th 1062, 1066 (10th Cir. 2022) (cleaned up). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Bledsoe,* 53 F.4th at 606.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*.

## III.    Facts

The following facts must be accepted as true for purpose of the motion to dismiss: Plaintiff is a licensed professional counselor and licensed addiction counselor. V. Compl. ¶ 104. Speech is the only tool that Plaintiff uses in her counseling with minors seeking to discuss their sexuality. V. Compl. ¶ 84. She sits down with her clients and talks to them. *Id*. She asks about

---

[1] Plaintiff incorporates the arguments she made in her motion for preliminary injunction and her reply in support of that motion in this response.

their goals, objectives, religious or spiritual beliefs, values, desires, and identity to: (1) help

them explore and understand their feelings, and (2) formulate methods of counseling that will

most benefit them. *Id*. Sometimes, Plaintiff's clients desire to change their sexual behaviors or

grow in the experience of harmony with their physical body. V. Compl. ¶ 87.  But the

Counseling Censorship Law[2] prohibits Plaintiff from speaking words she desires to speak and

her clients desire to hear. V. Compl. ¶¶ 5-6. Before the Law's enactment, Plaintiff helped

clients freely discuss sexual attractions, behaviors, and identity by talking with them. Since the

Law went into effect, she has intentionally avoided such conversations with certain clients for

fear of violating the Law. V. Compl. ¶ 84.

Plaintiff is not currently engaging in discussions with minor clients if they have

concerns about their sexual attractions or sexual orientation due to the Law. V. Compl. ¶ 95 She

cannot provide acceptance and support to a client who comes in for counseling and requests

assistance in seeking not to act on unwanted same-sex attractions. V. Compl. ¶ 115 Plaintiff

wants to counsel her clients without the imposition of the Law's "acceptance-only" government

mandate. *Id*.

The legislators who sponsored the bill that became the Counseling Censorship Law

asserted that their goal was to reduce the risk of suicide by minors.  *See, e.g*., House Committee

on Public Health Care & Human Services, February 13, 2019 (available at

https://bit.ly/3qzptD2), timestamp 1:00:20 to 1:01:04 (prime sponsor Rep. Michaelson Jenet).

But any claim that science supports the conclusion that SOCE counseling increases the risk of

suicide among minores is based on flawed studies that have been debunked by recent, high

quality research. The recently published *A Clinical Guide for Therapists Working with Gender-*

---

[2] C.R.S. § 12-245-224(1).

*Questioning Youth* (2022), available at bit.ly/3WMYguQ (last visited December 29, 2022)

("Guide") is an essential resource with respect to this issue. A copy of the Guide is attached as

Exhibit A. The Guide concludes that the prior research in this area (including the research relied

on by the State's expert) is shoddy, Guide, pp. 1-2, and there "is little to no evidence that

transition reduces the risk of completed suicide, *id*. at 6. The Guide states that "the 'transition or

die' storyline is worse than mistaken; it is unethical." *Id*. at 31. Instead of the "affirmative only"

approach mandated by the Counseling Censorship Law, the Guide advocates an "exploratory

approach." *Id*. at 1. The approach recommended by the Guide is the approach Chiles wishes to

implement but cannot because of the Law. V. Compl. ¶ 5. The Guide[3] emphasizes a flexible

clinical approach in which the individual might come to identify with their birth sex or go

ahead with gender transition because these "outcomes are equally valid and equally legitimate."

Guide, p. 5. Again, this is the approach Chiles wishes to take but cannot. V. Compl. ¶¶ 5, 85-87.

The Guides states that "[a]lthough the affirmative approach is often presented as the gold

standard treatment for gender dysphoria, there is no robust evidence to justify this assertion.

Guide, p. 7. And therefore, "[e]xploratory therapy . . . accepts that gender-affirming

interventions can be helpful for some individuals but may be unhelpful, **or even harmful**, for

others." *Id*. (emphasis added).

