# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2287**

KALEY CHILES, DEEPER STORIES COUNSELING, P.C., and JOEL ROBERTS,

Plaintiffs,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies; and
REINA SBARBARO-GORDON, in her official capacity as Program Director of the State Board of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor Examiners;
JENNIFER LUTTMAN, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
AMY SKINNER, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
KAREN VAN ZUIDEN, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
MARYKAY JIMENEZ, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
KALLI LIKNESS, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
SUE NOFFSINGER, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
RICHARD GLOVER, in his official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
ERIKA HOY, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;
KRISTINA DANIEL, in her official capacity as a member of the State Board of Addiction Counselor Examiners;
HALCYON DRISKELL, in her official capacity as a member of the State Board of Addiction Counselor Examiners;
CRYSTAL KISSELBURGH, in her official capacity as a member of the State Board of Addiction Counselor Examiners;
ANJALI JONES, in her official capacity as a member of the State Board of Addiction Counselor Examiners;
THERESA LOPEZ, in her official capacity as a member of the State Board of Addiction Counselor Examiners; and
JONATHAN CULWELL, in his official capacity as a member of the State Board of Addiction Counselor Examiners;

Defendants.

## AMENDED VERIFIED COMPLAINT

Plaintiffs Kaley Chiles, Deeper Stories Counseling, P.C., and Joel Roberts submit the following Amended Verified Complaint against Defendants:

## I. INTRODUCTION

1. The relationship between mental health professionals and their clients has always been based on a deeply held trust from which a critical therapeutic alliance forms. The client communicates their goals, desires, and objectives, and the mental health professional provides counseling that aligns with the client's self-determined choices. This relationship has always been viewed as sacrosanct and inviolable. Until now.

2. With the passage of the Counseling Censorship Law (defined below), the government has interjected itself between mental health professionals and their clients as effectively as if Defendants were standing in the counselor's office with their hand over her mouth lest she dare say something contrary to the state-approved orthodoxy mandated by the law. This is repugnant to the First Amendment liberties of both counselors and their clients. Defendants' actions have caused, are causing, and will continue to cause irreparable injury to Plaintiffs' fundamental liberties. Therefore, Plaintiffs bring this action to challenge the constitutionality of the Counseling Censorship Law.

3. Plaintiffs engage in licensed, ethical, and professional counseling that honors their clients' autonomy and right to self-determination, that permits clients to prioritize their religious and moral values above unwanted opposite-sex, same-sex, or other sexual attractions, behaviors, feelings, practices, or relationships, or identities—including their identification as a gender identity inconsistent with their sex—and that enables clients to choose a licensed

counselor who can help them achieve their self-determined values and goals, not values and goals imposed by the government. Plaintiffs have First and Fourteenth Amendment rights as licensed counselors to engage in and provide counseling consistent with their and their clients' sincerely held religious and moral beliefs, and their clients have First Amendment rights to receive such counseling free from Defendants' blatant and egregious viewpoint discrimination.

4. The Counseling Censorship Law prevents a minor from seeking counseling to address a conflict about, or to seek change concerning, his or her unwanted opposite-sex, same-sex, or other sexual attractions, behaviors, feelings, practices, or relationships, or his or her gender identity and from seeking to reduce or eliminate his or her unwanted opposite-sex, same-sex, or other sexual attractions, feelings, behaviors, practices, relationships, or identities through counseling, if that is the client's desired predetermined outcome. The Counseling Censorship Law also prevents a minor from seeking counseling to reduce feelings of gender incongruence, avoid practices or behaviors associated with a gender identity different from their sex, develop comfort with their sex and body, move away from identifying as a gender inconsistent with their sex, and instead align their gender identity with their sex if that is the client's predetermined outcome. Thus, the law denies Plaintiffs' minor clients their right to self-determination, their right to prioritize their religious and moral values, and their right to receive effective counseling consistent with their freely chosen values.

5. By prohibiting Plaintiffs from counseling with clients who desire to eliminate or reduce unwanted opposite-sex, same-sex, or other sexual attractions, feelings, behaviors, practices, or relationships, to align the client's gender identity with their sex, to gain comfort with the client's sex, or to address desired changes to sexual orientation or gender identity, even when the client desires and freely consents to such counseling and even when the counseling involves nothing but speech between the counselor and the client, the Counseling Censorship Law violates the

Plaintiffs' constitutional rights.

6. The U.S. Supreme Court already held that the Counseling Censorship Law violated fundamental constitutional principles by discriminating against Plaintiff Chiles's speech by "prescribing what views she may and may not express." *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026). To circumvent that outcome, Colorado made changes to its Counseling Censorship Law. But those changes still violate the fundamental rights of counselors and their clients. The Counseling Censorship Law still prohibits counselors from offering voluntary talk therapy to help minors pursue the minor clients' predetermined outcomes related to sexuality, sexual orientation, and gender identity. This is causing immediate and irreparable harm to Plaintiffs and their clients.

7. By denying minors the opportunity to pursue a particular course of action that could most effectively help them address the conflict between their beliefs and their sexual orientation, unwanted opposite-sex, same-sex, or other sexual attractions, feelings, behaviors, practices, relationships, or identity, or their gender identity, the Counseling Censorship Law is causing those minors harm and anxiety and infringing on their free speech and religious liberty rights.

8. Plaintiffs seek to enjoin enforcement of the Counseling Censorship Law because it violates their and their clients' rights to freedom of speech and free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

9. Plaintiffs also seek a judgment declaring that the Counseling Censorship Law is an unconstitutional violation of the First and Fourteenth Amendments to the United States Constitution.

## II. PARTIES

10. Kaley Chiles is a licensed counselor and a resident of the State of Colorado.

11. Joel Roberts is a licensed counselor and a resident of the State of Colorado.

12. Roberts is the sole owner and director of Deeper Stories Counseling, P.C., a for-profit corporation organized under Colorado law.

13. Roberts operates his professional counseling practice through Deeper Stories Counseling.

14. Chiles works with Roberts and is employed by Deeper Stories Counseling.

15. Patty Salazar ("Salazar") is the Executive Director of the Colorado Department of Regulatory Agencies.

16. The Colorado State Board of Licensed Professional Counselor Examiners shall be referred to herein as the Counselor Board. The Colorado State Board of Addiction Counselor Examiners shall be referred to herein as the Addiction Board. The Counselor Board and the Addiction Board shall be referred to jointly as the "Boards."

17. Reina Sbarbaro-Gordon ("Sbarbaro-Gordon") is the Program Director of both the Counselor Board and the Addiction Board.

18. Jennifer Luttman, Amy Skinner, Karen Van Zuiden, MaryKay Jimenez, Kalli Likness, Sue Noffsinger, and Richard Glover are the members of the Counselor Board.

19. Erika Hoy, Kristina Daniel, Halcyon Driskell, Crystal Kisselburgh, Anjali Jones, Theresa Lopez, and Jonathan Culwell are the members of the Addiction Board.

20. All Defendants are sued in their official capacities.

21. All Defendants are, for all purposes relevant to this Complaint, acting under color of state law.

## III. JURISDICTION AND VENUE

22. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §1983.

23. This Court has jurisdiction under 28 U.S.C. §§1331 and 1343.

24. Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

25. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

26. This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## IV. GENERAL ALLEGATIONS

### A. THE COUNSELING CENSORSHIP LAW

27. C.R.S. § 12-245-202(3.5) previously stated:

> (a) 'Conversion therapy' means any practice or treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex.
>
> (b) 'Conversion therapy' does not include practice or treatments that provide:
>
> (I) Acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practice, as long as the counseling does not seek to change sexual orientation or gender identity; or
>
> (II) Assistance to a person undergoing gender transition.

28. Colorado later passed HB26-1322 to amend C.R.S. § 12-245-202(3.5). It now states:

> [Subsection (a) marker has been deleted] 'Conversion therapy' means any practice or treatment by a licensed mental health-care provider that seeks to direct a patient toward a predetermined sexual orientation or gender identity outcome, or eliminate or reduce sexual or romantic attractions or feelings toward individuals of a particular sex or gender, regardless of the sexual orientation or gender identity the patient is directed toward.