For this reason, authorities in Finland, France, Sweden and the United Kingdom have

recently issued guidance limiting "affirmative only" practices. V. Compl. ¶ 66, 67, The

National Board of Health and Welfare of Sweden, *Care of children and adolescents with*

---

[3] The Guide recommends against "Conversion Therapy." *Id*., 7. However, the Guide defines "conversion therapy"
differently than the Colorado statute. The Guide defines the term as an attempt to "force a normative gender
identification and expression." *Id*. The statute prohibits even voluntary counseling. Chiles does not attempt to force
any change. V. Compl. ¶¶ 85-87.

*gender dysphoria Summary*, English translation, https://bit.ly/3B509uL (last visited Sept. 1,

2022).

IV.    **The Counseling Censorship Law Unconstitutionally Suppresses Kaley Chiles'
       Speech – Not Her Conduct – and Does so Based on Her Speech's Content and
       Viewpoint**

 "The Supreme Court has held that facially '[c]ontent-based laws – those that target

speech based on its communicative content – are presumptively unconstitutional and may be

justified only if the government proves that they are narrowly tailored to serve compelling state

interests.'" *Peck v. McCann*, 43 F.4th 1116, 1134 (10th Cir. 2022), *quoting Reed v. Town of*

*Gilbert*, 576 U.S. 155, 163 (2015).  A restriction is content-based if it (1) facially draws distinc-

tions based on a speaker's message, (2) cannot be justified without reference to speech's

content, or (3) was adopted because of disagreement with the message conveyed. *Reed*, 576

U.S. at 163-164. *Accord Peck*, 43 F.4th 1134-35 (statute "is a content-based restriction on

speech in that it targets and prohibits speech based on its content . . . As such, it is subject to

strict scrutiny").  If a law goes further and suppresses speech based "not [only on] subject

matter, but [also on] particular views taken by speakers on a subject," then that law

discriminates based on viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S.

819, 829 (1995), which is a particularly "egregious form of content discrimination," *Reed v.*

*Town of Gilbert*, 576 U.S. 155, 168 (2015). Laws that censor based on content and viewpoint

are "presumptively invalid." *R.A. V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

 The Counseling Censorship Law singles out disapproved speech based on both content

and viewpoint. A simple test to determine whether a speech restriction is content-based is to ask

whether enforcement authorities must examine the content of the message that is conveyed.  *Id*.

at 862, *quoting McCullen v. Coakley*, 573 U.S. 464, 479 (2014). Here, the Counseling

Censorship Law is implicated only if the counselor discusses "sexual orientation or gender identity" in a particular manner. C.R.S. § 12-245-202(3.5)(a).  If a counselor's speech somehow "seeks to change an individual's sexual orientation or gender identity," then the law punishes that speech. C.R.S. § 12-245-224(1). But if the counselor instead "provide[s] acceptance, support, and understanding" of the client's "identity exploration and development," then the counselor does not violate the law. C.R.S. § 12-245-202(3.5)(b)(I).  Because the law's trigger depends on "the topic discussed," it necessarily regulates speech based on content. *Reed*, 576 U.S. at 163. The Censorship Law goes further and suppresses speech based on viewpoint when it targets "the specific motivating ideology or the opinion or perspective of the speaker." *Id*. at 168-69. Accordingly, the Law is presumptively unconstitutional.

As the Eleventh Circuit has held in striking down a substantively indistinguishable censorship law, the government "cannot regulate [Chiles'] speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020) ("*Otto I*"). Counseling "is speech, not conduct." *Brokamp v. D.C.*, 2022 WL 681205, at *1 (2022).  Though some laws that regulate conduct will incidentally affect speech, to try to bypass the First Amendment by calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *Wallschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (*en banc*). Here, the Counseling Censorship Law prohibits Chiles from uttering words if those words might assist her clients in aligning their desires with their beliefs or their biology. And "[w]hen the government restricts professionals from speaking to their clients, it's restricting speech, not conduct." Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277, 1346 (2005).