(b) 'Conversion therapy' does not include:

(I) [Deleted]

(II) Counseling or therapy that provides acceptance, support, and understanding of a patient or facilitates a patient's coping, social support, and identity exploration and development, without seeking to direct the patient toward a predetermined sexual orientation or gender identity outcome;

(III) Counseling or therapy that is neutral with respect to sexual orientation and gender identity and that does not seek to direct the patient toward a predetermined sexual orientation or gender identity outcome; or

(IV) Counseling or therapy related to a patient's sexual behaviors, practices, or relationships, provided that the counseling or therapy does not seek to direct the patient toward a predetermined sexual orientation or gender identity.

29. C.R.S. § 12-245-224(1) states in pertinent part:

"A person licensed, registered, or certified under this article 245 violates this article 245 if the person: . . .

(t) Has engaged in any of the following activities and practice: . . .

(V) Conversion therapy with a client who is under eighteen years of age.

30. C.R.S. § 12-245-224(1)(t)(V) shall be referred to herein as the "Counseling Censorship Law" or the "Law."

**B. THE COLORADO LICENSING LAWS**

31. Pursuant to C.R.S. § 12-245-604(1), the Counselor Board issues licenses to qualified professional counselors.

32. Pursuant to C.R.S. § 12-245-804(1), the Addiction Board issues licenses to qualified addiction counselors.

33. Chiles and Roberts each hold a license as licensed professional counselors issued by the Counselor Board.

34. Chiles holds a license as an addiction counselor issued by the Addiction Board.

35. Each of the Boards is a "regulator" as that term is used in Title 12 of the Colorado

Revised Statutes. See C.R.S. § 12-20-102(14).

36. Pursuant to C.R.S. § 12-20-403, regulators, including the Boards, are authorized to initiate and carry out disciplinary procedures for any alleged violations of the provisions of the Counseling Censorship Law by a licensee.

37. Board members, as "persons," may also initiate complaints. C.R.S. § 12-245-226(1)(a)(II)(A).

38. Pursuant to C.R.S. § 12-245-225, the Boards may revoke or suspend the license of any licensee that violates any provision of C.R.S. § 12-245-224, including violating the Counseling Censorship Law.

39. Sbarbaro-Gordon has authority to initiate and/or review complaints against licensees under the Boards' jurisdiction.

40. Pursuant to C.R.S. § 12-20-401, Salazar has authority to assign a complaint against a licensee to the appropriate regulator, assign a complaint specially for investigation, or take such other action on the complaint as appears to her to be warranted in the circumstances.

41. In summary, the Boards have issued licenses to Plaintiffs. If Plaintiffs were accused of violating the Counseling Censorship Law, each of the Defendants would play a role in the process of investigating the complaint against Plaintiffs and taking action in response to the complaint, up to and including revoking Plaintiffs' licenses.

42. Chiles and Roberts are "licensee[s]" who have "a duty to report" a violation of C.R.S. § 12-245-224 "to the board that licenses, registers, or certifies the licensee" when they have "direct knowledge" of a violation. C.R.S. § 12-245-226(8).

43. "Direct knowledge" includes having "seen, heard, or participated in the alleged violation"; "been informed by the client/victim and obtained informed consent to release information as to the event or the client's name"; "been informed of a violation by the

violator"; "been informed by a guardian of a minor or adult and obtained informed consent from the guardian to release information"; or "been informed by a professional organization, agency, or any other entity, that an alleged violation occurred." 4 CCR 737-1:1.6(B).

44. If Chiles or Roberts have "direct knowledge" that the other has violated C.R.S. § 12-245-224(1)(t)(V), they must report the other to the Boards.

45. Roberts has "direct knowledge" that Chiles has engaged or intends to engage in counseling that violated or would violate C.R.S. § 12-245-224(1)(t)(V).

46. Chiles has "direct knowledge" that Roberts has engaged in or intends to engage in counseling that violated or would violate C.R.S. § 12-245-224(1)(t)(V).

47. Failure to report a known violation of C.R.S. § 12-245-224(1)(t)(V) also violates C.R.S. § 12-245-224(1)(b) which prohibits counselors from "assist[ing]," "abet[ing]," or "conspire[ing]" to violate C.R.S. § 12-245-224(1)(t)(V).

48. Chiles and Roberts, therefore, would risk violating the Counseling Censorship Law if they did not report the other to the Boards if they had "direct knowledge" of a violation.

49. Deeper Stories Counseling carries liability insurance for Chiles and Roberts.

50. Roberts or another counselor referred by Roberts would be required to take over Chiles's caseload if she were to lose her counseling license or otherwise be unable to practice counseling.

51. Colorado intends to and does actively enforce the Counseling Censorship Law.

52. Colorado's stated legislative declarations and findings in HB26-1322 explicitly announce the State's goal to prevent "efforts to change an individual's sexual orientation or gender identity" and to punish "sexual orientation or gender identity change efforts."

53. Colorado intends to actively enforce the Counseling Censorship Law even after the Supreme Court held that Colorado could not discriminate against Chiles's speech with

minor clients based on the viewpoint of the speech.

54. When Governor Polis signed HB26-1322, he called counseling that helps minors pursue their predetermined outcomes related to sexuality, sexual orientation, and gender identity a “rip[] off,” “hateful,” and “a scam.” *Protecting LGBTQ Youth: Governor Polis Signs Bill and Exec. Ord. to Protect Coloradans from Harmful Conversion Therapy*, Colorado Governor Jared Polis (June 1, 2026), https://tinyurl.com/3sw3et95.

55. Other legislators at the signing explained that the changes to C.R.S. § 12-245-202(3.5) were meant to circumvent the Supreme Court’s decision in *Chiles v. Salazar* to “create avenues” to prosecute counselors who help minors pursue their predetermined outcomes related to sexuality, sexual orientation, and gender identity. *Id.*

56. Since this lawsuit was filed, Sbarbaro-Gordon has investigated multiple complaints against Chiles filed by persons who were not Chiles’s clients, accusing her of engaging in “conversion therapy.”

57. Chiles has been required to divert time and resources into responding to these complaints.

58. Deeper Stories has been referenced in at least one of the complaints.

59. Sbarbaro-Gordon requested that Chiles respond to those complaints.

60. The purpose of this action is to seek a declaration that the Counseling Censorship Law is unconstitutional and to enjoin the Defendants from enforcing this unconstitutional law against Plaintiffs and others.

## C. RESEARCH ON COUNSELING RELATED TO SEXUAL ORIENTATION AND GENDER IDENTITY

61. An increasing number of young people are struggling with questions of gender identity and sexual orientation.

62. Minors’ perception of their gender identity and sexual orientation are not static but can

and sometimes do change over time.

63. There is an ongoing debate within the medical field and society about how to best treat children who identify as a gender contrary to their sex or experience gender dysphoria (feelings of incongruence between their sex and their perception of their gender).

64. The vast majority of pre-pubertal children who suffer feelings of gender incongruence will find those feelings desist and will become comfortable with a gender identity congruent with their sex by young adulthood, if they are not encouraged as children to identify contrary to their sex.

65. In fact, up to 80–95% of children experiencing gender dysphoria before puberty will desist by the time they reach adulthood.

66. By contrast, children who socially transition are more likely to proceed toward a medical transition pathway. That can lead children to risky, life-altering, and often harmful interventions, including puberty blockers, cross-sex hormones, and surgeries.

67. Counseling a minor to identify as a gender other than their sex is a form of social transitioning.

68. Individuals who have engaged in counseling to address unwanted same-sex attraction, feelings, relationships, or identifies have experienced benefits from such counseling.

69. These benefits have included helping them to live in a manner consistent with their faith, affirming their religious identity, and finding a sense of community.

70. Colorado has no valid evidence or legitimate studies showing that voluntary counseling conversations between a licensed counselor and a willing minor who seeks change on issues of gender identity or sexual orientation causes the minor harm.

## D. VOLUNTARY COUNSELING PROVIDED BY PLAINTIFFS

71. Plaintiffs do not engage in aversive techniques; nor are they aware of any practitioner

who engages in such practice with clients seeking to reduce or eliminate their unwanted same-sex attractions, feelings, behaviors, practices, relationships, or identity, to realign their gender identity with their sex, or to gain comfort with their sex.