The Ninth Circuit reached the opposite conclusion in *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), by labeling counselor speech "professional speech" and giving that speech less constitutional protection than any other speech. But in *NIFLA*, the Supreme Court rejected that approach, warning lower courts *not* to "exempt a category of speech from the normal prohibition on content-based restrictions." 138 S. Ct. at 2372 (cleaned up). The Supreme Court cited *Pickup* to "directly criticize[ ] it," *Otto I*, 981 at 867, and it rejected *Pickup*'s premises. *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (recognizing *NIFLA* is irreconcilable with *Pickup*); *Vizaline, LLC v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020) (same); *EMW Women's Surgical Ctr., PSC v. Beshear*, 920 F.3d 421, 436 (6th Cir. 2019) (same).

So should this Court. Plaintiff's speech does not become conduct just because Colorado labels it a "treatment." "Talk therapy [may be] . . . a form of treatment," but it "consists—entirely—of words." *Otto v. City of Boca* Raton, 41 F.4th 1271, 1274 (11th Cir. 2022) (*Otto II*) (Grant, J., concurring in the denial of rehearing en banc). And no one—not the State nor the Court in *Pickup*—has identified any "separately identifiable" conduct that Plaintiff engages in apart from the words she uses. Indeed, if Colorado can wave a legislative wand and transform a counselor's speech into conduct, it could do the same regarding "teaching or protesting," "[d]ebating," and "[b]ook clubs." *Otto I*, 981 F.3d at 865.

The Ninth Circuit recently reaffirmed *Pickup's* holding in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), justifying the precedent as consistent with the historical regulation of health-care practice. But the Supreme Court has warned lower courts not "to exempt a category of speech from the normal prohibition on content-based restrictions." *NIFLA*, 138 S. Ct. at 2372 (cleaned up). And "there is *no* tradition of regulating professional speech"—not even speech related to medicine or therapy. *Otto II*, 41 F.4th at 1274 (Grant, J. concurring in the denial of

rehearing en banc). The fact that states have historically regulated some aspects of medical *practice* is irrelevant to whether they have historically censored medical speech. This Court should reject the Ninth Circuit's discredited approach and align itself with the Eleventh Circuit's decisions in *Otto I and II* and the Third Circuit's decision in *King v. Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014) (criticizing *Pickup* and holding that when a counselor "is peaking as a licensed professional," that capacity in which she speaks "does not transmogrify her words into 'conduct.'").

In any other context, there would be no controversy about recognizing Chiles' speech as an information exchange indubitably entitled to First Amendment protection. Clients disclose their issues and goals to Chiles. Chiles listens and asks questions to help them. If "the[se] acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). Thus, the Counseling Censorship Law impermissibly "sanction[s] speech directly" and not mere conduct. *Otto I*, 981 F.3d at 866.

Similarly, the government cannot alchemize Chiles' speech into non-speech by labeling it as "treatment." The Court in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), repudiated this gambit. In that case the government sought to revoke doctors' licenses for the offense of "recommending" the use of medical marijuana. The government argued that the doctors' recommendation was treatment (i.e., prescribing) that could be regulated and not speech protected by the First Amendment. The Court disagreed: "The government policy [] strike[s] at core First Amendment interests of doctors and patients. An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Id.*, 309 F.3d at 636.

As in *Conant*, an integral component of counseling is the communication between a counselor and her client. Counselors must be able to speak frankly and openly to clients, and any attempt to regulate pure speech by relabeling it "treatment" runs afoul of the First Amendment. We must call words what they are: speech. *Otto I*, 981F.3d at 866.

Nor can the government label Chiles' speech as incidental to conduct. As applied to talk counseling, Colorado cannot identify "any separately identifiable conduct" that its law would punish. *Cohen v. California*, 403 U.S. 15, 18 (1971). In this setting, the only conduct the government seeks to punish" is "the fact of communication," in violation of the First Amendment. *Id.* Such laws are subject to strict scrutiny. The Counseling Censorship Law, "which prohibit[s] talk therapy on a particular – and particularly controversial – subject, [is] no exception to this rule." *Otto II*, 41 F.4th at 1272. To hold otherwise would allow the government to mislabel "wide swaths of protected speech" as associated with some trivial (or in this case nonexistent) conduct, label the speech as a mere "mechanism" that delivers the conduct, and freely censor the speech. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). Under this logic, what would stop the government from suppressing a newspaper editorial as a "mechanism" incidental to "the mechanical operation of a printing press[?]" *Id* ., citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974). "Simply put, it is never enough for the government to show how speech can also be framed as conduct." *Otto I*, 981 F.3d at 866. "Speech is not conduct just because the government says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d at 752. The law is simple: "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Wallschlaeger*, 848 F.3d at 1307 (cleaned up).