72. Chiles began her career focusing on trauma. This led her to focus on adjacent and co-occurring clinical issues such as addictions, attachment, and then personality disorders. Subsequently, Chiles desired to focus on other adjacent and potentially co-occurring clinical issues like eating disorders and sexuality. Prior to enactment of the original Counseling Censorship Law, Chiles helped clients freely discuss sexual attractions, feelings, behaviors, practices, identities, or relationships and gender identity by talking with them about gender roles, identity, sexual attractions, practices, behaviors, or relationships, root causes of desires, behavior, and values. Since the enactment of the original Counseling Censorship Law, she has continued to have these discussions freely with some clients but has intentionally avoided client conversations that may be perceived as violating the Law.

73. Roberts specializes in men's issues, couple's issues, trauma, military life, spiritual abuse, and the intersection of faith and sexuality. Roberts receives many referrals from local churches. Those referrals have included requests to help minors navigate issues related to sexual attractions, feelings, behaviors, practices, relationships, and identity. Roberts used to freely discuss issues with minor clients related to sexual attractions, feelings, identities, and behaviors and gender identity by talking to them about family systems and root causes of desires, behavior, values, and identity. Roberts desires to help his clients, minors and adults alike, address issues related to sexual orientation, gender identity, and unwanted sexual attractions, feelings, behaviors, practices, and relationships. But Roberts no longer accepts minors who seek counseling because of the Counseling Censorship Law. The recent amendment of the law may require him to avoid counseling clients presenting with sexual

orientation and gender identity issues altogether in order to remain compliant. But for the Counseling Censorship Law, Roberts would immediately begin offering counseling to minors, including on the topics of sexuality, sexual orientation, and gender identity.

74. The limitations imposed by the Law have prevented Plaintiffs from being able to fully explore the topic of sexuality and gender identity with minors. Thus, Chiles had refrained from speech with minors on the topics of sexuality and gender identity and Roberts refrained from providing any counseling to minors. Even now, Roberts must continue to self-censor. Before this Court entered its preliminary injunction, Chiles too had been prevented from being able to fully explore these topics with minor clients, even when they had the goal of seeking changes to some aspect of their sexual orientation or gender identity. And minors seeking counseling from her to discuss sexual orientation or gender identity and potentially seek change in those areas were prevented from becoming clients.

75. Speech is the only tool that Plaintiffs use in their counseling with minors seeking to pursue any change to some aspect of their sexual orientation or gender identity. They sit down with their clients and talk to them about their goals, objectives, religious or spiritual beliefs, values, desires, and identity to help them (1) explore and understand their feelings and (2) formulate methods of counseling that will most benefit them.

76. Plaintiffs do not begin counseling with any predetermined goals other than those that align with beneficence and non-maleficence and those that the clients themselves identify and set. This is consistent with the clients' fundamental right of self-determination.

77. Plaintiffs seek only to assist minor clients with their stated desires and objectives in counseling, which sometimes includes minor clients seeking predetermined goals to change their sexual orientation; reduce or eliminate unwanted sexual attractions or feelings; change behaviors, practices, or relationships associated with same-sex attraction or a gender identity

inconsistent with biological sex; or grow in the experience of harmony with one's physical body, including by reducing feelings of gender incongruence, aligning their gender identity with their sex, or growing comfortable identifying with their sex rather than some other gender.

78. Plaintiffs consider that sexual orientation, sexual attractions, feelings, behaviors, practices, relationships, or identity, a sense of discomfort with one's sex or gender identity, or a sense that one must change one's physical body as a solution to gender dysphoria are (a) topics about which the client sometimes has anxiety or distress, (b) topics about which the client sometimes seeks predetermined goals that pursue change, and (c) topics about which the clients' values or deeply held religious beliefs sometimes inform their goals.

79. These considerations hold regarding many things for which clients seek counseling, including many that are not mental illnesses but that nevertheless impose great stress, anxiety, confusion, or grief on the client. In fact, it is commonly understood that quality counseling will include clinician stances such as challenge and confrontation in order to assist the client in building their own sense of self that is not dependent upon the counselor's (or anyone else's) approval or affirmation.

80. Plaintiffs have in the past provided counseling on the topics of sexuality, identity, or sexual orientation to address a minor client's predetermined outcomes related to those topics.

81. Absent the Counseling Censorship Law, Plaintiffs would offer and provide counseling to help a minor client pursue a predetermined outcome related to sexual orientation—including reducing unwanted same-sex attractions or feelings—if the client seeks that goal and if helping the client pursue the goal is not inconsistent with Plaintiffs' beliefs.

82. Absent the Counseling Censorship Law, Plaintiffs would offer and provide counseling to help a minor client pursue a predetermined outcome related to gender identity when the client seeks that goal and if helping the client pursue the goal is not inconsistent with Plaintiffs'

beliefs.

83. Absent the Counseling Censorship Law, Plaintiffs would provide counseling to help a minor client pursue a predetermined outcome related to sexual attractions, feelings, behaviors, practices, identities, or relationships and help a minor client pursue the goal of eliminating or reducing sexual or romantic attractions or feelings toward individuals of a particular sex or gender—including same-sex attractions or feelings—if the client seeks those goals and if helping the client pursue the goal is not inconsistent with Plaintiffs' beliefs.

**E. VAGUENESS PROBLEMS WITH THE COUNSELING CENSORSHIP LAW**

84. Because of the difficulty in measuring sexual orientation and gender identity, the prohibitions in the Counseling Censorship Law are hopelessly vague and leave Plaintiffs guessing at which practices are permitted and which are prohibited.

85. The Counseling Censorship Law prohibits Plaintiffs from engaging in any practice that seeks to change sexual orientation, reduce or eliminate sexual or romantic attractions, feelings, behaviors, or identity, or help clients gain comfort with their sex, desist from identifying with a gender different from their sex, avoid behaviors or practices related to identifying with a gender different from their sex, or realign their gender identity with their sex when that is the client's predetermined goal. This has caused the Plaintiffs to self-censor their speech on these topics—Roberts is still self-censoring, and Chiles was self-censoring before this Court entered the preliminary injunction in this case—because the prohibition is virtually impossible for Plaintiffs to comply with. Roberts has declined to offer counseling to prospective minor clients at all because of the Counseling Censorship Law. It is well understood in the mental health profession that sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practice, identity, attractions, sexual fantasy, romantic attractions, and erotic desires.

86. The Counseling Censorship Law does not specify which clients would be classified as seeking a "predetermined … outcome" related to sexual orientation, sexual attractions, feelings, behaviors, practices, identities, or relationships, or gender identity. As Plaintiffs' clients do not always immediately present wanting a "predetermined … outcome" on the topics of sexuality and identity but may develop desired outcomes concerning matters related to sexuality and gender at any point during the relationship, Plaintiffs are left to guess at which point any of their counseling practices would be deemed to seek a forbidden "predetermined … outcome."

87. The Counseling Censorship Law does not define sexual orientation or gender identity.

88. Sexual orientation is a multifaceted construct. As used varyingly in the scientific literature, it sometimes references a person's sexual attractions or feelings; other times refers to a person's sexual behavior or relationships; other times references a person's self-identification; and other times refers to a combination of all these features. There is no consensus definition of what sexual orientation is.

89. Nor is there consensus on whether sexual orientation is a categorical construct or exists on a continuum. A client's motives, attractions, feelings, identification, and behaviors may vary over time and circumstances with respect to one another, which makes them dynamically changing features of an individual's concept of self.

90. Some acknowledge many different types of sexual orientation beyond heterosexual, homosexual, or bisexual.

91. As non-exhaustive examples, a fluid orientation "changes and is not fixed," a bicurious orientation refers to someone who "is considering or curious about engaging in sexual activity with an individual who may have a sex or gender different than their partners in the past," and a libidoist asexual orientation refers to someone who experiences "sexual feelings and satisfy these through self-stimulation or masturbation." *A Guide to 25 Different Types of Sexualities*,

Choosing Therapy (December 30, 2022), https://www.choosingtherapy.com/types-of-sexuality/.