The Supreme Court has consistently held that the government cannot characterize speech as conduct to justify regulation. For instance, *in Holder v. Humanitarian Law Project* , 561 U.S. 1 (2010), the plaintiffs challenged a federal statute that forbade providing "material support" to terrorist organizations.  The government defended the statute by arguing "that the only thing truly at issue . . . is conduct, not speech," but the Supreme Court rejected that contention because "the conduct triggering coverage under the statute consists of communicating a message." *Id*. at 26-28.

Likewise, in *NIFLA*, the Court began its consideration of professional speech by including both the "doctor-patient discourse" and speech between counselor and client as examples of communications that the First Amendment *protects* – an analysis that cannot be reconciled with Colorado's arguments here. 138 S. Ct. at 2374-75. Then, responding to the suggestion that such "professional speech" should receive lessened protection, the Court noted that it has never recognized such a less-protected category and emphasized its "reluctan[ce] to mark off new categories of speech for diminished constitutional protection," analogizing governmental efforts to control doctor-patient speech  with the Nazi, Romanian, and Soviet totalitarian regimes. *Id*. at 2372, 2374. Speech is speech, and this Court should protect it.

## V.    The Counseling Censorship Law Violates Chile's Free Exercise Rights

The First Amendment also prohibits the government from burdening the free exercise of religion. If the government enacts a law that targets religious beliefs or practices, such a law doubtlessly violates this core protection. *Emp. Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990). The Free Exercise clause is also violated if the government has burdened a plaintiff's sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Kennedy v. Bremerton Sch. Dist*., 142 S. Ct. 2407, 2421–22 (2022).

Colorado's Counseling Censorship Law is not neutral. When the Colorado General Assembly enacted the Law, it was well known that counseling from the now-prohibited viewpoint is primarily sought for religious reasons. V. Compl. ¶ 40. Counseling from the viewpoint and with the goals prohibited by the law is a "religious . . . practice." *Id*. ¶ 37. Researchers Diamond and Rosky noted that "the majority of individuals seeking to change their sexual orientation report doing so for religious reasons rather than to escape discrimination." *Id*. ¶ 40. The American Psychological Association similarly reported that "most [sexual orientation change efforts] currently seem directed to those holding conservative religious . . . beliefs, and recent research . . . includes almost exclusively individuals who have strong religious beliefs." V. Compl. ¶ 39. And the American Counseling Association asserted that "conversion therapy . . . is a religious . . . practice." V. Compl. ¶ 37. Thus, the law's ban falls "almost exclusively on" counselors and clients who hold "particular religious beliefs." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020).

The government's attempt to impose its views in an area of profound religious, philosophical, and scientific debate is a violation of neutrality. As the Supreme Court has recognized, sexual orientation and gender identity are sensitive political topics that are "undoubtedly matters of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council,* 138 S. Ct. 2448, 2476 (2018). On one side of that debate are major historic faiths, including Judaism, Christianity, and Islam, which have long taught that the only moral context for sexual relationships is within a marriage between one man and one woman. Colorado is free to disagree, even vehemently so. But it cannot force counselors and clients with these religious convictions to use their words to advocate only the contrary viewpoint, one that insists on "acceptance" rather than working to bring one's heart, desires,

and conduct into line with the teachings of one's own faith. It is not the government's role to decide this religious debate, but rather "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (internal quotation marks omitted). "The need to prevent the government from picking ideological winners and losers is as important" here "as it is in any other context." *Wallschlaeger*, 848 F.3d at 1328 (W. Pryor, J., *concurring*). When the government abandons its duty – when it is the one deciding which ideas should prevail – the people lose. *NIFLA*, 138 S. Ct. at 2375.