92. Gender identity likewise has no consensus definition.

93. One organization dedicated "to improv[ing] access to gender affirming care for transgender and nonbinary people worldwide" said "[t]here's no single way to define gender identity." *See Get to Know Gender GP*, Gender GP (last visited June 25, 2026), https://www.gendergp.com/en-us/about/; *Sexual Orientation Vs. Gender Identity: What is the Difference?*, Gender GP (May 19, 2026), https://www.gendergp.com/en-us/blog/sexual-orientation-vs-gender-identity-what-is-the-difference/.

94. Gender identity sometimes refers to a person's innermost concept of self as male, female, both, or neither, and can be based on how an individual perceives themselves.

95. Some assert that gender identity exists along a continuum.

96. Dr. Jack Turban, a prominent transgender researcher, states that the number of gender identities is "nearly infinite." Jack L. Turban, *Free to Be: Understanding Kids & Gender Identity* (2024).

97. Adding to the Counseling Censorship Law's vagueness, minors' perceptions of their gender identity and sexual orientation are not static but rather can and sometimes do change over time.

98. Other Colorado laws contain definitions of "sexual orientation," but those definitions vary significantly. *Compare* C.R.S. § 24-34-301(24) (defined as "an individual's identity, or another individual's perception thereof, in relation to the gender or genders to which the individual is sexually or emotionally attracted and the behavior or social affiliation that may result from the attraction") *with* C.R.S. § 18-9-121(5)(b) (defined as "a person's orientation toward sexual or emotional attraction and the behavior or social affiliation that may result from the attraction").

99. Other Colorado laws likewise have no consistent definition of "gender identity." *Compare* C.R.S. § 24-34-301(10) (defined as "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth") *with* C.R.S. § 18-1-901(3)(h.5) (defined as "a person's gender-related identity … whether or not that gender-related identity … is associated with the person's assigned sex at birth").

100. The Counseling Censorship Law does not incorporate or adopt any other law's definition of sexual orientation or gender identity.

101. Despite the difficulty in measuring and defining sexual orientation and gender identity and in predicting perceptual changes in one's sexuality or identity over time, Plaintiffs must now put their professional licenses in jeopardy when even discussing something that could be perceived as directing a minor client towards a predetermined sexual orientation or gender identity—even when the client sets that goal for himself or herself and even when the counselor is simply trying to direct the client in ways that seem fulfilling based on the client's own statements. Nearly anything a counselor says about sexuality, sexual orientation, sexual behavior or relationships, sexual or romantic attraction, sexual identification, gender, gender-related manners of dress, speech, or expression, or gender identity—including simply trying to respond substantively and helpfully to the client's own statements—could be perceived as directing the client toward something predetermined, particularly as the client's feelings and perceptions about sexuality and gender naturally change over time.

102. The Counseling Censorship Law permits licensed counselors to provide counseling that provides "acceptance, support, and understanding" of a client's same-sex attractions, behaviors, or identity or of a client's asserted gender identity or that "facilitates a patient's coping, social support, and identity exploration and development" of those issues. This presents another major source of confusion, uncertainty, and vagueness for Plaintiffs. It is

impossible for Plaintiffs to provide acceptance, support, and understanding or coping, social support, and identity exploration and development to a client who requests assistance in seeking and has a goal to eliminate or reduce unwanted same-sex attractions, behaviors, or identity or to align their gender identity with their sex or to gain comfort with their sex. This places counselors, including Plaintiffs, in an impossible position of having to police the client's goals, both at the outset of the counseling and as those goals change over time, to ensure the counselor's "acceptance, support, and understanding" aren't offered in a context in which the client desires an outcome that Colorado prohibits. This creates a Catch-22 where the counselor is supposed to assist the client's "identity exploration and development," presumably so the client can reach conclusions about his or her identity, but as soon as the client expresses a desired outcome concerning their sexual orientation or gender identity, the counselor risks liability if he or she continues the conversation.

103. The Counseling Censorship Law also permits counseling "related to a patient's sexual behaviors, practices, or relationships, provided that [it] does not seek to direct the patient toward a predetermined sexual orientation or gender identity." But terms like "sexual behaviors, practices, [and] relationships" are vague; they cover a vast amount of activities; and the Law never defines them. Also, this statutory permission does not apply if the client wants to pursue a "predetermined sexual orientation or gender identity." So all the vagueness inherent in defining a "predetermined" outcome also applies to this part of the Law.

104. Plaintiffs' clients and potential clients may not always initially request counseling specifically to change sexual orientation or gender identity or to reduce or eliminate unwanted same-sex attractions, feelings, behaviors, practices, and relationships. Instead, they want help and counseling to understand the sources, causes, and origins of sexuality, gender identity, and sexual attractions, feelings, behaviors, practices, and relationships. Moreover, these attractions,

feelings, and identities may not be known or discussed during the intake process and may arise during the course of counseling for other issues. During the course of such counseling, some clients will come to recognize that feelings related to sexuality or gender are bound up in the issues they sought counseling on, and they will begin to experience a change in their sexual attractions, feelings, behaviors, practices, relationships, or identity or their gender identity as they advance toward their predetermined goals. And in this process, they will come to desire this change and to seek it as a new predetermined goal of the remaining counseling services. This is true even if the clients did not initially seek to experience such a change in sexual orientation or gender identity or to reduce or eliminate sexual attractions, feelings, behaviors, practices, or relationships, but rather experience those changes as they work through other predetermined goals and come to adopt the change as a goal of the counseling. Plaintiffs are left to guess at whether counseling under these circumstances runs afoul of the Counseling Censorship Law's prohibitions.

105. Plaintiffs also know—and the scientific literature demonstrates—that individuals' perceptions of their sexual orientation and gender identity often shift over time, particularly among young people. So any shift that a young person experiences through counseling conversations and later regards as undesirable could lead to a complaint that triggers liability.

106. Thus, Plaintiffs are left to guess at what is permissible when a minor client presents with anxiety, confusion, distress, or conflict over their sexual orientation, unwanted sexual attractions, feelings, behaviors, practices, relationships, or identity, or gender identity, and the Counseling Censorship Law provides no clear guideposts on such issues.

## F. VIEWPOINT, CONTENT, AND INDIVIDUALIZED EXEMPTIONS IN THE COUNSELING CENSORSHIP LAW

107. The Counseling Censorship Law also establishes a system of viewpoint-based, content-

based, and individualized exemptions. The law permits counseling on the broad topic of sexual orientation, gender identity, and sexual attractions, feelings, behaviors, practices, relationships, and identities of minors seeking counseling, but it prohibits such counseling when the client desires to receive counseling related to a predetermined outcome on sexual orientation, gender identity, or sexual attractions, feelings, behaviors, practices, relationships, or identity—including reducing or eliminating same-sex attractions, feelings, behaviors, practices, or relationships.

108. The Counseling Censorship Law allows counselors to offer counseling that encourages or promotes existing sexual or romantic attractions, but counselors cannot offer counseling that seeks the predetermined goal of eliminating or reducing those sexual or romantic attractions. C.R.S. § 12-245-202(3.5).

109. The Counseling Censorship Law also allows counselors to offer counseling that maintains the status quo of a minor client's existing gender identity, sexual orientation, or sexual attractions, feelings, behaviors, practices, and relationships, but counselors cannot offer counseling that helps minor clients pursue, as a predetermined goal, a different gender identity, sexual orientation, or sexual attraction, feeling, behavior, practice, and relationship. C.R.S. § 12-245-202(3.5).

110. Counselors may offer counseling that accepts and supports a client's existing sexual orientation, gender identity, or sexual attractions, feelings, behaviors, practices, and relationships, or facilitates a client's coping, social support, and identity exploration of existing sexual orientation, gender identity, or sexual attractions, feelings, behavior, practices, and relationships, but counselors cannot offer counseling that helps minor clients pursue, as a predetermined goal, a different sexual orientation, gender identity, or sexual attraction, feeling, behavior, practice, or relationship. C.R.S. § 12-245-202(3.5)(b).

111. Counselors may also offer counseling related to "a patient's sexual behaviors, practices,

or relationships" as those behaviors, practices, or relationships exist at the time of counseling, but may not direct or assist a client "toward a predetermined sexual orientation or gender identity" even if that is the client's stated goal. C.R.S. § 12-245-202(3.5)(b)(IV).