## VI.     The Law Triggers Strict Scrutiny Under the Hybrid Rights Doctrine

This Court should also subject the law to strict scrutiny because it implicates both free-exercise and free-speech rights. A "hybrid-rights claim" invokes strict scrutiny. *Smith*, 494 U.S. at 881-82; *see also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 655–56 (10th Cir. 2006) (recognizing hybrid claim doctrine).  Under this doctrine, a party establishes a violation of the Free Exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both a free-exercise right and another constitutional right.  *Id.*, 451 F.3d at 655-56.  A plaintiff need only demonstrate that the companion constitutional claim is "colorable."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). Chiles has surpassed this low threshold here.

## VII.    The Counseling Censorship Law Cannot Survive Strict Scrutiny

The Law violates both Chiles' free-speech and free-exercise rights by censoring speech in content- and viewpoint-based ways. Accordingly, the Law is presumptively unconstitutional, *R.A.V*, 505 U.S. at 382, and the government bears the burden to show that the law survives strict scrutiny review, the most demanding test known to constitutional law. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). To do so, the government must demonstrate that the law is

narrowly tailored to serve compelling state interests. *Reed*, 576 U.S. at 163 (free speech); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (free exercise). Colorado can demonstrate neither.

The law's text and legislative history confirm that, in enacting the law, the State's primary interest was suppressing a viewpoint with which it disagrees. But "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "While the law is free to promote all sorts of conduct," "it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995). The government has no business "picking ideological winners and losers." *Wallschlaeger*, 848 F.3d at 1328 (W. Pryor, J., concurring). No matter how much the government dislikes the ethics, goals, and religious beliefs that motivate clients to seek counseling for unwanted gender identity and sexual attraction issues the government may not prevent them from seeking this information. "However noxious [a person's] ideas might [be] to the authorities, the freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the conventional wisdom, may not be abridged. *Eisenstadt v. Baird*, 405 U.S. 438, 457 (1972) (Douglas, J., concurring). It follows that the government has absolutely no interest in suppressing disapproved views of human sexuality, much less a compelling interest.

Similarly, the government does not have an interest in protecting Chiles' clients from making what it deems to be "bad decisions" with the information she provides to them. *Thompson v. W States Med . Ctr.*, 535 U.S. 357, 374 (2002). For example, the State might

believe, contrary to the best medical evidence, that choosing to align one's mind with one's

biological sex is not possible or desirable. And it might believe that those who pursue such a

path are making a mistake that may harm them. But the government cannot stop those clients

from voluntarily making the choices they believe will increase their well-being solely because,

in the government's eyes, that is a bad decision. *Id.* The Supreme Court has consistently

rejected such an approach as illegitimately "paternalistic." *Id*. at 375. "It is precisely this kind of

choice, between the dangers of suppressing information, and the dangers of its misuse if it is

freely available, that the First Amendment makes for us." *Virginia State Bd. of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 770, (1976).

> The Clinical Guide (Exhibit A) states:

> Most clinicians who provide gender-affirmative care *mistakenly believe* that it is
> the accepted standard of care (Malone, D'Angelo, et al., 2021; Malone, Hruz, et
> al., 2021). *Although the safety and efficacy of pediatric gender transition have
> been endorsed by several professional medical societies, the best available
> evidence suggests that the benefits of gender-affirmative interventions are of very
> low certainty* (Clayton et al., 2021; National Institute for Health and Care
> Excellence, 2020a; National Institute for Health and Care Excellence, 2020b).

Guide, p. 14 (emphasis added).

"Affirmation only" is not the standard of care. And no matter how many "professionals

"agree with the government's viewpoint, that does not give the government an interest in

silencing the other side of the debate. "[M]ajority preferences must be expressed in some

fashion other than silencing speech on the basis of its content." *R.A.V*., 505 U.S. at 392. So

"[s]trict scrutiny cannot be satisfied by professional societies' opposition to speech." *Otto I*, 981

F.3d at 869. After all, "it is not uncommon for professional organizations to do an about-face in

response to new evidence or new attitudes." *Otto I*, 981F.3d at 869.