112. The Counseling Censorship Law makes no distinction between a "practice" or "treatment" that involves only conversation and those that use physically intrusive, aversive, or coercive techniques to alter gender identity or sexual orientation.

113. In that way, the Counseling Censorship Law has the effect of regulating counselors' speech when voluntary conversations are the only practice or treatment that a counselor uses when addressing issues of sexuality, sexual orientation, or gender identity with a minor client.

114. The Counseling Censorship Law has the effect of prohibiting counselors from offering counseling that helps clients pursue their stated goal of seeking a change in their gender identity, sexual orientation, or sexual attractions, feelings, behaviors, practices, and relationships.

115. Indeed, the stated legislative purpose of HB26-1322 is to prohibit counseling that would support change regarding a client's gender identity, sexual orientation, or sexual attractions, feelings, behaviors, practices, and relationships if that is the client's desired predetermined outcome.

116. Colorado's legislature explicitly identified HB26-1322 as a tool to prohibit "efforts to change an individual's sexual orientation or gender identity" and to punish "sexual orientation or gender identity change efforts."

117. Colorado's legislature referenced its desire to prohibit efforts to change an individual's sexual orientation or gender identity in eight of the ten declaratory paragraphs.

118. Colorado's legislature relied on statements by organizations denouncing efforts to change an individual's sexual orientation or gender identity.

119. In these ways, the Counseling Censorship Law singles out particular content and viewpoints for differential treatment.

120. The Counseling Censorship Law censors only particular viewpoints on sexuality, sexual orientation, and gender identity.

121. Colorado singles out content and viewpoint on sexuality, sexual orientation, and gender identity that the State disfavors and seeks to impose its favored views on counselors and their clients.

122. The Counseling Censorship Law also has many exemptions that undermine any state interest.

123. For example, the Law does not apply to "[a] person engaged in the practice of religious ministry." C.R.S. § 12-245-217(1).

124. The Law also does not apply to "[t]he practice of employment or rehabilitation counseling," "[e]mployees of the department of human services or the behavioral health administration in the department of human services," "students who are enrolled in a school program and are practicing as part of a school practicum or clinical program," and "[p]ersons who are licensed pursuant to section 22-60.5-210," including occupational therapists, physical therapists, and school nurses who work in school districts, nonpublic schools, and charter schools, and a "professional practicing auricular acudetox." *See* C.R.S. § 12-245-217(2)(a)-(c), (g), (h); C.R.S. § 22-60.5-210(1); 1 CCR 301-37:5.00.

125. Colorado also applies a different definition of "conversion therapy" to "a licensed physician specializing in the practice of psychiatry." C.R.S. § 12-240-104(5.5)(a) (defining "conversion therapy" as "any practice or treatment by a licensed physician specializing in the practice of psychiatry that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or

reduce sexual or romantic attraction or feelings toward individuals of the same sex").

126. Under that definition, psychiatrists may engage in practices that provide "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity," and psychiatrists may "[a]ssist" a "person undergoing transition." C.R.S. § 12-240-104(5.5)(b)(I)-(II).

## G. PLAINTIFFS' WORK

127. Chiles graduated with a Master of Arts in clinical mental health in 2014. She is a licensed professional counselor and licensed addiction counselor in the state of Colorado. She is a practicing Christian. She adamantly disagrees with the proposition that a person can practice counseling while denying or omitting their philosophical and existential framework. While she does not believe it is possible to practice counseling in a philosophical vacuum, she highly respects client autonomy and therefore does not seek to impose her values or beliefs on her clients.

128. Chiles provides counseling for clients, court-ordered coparenting classes, parent coordinator/decision making, and court-ordered substance-abuse evaluations.

129. Chiles works at Deeper Stories Counseling in Colorado Springs. Her duties include counseling assigned clients as well as supervising post-graduate clinicians. Roberts, the owner of Deeper Stories, allows clinicians to limit or expand caseloads depending on interest and specialties. Currently, Chiles works with adults who are seeking general or Christian counseling and with minors who are seeking general or Christian counseling.

130. Chiles worked part time at the Cascade, Colorado location of Sandstone Care from December 2018 to 2022. Initially, Chiles worked in a program that offered 30 days of

residential treatment for adolescents ranging from 13-18 years old. Chiles created and facilitated the "family immersion program," which included parents (and sometimes siblings) coming to the facility for a "weekend" (Thursday, Friday, and Saturday) during their adolescent's stay. During these weekends, Chiles would see up to three families, facilitating parent groups and family groups and overseeing the families' stay at the facility. On weeks the family was not physically present, Chiles would facilitate online sessions.

131. Plaintiffs are client-directed counselors in that it is the client who sets the goals for counseling. Plaintiffs do not impose an agenda on their clients; nor do they determine clients' goals for counseling. Clients set their own goals and desired predetermined outcomes for counseling. Outside of their court-ordered work, Plaintiffs only work with voluntary clients who determine the goals that they have for themselves. Plaintiffs do not coerce their clients into engaging in counseling but respect their clients' right of self-determination. They treat each client with unconditional positive regard regardless of the client's personal beliefs, concept of self, sexual orientation, gender identity, sexual attractions, feelings, behaviors, practices, relationships, or identity—including unwanted same-sex attractions, feelings, behaviors, practices, or relationships.

132. Roberts graduated with a Doctor of Philosophy in Counselor Education and Supervision from Denver Seminary in 2025. Roberts also received a Master of Arts degree in Clinical Mental Health Counseling from Denver Seminary in 2016.

133. He is a licensed professional counselor in the state of Colorado.

134. He is also a practicing Christian.

135. Roberts takes a teleological approach to counseling that attempts to ground the human condition in reality, not subjective perceptions, so that clients can align their subjective sense of self with reality.

136. Roberts regularly counsels clients who struggle with unwanted sexual attractions, feelings, behaviors, practices, or relationships.

137. Roberts desires to offer counseling to minors and adults struggling with unwanted sexual attractions, feelings, behaviors, practices, or relationships and to help minors and adults to reduce or eliminate sexual attractions or feelings based on the client's predetermined outcomes, but he is refraining from offering that counseling to minors because of the Counseling Censorship Law.

138. Roberts also desires to offer counseling related to minor and adult clients' predetermined outcomes on sexual orientation and gender identity consistent with his religious beliefs, but he is refraining from offering that counseling to minors because of the Counseling Censorship Law.

139. Roberts has in the past provided counseling to minor clients experiencing unwanted same-sex attractions or sexual behaviors and helped direct them toward the client's predetermined outcome of attempting to align their sexuality with their faith.

140. But Roberts is currently refraining from seeing any minor clients because of the Counseling Censorship Law.

141. Plaintiffs have had both minor and adult clients with same-sex attractions, feelings, behaviors, practices, or relationships who have expressed that they are happy identifying as gay, lesbian, bi-sexual, or gender non-conforming and do not want help changing identity, attractions, or behavior. They do not try to help these individuals change their sexual orientation, gender identity, or sexual attractions, feelings, behavior, practices, relationships, or identity. In such cases, Plaintiffs ask if there are any other goals that the client is interested in pursuing. In many cases, clients, both minor and adult, ask for help with social issues, family relationships, parent-child communication, or facilitating the parents' coping with the sexual

identity of the child. Plaintiffs have helped a number of minors and parents with those goals. Because Plaintiffs engage in client-directed counseling, if the client states that they neither have a therapeutic goal nor wish to explore one, counseling is terminated. The only exception to this is Chiles's residential work as a family counselor where adolescents may still be required to attend family sessions.

142. Many of Plaintiffs' clients are referred through churches or word of mouth. Many of their clients embrace a biblical worldview, which includes the concepts that attractions do not dictate behavior, nor do feelings and perceptions determine identity. Clients who identify as Christians holding to a biblical worldview typically believe their faith and their relationships with God supersede sexual and romantic attractions, feelings, behaviors, practices, and relationships and self-perceived gender identity and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity.