One example in particular stands out. *Id*. For many years, "the American Psychiatric Association considered homosexuality a paraphilia, disorder, or disturbance." *Id*. Today, that position is, "to put it mildly, broadly disfavored." *Id*. This example demonstrates why "[n]eutral principles," rather than the ever-shifting tides of "professional consensus," must govern this case and others like it. *Id*. at 869-70. "Professional opinions and cultural attitudes may have changed, but the First Amendment has not." *Id*. at 870.

Colorado cannot show that the Counseling Censorship Law serves a compelling governmental interest on the ground that speaking certain words would be "harmful." Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574. Ideas may have consequences, but those consequences cannot support censorship unless they present a high and immediate risk of physical harm. *See Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (*per curiam*). Even then, the "degree of imminence" that physical harm will occur must be "extremely high before" speech can "be punished." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978). And the government would need "actual facts" that show that a counselor and her client speaking words to each other causes physical harm. *Id*. at 843.

The government does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011).[4] Minors are entitled to a significant measure of First Amendment protection, and "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. "Speech that is neither obscene as to youths nor subject to some other

---

[4] The State cannot rely on cases approving so-called "harmful to minors" statutes. *Brown*, 564 U.S. at 793. Obscenity is not a protected category of speech, and those statutes ban exposing minors to materials that are obscene from their perspective. *Id*.

16

legitimate proscription cannot be suppressed solely to protect the young from *ideas or images
that a legislative body thinks unsuitable for them*." *Id.* (emphasis added).

In *Brown,* the Supreme Court reviewed a California law regulating minors' access to
violent video games. The Court held that the law burdened speech, and that strict scrutiny
applied. California asserted it had a compelling interest in restricting minors' access to these
games because they were harmful to minors. The Court evaluated social science evidence
regarding alleged harm to minors to assess that claim and found it wanting. The Court rejected
this evidence because it suggested a mere correlation between watching the video games and
the harmful effects alleged by the state. *Id.*, 564 U.S. at 800. The evidence did not prove the
video games directly caused the harmful effects. *Id.*

The legislators who sponsored the bill that became the Counseling Censorship Law
likewise asserted that there is a correlation between minors' hearing words that did not
unambiguously affirm their sexual identify and increased risk of suicide.[5] As discussed above,
this is not true. But regardless, under *Brown*, a mere correlation is insufficient to establish a
compelling governmental interest. Colorado "bears the risk of uncertainty, *Id.*, 564 U.S. at 799-
800. Therefore, "ambiguous proof will not suffice." *Id.* The State must show that the words
they have prohibited *directly* cause the harm they seek to prevent. The State has failed to make
such a showing. The government's suppression of speech and compelled over-affirmation is
more likely to be harmful than providing true information. Guide, p. 7. And this is why, as
discussed above, European health agencies are turning away from an "affirm at all costs"
approach to counselling. V. Compl. ¶¶ 65-68.

---

[5] See, e.g., House Committee on Public Health Care & Human Services, February 13, 2019 (available at
https://bit.ly/3qzptD2), timestamp 1:00:20 to 1:01:04 (prime sponsor Rep. Michaelson Jenet).

## VIII.   The Law Is Both Overinclusive and Underinclusive

"A narrowly tailored regulation . . . does not sweep too broadly (is not overinclusive)

[and] does not leave significant influences bearing on the interest unregulated (is not underin-

clusive)" *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005); *accord*

*Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227-28 (9th Cir. 2019).  Colorado's law fails

on both counts.