143. Clients who have same-sex attractions or gender-based struggles and who also prioritize a biblical worldview are often seeking to live a life consistent with their faith. When those clients have been living a life inconsistent with their faith or values, they often present with issues like internal conflicts, depression, anxiety, addiction, and eating disorders, and they are seeking resolution of such turmoil.

144. Chiles began her career with an interest in serving underserved populations, whom she perceived as having issues that are resistant to typical counseling or that prevented them from benefiting from typical talk therapy. This led her to specialize in trauma. This focus then led her to specialize also in addictions and then personality disorders. Recently, she has taken more interest in specializations such as eating disorders, gender dysphoria and sexuality. However, after the mandates of the Counseling Censorship Law were imposed on

her, Chiles had been unable to fully explore certain clients' bodily experiences around sexuality and gender identity and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect until an injunction was entered in this case allowing her to have conversations on those topics with minor clients.

145. Before the injunction issued in this case, Chiles declined requests from prospective clients seeking counseling from her on matters related to sexual attractions, feelings, identities, behaviors, practices, or relationships, unwanted same-sex attractions, and gender identity.

146. For example, Chiles received and declined a request about counseling a minor male who identified as a female.

147. Chiles received and declined a request to provide family counseling in a situation where a daughter expressed concerns about her sexuality and gender identity.

148. Chiles received and declined a request from a mother asking Chiles to provide counseling for her daughter for issues related to her gender identity.

149. Chiles received and declined a referral from another therapist to offer counseling to a minor experiencing same-sex attraction.

150. Chiles declined these requests because of the Counseling Censorship Law.

151. All those requesting individuals were harmed by the Counseling Censorship Law because they could not obtain the counseling they sought.

152. Roberts, on behalf of Deeper Stories Counseling, has also declined requests from prospective clients who sought counseling from Deeper Stories Counseling that may have conflicted with the Counseling Censorship Law.

153. All those requesting individuals were harmed by the Counseling Censorship Law because they could not obtain the counseling they sought.

154. Many prospective future clients of Plaintiffs will also be adversely affected by the

Counseling Censorship Law. As alleged above, Chiles has periodically received requests for counseling for both matters related to sexual attractions and gender identity while Roberts is currently not accepting minor clients because of the Counseling Censorship Law. The Counseling Censorship Law will prevent future clients from getting help.

## H. IRREPARABLE HARM TO PLAINTIFFS AND THEIR CLIENTS

155. Consistent with their First Amendment rights, Plaintiffs want to offer a counseling approach to minor clients and potential clients that includes a full exploration of clients' reported sexual orientation, gender identity, and sexual attractions, behaviors, feelings, practices, and relationships, including where the client has a predetermined goal of changing his or her sexual orientation, gender identity, or sexual attractions, behaviors, feelings, identities, practices, and relationships without the Counseling Censorship Law's prohibition on clients pursuing predetermined outcomes on those topics. They ask for the same freedom in discussing these topics that they would have with minor clients surrounding other controversial topics such as eating disorders, addiction, and criminal behavior.

156. Consistent with their First Amendment rights, Plaintiffs want to provide voluntary counseling that involves nothing but speech related to sexuality and gender identity with their minor clients and potential clients.

157. Because of the Counseling Censorship Law, Plaintiffs are prohibited from offering certain types of voluntary counseling that involves nothing but speech related to sexuality and gender identity with their minor clients and potential clients.

158. Because of the Counseling Censorship Law, Plaintiffs are prohibited from engaging in constitutionally protected speech, including offering certain types of counseling to clients and potential clients. The Law literally prohibits them from uttering certain words to their clients if such words are counter to the state's mandated orthodoxy or could be perceived to

seek a predetermined outcome.

159. Because of the Counseling Censorship Law, Plaintiffs' speech has been chilled in their constitutionally protected expression.

160. Because of the Counseling Censorship Law, and without an injunction, Plaintiffs have been and will be forced to deny voluntary counseling that fully explores sexuality and gender identity with their clients and potential clients or that directs clients towards the clients' predetermined outcome on issues of sexuality, sexual orientation, and gender identity. This violates Plaintiffs' and their clients' sincerely held religious beliefs.

161. Because of the Counseling Censorship Law, Plaintiffs have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to freedom of speech.

162. Because of the Counseling Censorship Law, Plaintiffs have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to free exercise of religion.

163. Because of the Counseling Censorship Law, Plaintiffs' minor clients are prohibited from receiving voluntary counseling that fully explores sexuality and gender that the clients desire to obtain, including counseling that helps clients pursue their predetermined goals on issues of sexuality, sexual orientation, and gender identity, from a licensed professional with expertise in this area. Plaintiffs' minor clients have thus suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to receive information.

164. Because of the Counseling Censorship Law, Plaintiffs' clients and prospective clients have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to free exercise of religion.

165. Because of the Counseling Censorship Law, Plaintiffs have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their Fourteenth Amendment rights to due process of law.

166. Plaintiffs and their clients and potential clients have no adequate remedy at law to protect the ongoing, immediate, and irreparable injury to their First and Fourteenth Amendment liberties.

## V. LEGAL ALLEGATIONS

### I. FIRST CLAIM FOR RELIEF
### (First Amendment: Free Speech)

167. Plaintiffs reiterate and reallege the above allegations in paragraphs 1 through 167 of this complaint.

168. The Free Speech Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' freedom of speech.

169. The Counseling Censorship Law, on its face and as applied, is an unconstitutional prior restraint on Plaintiffs' speech.

170. The Counseling Censorship Law, on its face and as applied, unconstitutionally discriminates on the basis of the content and viewpoint of speech in private counseling sessions. The Counseling Censorship Law authorizes only certain viewpoints on sexual orientation, gender identity, and sexual attractions, feelings, behaviors, practices, relationships, and identity by forcing Plaintiffs to present only certain viewpoints on those topics. The Counseling Censorship Law also discriminates against Plaintiffs' speech on the basis of the content of the message they offer.

171. The purpose and justification of the Counseling Censorship Law, as expressed in the official legislative findings and declaration, prove that the Law discriminates based on the content and viewpoint of constitutionally protected speech.

172. Defendants lack compelling, legitimate, significant, or even rational governmental interests to justify the Counseling Censorship Law's infringement of the right to free speech.

173. The Counseling Censorship Law is not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

174. The Counseling Censorship Law does not leave open ample alternative channels of communication for Plaintiffs.

175. The Counseling Censorship Law unconstitutionally chills and abridges the right of Plaintiffs to freely communicate information pertaining to sexual orientation or gender identity.

176. The Counseling Censorship Law abridges Plaintiffs' right to offer information to their clients, prospective clients, and their clients' and prospective clients' parents.

177. The Counseling Censorship Law also compels Plaintiffs' speech by requiring them to report to the State that the other has violated the Law when they have "direct knowledge" of such a violation.

178. The Counseling Censorship Law compels Plaintiffs to report on each other for engaging in constitutionally protected speech.

179. The Counseling Censorship Law compels these reports of violations of the Law based on content and viewpoint, and not based on factual, noncontroversial, or commercial speech.

180. The Counseling Censorship Law is unconstitutionally vague on its face and as applied to Plaintiffs, and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the law.

181. The Counseling Censorship Law is unconstitutionally vague and gives enforcement

officials unbridled discretion because it provides no standards or guidelines defining the line between speech that permissibly provides "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" and speech that unlawfully seeks "a predetermined sexual orientation or gender identity outcome."

182. Given that "development" necessarily involves "change," the purported distinction is incoherent, and thus leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

183. The prohibition on seeking "to direct the patient toward a predetermined sexual orientation or gender identity outcome" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because the terms "sexual orientation" and "gender identity" are undefined in the law and are vague and overbroad and could encompass any sexual or gender-related attitude, behavior, practice, attraction, orientation, identity, or expression that the client expresses a desire to adopt or avoid.

184. The Counseling Censorship Law uses other vague and arbitrary terms and phrases that leave Plaintiffs guessing as to whether their counseling violates the Law, including references to "eliminat[ing] or reduc[ing] sexual or romantic attractions or feelings," "neutral" counseling, and "sexual behaviors, practices, or relationships."

185. Those terms are vague and arbitrary because, for example, they are subjective, are often based on personal perspectives, or cannot be quantified.

186. The Counseling Censorship Law is also facially overbroad because it prohibits a substantial amount of protected speech and expressive activity relative to any otherwise

legitimate sweep.

187. For example, the Counseling Censorship Law prohibits counseling that seeks a change to any aspect of a minor's sexual orientation or gender identity even when that change is desired and sought by the minor and even when that change would benefit the minor.

188. For example, counseling that seeks to assist minors in realigning their gender identity with their sex helps them avoid lifelong medical interventions that come with serious risks of physical harm without good evidence of mental health or physical improvements.

189. The Counseling Censorship Law's violations of Plaintiffs' rights of free speech have caused, are causing, and will continue to cause Plaintiffs and their clients to suffer undue and actual hardship and irreparable injury.

190. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

191. Accordingly, as applied to Plaintiffs, the Counseling Censorship Law violates their freedom of speech.

192. And the Counseling Censorship Law also violates the First Amendment's protections for free speech.

## II. SECOND CLAIM FOR RELIEF
## (First Amendment: Clients' and Their Parents' Right to Receive Information)

193. Plaintiffs reiterate and reallege the above allegations in paragraphs 1 through 167 of this complaint.

194. The First Amendment, as applied to the states by the Fourteenth Amendment, protects an individual's freedom of speech and the corollary to that right—the right to receive information.

195. Plaintiffs' minor clients and their minor clients' parents have sincerely held religious beliefs and other beliefs that shape their desire to receive counseling and the information that

Plaintiffs can provide on sexual orientation, gender identity, and reducing, eliminating, or changing sexual attractions, feelings, identities, behaviors, practices, or relationships.

196. The Counseling Censorship Law prevents Plaintiffs' minor clients and their minor clients' parents from receiving counseling expressing certain content and views about sexual orientation, gender identity, and reducing, eliminating, or changing sexual attractions, feelings, identities, behaviors, practices, or relationships and deprives them of the opportunity to even obtain information about that counseling from licensed counselors.

197. Minor clients and minor clients' parents request Plaintiffs' help through counseling to address some of the most intimate, difficult, important, and embarrassing topics in their lives, which makes it extremely difficult or even impossible for these clients and their parents to bring suit to protect their own constitutional rights.

198. Many clients and their minor clients' parents seek Plaintiffs' help because they share their faith background.

199. Plaintiffs' clients and their minor clients' parents are not themselves subject to penalties under the Counseling Censorship Law and risk being denied their right to receive information without any forum in which to assert and protect that right.

200. Plaintiffs have close and ongoing counseling relationships with their minor clients and their parents.

201. The Counseling Censorship Law is not supported by compelling government interests.

202. Even if the Counseling Censorship Law were supported by compelling government interest, it is not narrowly tailored to achieve that purpose and therefore violates the fundamental rights of Plaintiffs' clients to receive information.

203. The Counseling Censorship Law is not the least restrictive means to accomplish any

permissible government purpose sought to be served by the law.

204. The Counseling Censorship Law's violations of the fundamental rights of Plaintiffs' clients have caused, are causing, and will continue to cause undue and actual hardship and irreparable injury.

205. Plaintiffs' clients have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

206. Accordingly, as applied to Plaintiffs' minor clients and their minor clients' parents, the Counseling Censorship Law violates the First Amendment's free speech protections.

## III. THIRD CLAIM FOR RELIEF
## (First Amendment: Free Exercise of Religion)

207. Plaintiffs reiterate and reallege the above allegations in paragraphs 1 through 167 of the complaint.

208. The Free Exercise Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion.

209. Many of Plaintiffs' clients have sincerely held religious beliefs that conflict with embracing same-sex sexual attractions, behaviors, practices, relationships, or identity or adopting a gender identity contrary to their sex, and they seek to resolve these conflicts between their religious beliefs and their sexuality or gender identity in favor of their religious beliefs.

210. Plaintiffs are also religiously motivated and have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel on topics like sexuality, sexual orientation, and gender identity. Plaintiffs are religiously motivated and maintain sincerely held religious beliefs that they should counsel clients on the subject matter of sexuality, sexual orientation, and gender identity from a religious viewpoint that aligns with

their religious beliefs and those of their clients.

211. The Counseling Censorship Law, on its face and as applied, targets Plaintiffs', their minor clients', and those clients' parents' sincerely held religious beliefs regarding human nature, ethics, morality, sexuality, sexual orientation, and gender identity, which are informed by the Bible and constitute central components of their faith. The Counseling Censorship Law causes a direct and immediate conflict with their religious beliefs by prohibiting them from offering or receiving counseling on sexuality, sexual orientation, and gender identity that is consistent with their religious beliefs.

212. The Counseling Censorship Law, on its face and as applied, has impermissibly burdened Plaintiffs', their minor clients', and those clients' parents' sincerely held religious beliefs. Indeed, the law forbids them from speaking and acting according to those beliefs. The Counseling Censorship Law has forced Plaintiffs and those clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the State.

213. The Counseling Censorship Law places Plaintiffs and their affected clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the Law.

214. The Counseling Censorship Law does not force nonreligious counselors or counselors with favored religious views to choose between their sincerely held beliefs and compliance with the Law.

215. The Counseling Censorship Law, therefore, imposes special disabilities on Plaintiffs, their minor clients, and those clients' parents due to their religious beliefs.

216. The Counseling Censorship Law also puts substantial pressure on Plaintiffs, their minor clients, and those clients' parents to violate their sincerely held religious beliefs by

ignoring or acting and speaking contrary to the fundamental tenets of their faith concerning sexuality, sexual orientation, and gender identity.

217. The Counseling Censorship Law, on its face and as applied, is neither neutral nor generally applicable, but rather specifically and discriminatorily targets the religious speech, beliefs, and viewpoints of those individuals who believe it is possible to change some aspects of sexual orientation or gender identity. The law thus imposes a substantial burden on Plaintiffs', their minor clients', and their minor clients' parents' sincerely held religious beliefs.

218. The Counseling Censorship Law impermissibly treats comparable secular activities more favorably than Plaintiffs' religious exercise by exempting those comparable secular activities even when they address sexuality, sexual orientation, or gender identity or involve other potentially harmful counseling practices.

219. For example, Colorado does not forbid other counseling that the American Psychological Association opposes as unsafe. *See* American Psychological Ass'n, *Special Issue on Harmful Treatments in Psychotherapy* (May 24, 2021), https://perma.cc/3P9G-N8MJ (opposing "critical incident stress debriefing" to help with trauma and "[s]cared [s]traight" interventions for unruly minors).

220. Colorado allows anyone except certain licensed mental health professionals to provide the prohibited counseling.

221. Colorado also allows counselors to provide counseling to adults that is prohibited for minors by the Colorado Censorship Law, even though the American Psychological Association opposes this counseling regardless of age.

222. The Counseling Censorship Law also violates free-exercise rights under the hybrid-rights doctrine because it implicates free-exercise rights in conjunction with other constitutional protections, including free speech.

223. No compelling government interest justifies the burdens Defendants impose upon Plaintiffs', their minor clients', or their minor clients' parents' rights to the free exercise of religion.

224. Even if the Counseling Censorship Law were supported by compelling government interests, it is not the least restrictive means to accomplish any permissible government purpose that the Counseling Censorship Law seeks to serve.

225. The Counseling Censorship Law, both on its face and as applied, does not accommodate Plaintiffs', their minor clients', or those clients' parents' sincerely held religious beliefs.

226. The Counseling Censorship Law, both on its face and as applied, specifically targets religion for disparate treatment and has set up a system of individualized exemptions that permits some counseling on sexuality, sexual orientation, and gender identity while denying certain religious counseling expressing state-disfavored viewpoints on the same subjects.

227. The Counseling Censorship Law, both on its face and as applied, constitutes a religious gerrymander.

228. The Counseling Censorship Law's violations of Plaintiffs', their minor clients', and their minor clients' parents' rights to free exercise of religion has caused, is causing, and will continue to cause them to suffer undue and actual hardship and irreparable injury.

229. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of these most cherished constitutional liberties.

230. Accordingly, as applied to Plaintiffs, their minor clients, and those clients' parents, the Counseling Censorship Law violates the First Amendment's protections to freely exercise religion.

## IV. FOURTH CLAIM FOR RELIEF
## (Fourteenth Amendment: Due Process)

231. Plaintiffs reiterate and reallege the above allegations in paragraphs 1 through 167 of the complaint.

232. The Fourteenth Amendment's guarantee of Due Process prohibits the government from imposing or threatening punishment based on laws that are so vague or overbroad that they do not provide fixed legal standards as to what is prohibited and what is not and so leave room for standardless or discriminatory enforcement.

233. In fact, as detailed below, essentially all of the key terms in the Counseling Censorship Law are undefined in the law itself and also undefined in science.

234. As a result, the Counseling Censorship Law is unconstitutional on its face and as applied because it does not provide adequate standards or guidelines to govern the actions of Defendants when they enforce the Law. Instead, the Law enables and authorizes those who are empowered to pursue enforcement actions in this highly controversial and politicized area to do so based on their personal predilections, rather than on any fixed legal standard, and likewise to pursue discriminatory enforcement.

235. The vagueness, overbreadth, and lack of fixed legal standards in the Counseling Censorship Law is all the more impermissible because it impacts a fundamental right. Because of this vagueness, overbreadth, and the unbounded discretion that it affords to those authorized to bring enforcement actions, counselors engaging with a minor client who raises concerns or goals relating to sexuality, sexual orientation, or gender identity must be all the more fearful that they will be accused of violating the law. As a result, consciously or unconsciously, counselors like Plaintiffs inevitably engage in a degree of self-censorship that infringes the freedom of speech of the counselor, the minor client, and the minor client's parents.

236. The Counseling Censorship Law is unconstitutionally vague and overbroad because it

provides no standards or guidelines defining the line between speech that permissibly provides "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" and speech that unlawfully seeks "a predetermined sexual orientation or gender identity outcome."

237. Given that "development" necessarily involves "change," the purported distinction is incoherent, and thus leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

238. The prohibition on helping clients "toward a predetermined sexual orientation or gender identity outcome" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because the terms "sexual orientation" and "gender identity" are undefined in the law and are vague and overbroad and could encompass any sexual or gender-related attitude, behavior, practice, attraction, orientation, identity, or expression that the client expresses a desire to adopt or avoid.

239. The Counseling Censorship Law uses other vague and arbitrary terms and phrases that leave Plaintiffs guessing as to whether their counseling violates the Law, including references to "eliminat[ing] or reduc[ing] sexual or romantic attractions or feelings," "neutral" counseling, and "sexual behaviors, practices, or relationships."

240. Those terms are vague and arbitrary because, for example, they are subjective, are often based on personal perspectives, or cannot be quantified.

241. "Gender identity" has no consensus definition.

242. Because the Counseling Censorship Law fails to define "gender identity," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal

predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

243. "Sexual orientation" has no consensus definition.

244. Because the Counseling Censorship Law fails to define "sexual orientation," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

245. When the Counseling Censorship Law prohibits any practice that helps clients "toward a predetermined sexual orientation or gender identity," the Law fails to provide any standards or guidelines as to whether this refers to the subjective intent of the client or that of the counselor, or when something becomes "predetermined," again leaving unfettered discretion on this critical question to any person authorized to bring an enforcement action and inviting discriminatory enforcement.

246. Indeed, a client's personal intention in raising a subject relating to sexuality, sexual orientation, or gender identity may or may not be known to the counselor and may change from one meeting to the next. Consequently, a counselor might face sanctions on the basis of the shifting subjective thoughts and goals of the client that are beyond the counselor's knowledge.

247. The Counseling Censorship Law further fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because it provides no definitions of terms "acceptance," "support," "understanding," "coping," "social support," "identity exploration and development," and "neutral."

248. In the absence of any clarity on these terms, almost any counseling conversation that relates to sexual orientation, gender identity, intimate relationships, or sexuality could be

accused of seeking a predetermined outcome with respect to "sexual orientation or gender identity" or sexual attractions, feelings, behaviors, practices, and relationships. Thus, the failure of the Counseling Censorship Law to define these terms leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes, including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

249. The Counseling Censorship Law is also overbroad because its terms prohibit a substantial amount of protected speech and expressive activity relative to any legitimate sweep the Law may have, the government lacks a compelling interest in restricting the prohibited speech and expressive activity, and the Law's restrictions are not narrowly tailored.

250. For example, the Counseling Censorship Law prohibits counseling that seeks a change to any aspect of a minor's sexual orientation, or gender identity even when that change is desired and sought by the minor and even when that change would benefit the minor.

251. For example, counseling that seeks to assist minors in realigning their gender identity with their sex helps them avoid lifelong medical interventions that come with serious risks of physical harm without good evidence of mental health or physical improvements.

252. Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what conversations between Plaintiffs or other counselors and their clients might fall within any of the vague, overbroad, or discretionary terms or phrases used by the Counseling Censorship Law and therefore cannot know what is prohibited by the Law.

253. Meanwhile, the sanctions faced by Plaintiffs for violating the Counseling Censorship Law are severe, ranging up to the revocation of their licenses, fines and the loss of their livelihoods, and Defendants can use the Counseling Censorship Law's vagueness, overbreadth, and accompanying unbridled discretion to apply the Law in a way that discriminates against content, viewpoints, and expression that Defendants disfavor.

254. For these reasons, the Counseling Censorship Law is so vague and overbroad and authorizes unbridled enforcement discretion on its face that it deprives licensees of Due Process rights protected by the Fourteenth Amendment.

255. The Counseling Censorship Law is also vague and overbroad and authorizes unbridled enforcement discretion as applied to Plaintiffs and deprives them of Due Process rights protected by the Fourteenth Amendment.

256. The deprivation of these rights constitutes irreparable injury.

257. Accordingly, facially and as applied to Plaintiffs, the Counseling Censorship Law violates the Fourteenth Amendment's Due Process Clause.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. That this Court issue preliminary and permanent injunctions enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them from enforcing (1) the Counseling Censorship Law against Plaintiffs' constitutionally protected counseling, (2) the requirement that Plaintiffs must report each other for violating the Law, and (3) the requirement that Plaintiffs respond to allegations filed with Defendants alleging violations of the Law.

B. That this Court issue preliminary and permanent injunctions facially enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them from enforcing the Counseling Censorship Law.

C. That this Court enter a Declaratory Judgment declaring that the Counseling Censorship Law and Defendants' actions in applying the Counseling Censorship Law to Plaintiffs' constitutionally protected counseling violates Plaintiffs' rights to free speech, free exercise, and due process and Plaintiffs' clients', prospective clients', and minor clients'

parents' rights to free speech and free exercise.

D. That this Court award Plaintiffs the reasonable costs and expenses of this action, including attorney fees, in accordance with 42 U.S.C. § 1988.

E. That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

Respectfully submitted this 1st day of July, 2026.


By: s/ Bryan D. Neihart
Jonathan A. Scruggs
Arizona Bar No. 030505
Henry W. Frampton, IV
South Carolina Bar No. 75314
Bryan D. Neihart
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
bneihart@ADFlegal.org

James A. Campbell
Virginia Bar No. 100090
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4737
jcampbell@adflegal.org

John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street, NW
Suite 600
Washington, DC 20001
616-450-4235
jbursch@adflegal.org

Shaun Pearman
Colorado Bar No. 16619
**Pearman Law Firm, P.C.**
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
303-991-7600
303-991-7601 (fax)
shaun@pearmanlawfirm.com


*Attorneys for Plaintiffs*

**DECLARATION UNDER PENALTY OF PERJURY**

I, Kaley Chiles, a citizen of the United States and a resident of the State of Colorado, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing allegations as they relate to me and my personal experiences are true and correct to the best of my knowledge, except for the matters stated on information and belief.

Executed this 29th day of June 2026.

Kaley Chiles

**DECLARATION UNDER PENALTY OF PERJURY**

I, Joel A. Roberts, a citizen of the United States and a resident of the State of Colorado, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing allegations as they relate to me and my personal experiences are true and correct to the best of my knowledge, except for the matters stated on information and belief.

Executed this _30_ day of __June___ 2026.

Joel A. Roberts, Ph.D.