First, The Colorado statute sweeps more broadly than necessary. "Precision must be the

touchstone when it comes to regulations of speech," but Colorado's law widely misses this

mark. *NIFLA*, 138 S. Ct. at 2376 (cleaned up). The sponsors of the law insisted that its purpose

was to stop unscrupulous counselors from psychologically abusing minors by forcing them to

convert to a different sexual identity against their will.  For example, Senator Stephan Fenberg

was the prime senate sponsor, and he testified that the purpose of the bill was to prevent

counselors from using "harmful practices such as rejection and shame and psychological abuse

to try to **force** young people into being somebody different from who they are." Senate

Committee on State, Veterans, & Military Affairs, March 18, 2019, https://bit.ly/3RDpRfX,

timestamp 3:43:08-20 (emphasis added).  Similarly, on the senate floor, Senator Fenberg stated

"minors should not be subjected to this by a licensed professional, which is assuming it is

essentially *against their will*." Senate Second Reading Debate, March 21, 2019,

https://bit.ly/3B2FcPO, timestamp 1:11:23-31 (emphasis added).

If the State wanted to stop coercive therapy of minors, it could have done so without

suppressing voluntary speech between counselors and clients.  In fact, an amendment was

offered that would have limited the law to coercive practices.  *Id*., timestamp 1:15:20. Senator

Gardner explained that the amendment "makes this a bill that talks about coercive means, things

18

that are not consensual." *Id.*, timestamp 1:19:58 -20:15.  He argued that the bill was overbroad

because it swept in constitutionally protected speech by prohibiting the voluntary speech

choices of free individuals:

> We have in this country had discussions about people's identity, gender identity,
> and orientation that suggests that it may for some be fluid, it may be changeable,
> it may be something that they not only would seek support of but they might
> make a choice about.  And if they did, they ought to be able to seek the therapy to
> help them not only clarify their choice but then to convert to the choice that they
> as a free human being have made.

*Id.*, timestamp 1:21:01-32. The bill sponsor opposed the amendment designed to limit the reach

of the bill to coercive practices and the amendment failed.  *Id.*, timestamp 1:22:47-49

and1:25:25-27.

Second, the law is also underinclusive, as the State's own witness testified.  Dr. Robert

Werthwein is the Director of the Office of Behavioral Health in the Colorado Department of

Human Services, and he testified at the House hearing on the bill.  In response to the question

"are we leaving any professions out?" from Representative Singer, Dr. Werthwein testified: "I

believe we are; those are unlicensed professionals." House Committee on Public Health Care &

Human Services, February 13, 2019 (available at https://bit.ly/3qzptD2), timestamp 1:09:56 to

1:10:11.  Such an exclusion from the effects of the law is inexplicable, because counseling by

unlicensed professionals would have the same effect as speech by licensed counselors. This

undermines any contention that the law "brook[s] no departures" from achieving its goals.

*Fulton*, 141 S. Ct. at 1882.

## IX.    The Counseling Censorship Law is Vague and Violates Due Process

Vague laws "raise[] special First Amendment concerns" because they empower the

government to silence viewpoints with which it disagrees. *Reno v. ACLU*, 521 U.S. 844, 871-72

(1997). Where First Amendment freedoms are at stake, a great "degree of specificity and clarity

of laws is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020).  When "[d]efinitions of proscribed conduct . . . rest wholly or principally on the subjective viewpoint of a law enforcement officer," such laws "run the risk of unconstitutional murkiness." *Id*. at 666.

Multiple ambiguities at the center of the Counseling Censorship Law combine to leave so much to the subjective viewpoint of enforcement authorities that the law impermissibly empowers them to silence only speech with which they disagree.  The law purports to prohibit speech that seeks to change gender identity or sexual orientation.  But it excepts speech that encourages "exploration and development."  C.R.S. § 12-245-202(3.5)(b)(I). "Development" is indisputably a type of "change," and "exploration" implies at least openness to change. As a result of these ambiguities, whether the counselor's speech qualifies as encouraging "exploration" (allowed) or "change" (prohibited) is left to the subjective judgment of enforcement authorities.  *Edge,* 929 F.3d at 667. Counselors like Chiles are thus left guessing as to when their speech crosses the line "and wrong guesses will yield severe consequences." *Wallschlaeger*, 848 F.3d at 1319. With the counselor's license and livelihood at risk, "a statute written in muted shades of gray will not suffice." *Id*.

## CONCLUSION

The Court should deny the State's Rule 12(b)(6) motion.


*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington